# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAPE COD HOSPITAL, *et al.*,         )
                                    )
                  Plaintiffs,     )
           v.                  )     Civil No. 07-1883 (RCL)
                                      )
MICHAEL O. LEAVITT, SECRETARY     )
United States Department of Health and Human Services,     )
                                    )
                  Defendant.    )
                                    )

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, plaintiffs respectfully move for summary judgment in their favor on the grounds that there are no material facts in dispute and that plaintiffs are entitled to judgment as a matter of law. In support of this motion, the Court is respectfully referred to the accompanying Memorandum in Support of Plaintiffs' Motion for Summary Judgment and In Opposition to Defendant's Motion to Dismiss, and Plaintiffs' Statement of Material Facts As to Which There Is No Genuine Dispute. A proposed order setting the relief requested by this motion is also attached.

Respectfully submitted,

/s/ Christopher L. Keough
Christopher L. Keough
  DC Bar No. 436567
Stephanie A. Webster
  DC Bar No. 479524
John M. Faust
  DC Bar No. 433553
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiffs

Dated: February 8, 2008

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPE COD HOSPITAL, *et al.*,           ) | |
|                       ) | |
|            Plaintiffs,      ) | |
|      v.                       ) | Civil No.  07-1883 (RCL) |
|                       ) | |
| MICHAEL O. LEAVITT, SECRETARY    ) | |
| United States Department of Health and Human Services,    ) | |
|                       ) | |
|            Defendant.      ) | |
| _____ ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Christopher L. Keough
  DC Bar No. 436567
Stephanie A. Webster
  DC Bar No. 479524
John M. Faust
  DC Bar No. 433553
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiffs

February 8, 2008

### TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................... 1

II.     FACTS ..................................................................................................... 4

        A.      Medicare Payment for Inpatient Hospital Services ..................... 4

        B.      The "Rural Floor" Adjustment ................................................... 5

        C.      The Fiscal Year 2007 Rulemaking ............................................ 11

        D.      The Fiscal Year 2008 Rulemaking ........................................... 12

        E.      The Hospitals' Appeals ............................................................ 16

III.    ARGUMENT ......................................................................................... 16

        A.      Standard of Review ................................................................. 16

        B.      The Secretary's Budget Neutrality Adjustment Methods
                Violate the Express Requirements of the BBA ......................... 17

        C.      The Secretary's Handling Of The Budget Neutrality
                Adjustment Is Arbitrary And Capricious .................................. 22

        D.      The Secretary Is Legally Required To Correct His Prior
                Year Budget Neutrality Adjustment Errors............................... 25

        E.      The Court Should Deny The Secretary's Motion To
                Dismiss And Remand................................................................ 28

                1.      The EJR Statute and Appeals from the Secretary's
                        PPS Payment Rate Determinations ............................. 29

                2.      The Board Issued A Final Decision Granting Expedited
                        Judicial Review By Determining It Lacked Authority
                        To Decide The Legal Question Before It ..................... 33

                3.      Even If The Board Had Not Made A Determination
                        That It Lacked Authority To Decide Plaintiff Hospitals'
                        Appeal, Remand Would Violate The EJR Statute ....... 36

                4.      The Secretary's Cases Are Not Controlling or Persuasive
                        Authority................................................................... 39

                5.      Remand Would Undermine the Clear Purpose of the EJR
                        Statute ...................................................................... 42

IV.     CONCLUSION ...................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

Administrators of Tulane Educational Fund v. Shalala,
987 F.2d 790 (D.C. Cir 1993) ...................................................................... 33, 39

Alexandria Hosp. v. Bowen,
631 F. Supp. 1237 (W.D. Va. 1986)..................................................... 40

Alvarado Cmty. Hosp. v. Shalala,
155 F.3d 1115 (9th Cir. 1998), amended by
166 F.3d 950 (9th Cir. 1999)................................................................. 26

Amoco Oil Co. v. EPA, 501 F.2d 722 (D.C. Cir. 1974) ................................. 24

Arbaugh v. Y & H Corp., 546 U.S. 500 (2006)............................................. 33

Baystate Med. Ctr. v. Mutual of Omaha,
PRRB Case Nos. 96-1822, 97-1579, 98-1827,
99-2061 (July 29, 2004)........................................................................ 43

Baystate Med. Ctr. v. Mutual of Omaha Ins. Co.,
reprinted in MEDICARE & MEDICAID GUIDE
(CCH) ¶ 81,506 (May 11, 2006) .......................................................... 43

Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399 (1988) ........................... 29, 34

Blackman v. Dist. of Columbia,
456 F.3d 167 (D.C. Cir. 2006) ............................................................. 33

Centra Health, Inc. v. Shalala,
102 F. Supp. 2d 654 (W.D. Va. 2000)................................................. 27

Chevron, U.S.A, Inc. v. Natural Res. Def. Council, Inc.,
467 U.S. 837 (1984) ............................................................................. 17

Citizens to Preserve Overton Park v. Volpe,
401 U.S. 402 (1971), overruled on other grounds
by Califano v. Sanders, 430 U.S. 99 (1977) ........................................ 43

Common Cause v. Fed. Election Comm'n,
108 F.3d 413 (D.C. Cir. 1997) ............................................................ 33

County of Los Angeles v. Shalala,
192 F.3d 1005 (D.C. Cir. 1999) .......................................................... 26

Crowley's Yacht Yard, Inc. v. Pena,
    863 F. Supp. 18 (D.D.C. 1994) ........................................................... 24

D.C. Hosp. Ass'n Wage Index Group Appeal,
    reprinted in MEDICARE & MEDICAID GUIDE (CCH)
    ¶ 41,025 (Jan. 15, 1993)................................................................... 29

Gardner v. United States,
    211 F.3d 1305 (D.C. Cir. 2000) ........................................................ 33

Georgetown Univ. Hosp. v. Bowen,
    862 F.2d 323 (D.C. Cir. 1988) .......................................................... 26

Hunterdon/Somerset 2001 Wage Index Group
    v. Riverbend Gov't Benefits Adm'r, PRRB
    Dec. No. 2004-D13, 2004 WL 2066675
    (Apr. 14, 2004).................................................................................. 29

Methodist Hosp. of Sacramento v. Shalala,
    38 F.3d 1225 (D.C. Cir. 1994) .................................................... 25, 26

Methodist Hosps. of Memphis v. Sullivan,
    799 F. Supp. 1210 (D.D.C. 1992),
    rev'd on other grounds sub nom. Adm'rs
    of Tulane Educ. Fund. v. Shalala,
    987 F.2d 790 (D.C. Cir. 1993) ................................................... passim

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm
    Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)................................ 17, 22

Mt. Diablo Hosp. v. Shalala, 3 F.3d 1226 (9th Cir. 1993) ............................ 26

National Tour Brokers Ass'n v. United States,
    591 F.2d 896 (D.C. Cir. 1978) .......................................................... 23

Riverside Methodist Hosp. v. Thompson,
    No. C2-02-94, 2003 U.S. Dist. LEXIS 15163
    (S.D. Ohio July 31, 2003) ................................................................. 26

San Francisco Gen. Hosp. v. Shalala, No. C 98 00916 SI,
    1999 WL 717830 (N.D. Cal. Sept. 8, 1999) ..................................... 40

Sarasota Mem'l Hosp. v. Shalala,
    60 F.3d 1507 (11th Cir. 1995)............................................... 25, 26, 29

Securities Indus. Ass'n v. Bd. of Governors,
    468 U.S. 137 (1984) ........................................................................... 37

Steel Co. v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ............................................................................ 33

Thomas Jefferson Univ. v. Shalala,
    512 U.S. 504 (1994) ........................................................................... 17

Time Warner Entm't Co. v. FCC,
    144 F.3d 75 (D.C. Cir. 1998) ............................................................. 39

Tuscon Medical Center v. Sullivan,
    947 F.2d 971 (D.C. Cir. 1991) ........................................................... 39

United States v. Mead Corp.,
    533 U.S. 218 (2001) ........................................................................... 17

Walter O. Boswell Mem'l Hosp. v. Heckler,
    749 F.2d 788 (D.C.Cir. 1984) ........................................................... 43

Washington Hosp. Ctr. v. Bowen,
    795 F.2d 139 (D.C. Cir. 1986) .................................................... 29, 37

## Statutes

5 U.S.C. § 553(c) ............................................................................... 24

5 U.S.C. § 706(2) ........................................................................... 3, 16

42 U.S.C. § 1395oo(a) ................................................................. 16, 29, 44

42 U.S.C. § 1395oo(f)(1) ................................................................. passim

42 U.S.C. § 1395ww(d) ......................................................................... 5

42 U.S.C. §§ 1395, et seq. .................................................................... 4

Balanced Budget Act of 1997, Pub. L. No. 105-33,
    § 4410(a), 42 U.S.C. § 1395ww note ............................................. 1, 5

Balanced Budget Act of 1997, Pub. L. No. 105-33,
    § 4410(b), 42 U.S.C. § 1395ww note .................................. 6, 17, 19, 20, 21, 45

Social Security Amendments of 1983, Pub. L. No. 98-21,
    § 602(h)(1) ..................................................................................... 29

## Rules

Fed. R. Civ. P. 56 ................................................................................................... 4

## Regulations

42 C.F.R. § 405.1842(b)(3) ................................................................................... 37

42 C.F.R. § 405.1842(d)(1)(ii) .............................................................................. 31

42 C.F.R. § 405.1842(g)(2) ................................................................................... 31

42 C.F.R. § 405.1867 ............................................................................................ 29

68 Fed. Reg. 45346 (Aug. 1, 2003) ............................................................... 6, 7, 18

69 Fed. Reg. 48916 (Aug. 11, 2004) .............................................................. 6, 7,18

70 Fed. Reg. 47278 (Aug. 12, 2005) ........................................................6, 7, 8, 18, 22

71 Fed. Reg. 47870 (Aug. 18, 2006) ........................................ 5, 6, 7, 8, 9, 12, 18, 22

71 Fed. Reg. 59886  (Oct. 11, 2006) ............................................................... 5, 12

72 Fed. Reg. 24680 (May 3, 2007) ............................................................... 12, 13

72 Fed. Reg. 47130 (Aug. 22, 2007) ............................................ 2, 7, 13, 14, 15, 20, 25

## Other Authorities

H.R. Rep. No. 96-1167 (1980),
       reprinted in 1980 U.S.C.C.A.N. 5526 .................................................... 31, 32, 45

## I.    __INTRODUCTION__

Unbeknownst to the plaintiff Hospitals (and through no fault of theirs), for over a decade, the Secretary of the U.S. Department of Health and Human Services  has underpaid the Plaintiff hospitals for inpatient services furnished to Medicare patients. The Secretary accomplished this by unlawfully implementing a congressionally required "budget neutrality" adjustment in a manner that, rather than achieving budget neutrality, systematically eroded payments to all Medicare hospitals year after year.

The underpayments result from a simple methodological error in an otherwise complex calculation.  The error occurs in what is known as the "rural floor" adjustment, which was intended to ensure that the "wage indexes" that are used to adjust Medicare payment rates for geographic variations in healthcare industry wage levels would not be lower for urban hospitals in a State than for rural hospitals in the same State.  See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4410(a) ("BBA"), 42 U.S.C. § 1395ww note.  Where a rural floor adjustment is required, it increases the wage indexes for urban hospitals.  Thus, in the absence of any offsetting adjustment, the floor would increase the total amount that the Medicare program pays out each year.  The budget neutrality adjustment is meant to offset that impact and keep aggregate payments the same year to year.  Of course, neutrality also requires that aggregate payments not be __reduced__ over prior years, either, and it is here where the Secretary has gone so terribly wrong.

Under the method chosen by the Secretary, to determine the budget impact of the rural floor for any particular Federal fiscal year, he should have compared estimated aggregate payments after application of the rural floor for the prior year, on the one hand, to estimated payments after application of the rural floor for the current year, on the

other. Then, to achieve budget neutrality, the Secretary needed to adjust Medicare rates for the current year to offset whatever incremental budget impact he discovered from one year to the next.

The Secretary did not proceed in this way, however. Instead, he looked to the prior year wage data without the rural floor applied, which had the effect, not of isolating the incremental changes in effect of the rural floor from year to year, but of capturing the total budget impact of the rural floor going back all the way to the first rural floor adjustment in 1998. He then used that inflated budget impact to reduce aggregate payments and, because he never reversed his annual budget neutrality adjustments once made, his current year adjustments largely duplicated all of his previous ones. The effect has been a steady erosion of aggregate Medicare payments, in plain violation of the unambiguous budget neutrality requirement of the BBA.

What the Secretary did is now clear, as are the implications, but that is a relatively recent discovery. For years, the Secretary incorrectly described in the Federal Register the simulation model his agency, the Centers for Medicare and Medicaid Services ("CMS"), actually used to determine the budget impact of the rural floor and what was supposed to be a corresponding neutrality adjustment. Even after the plaintiff Hospitals' consultant learned about the error and then brought the error to the Secretary's attention, the Secretary failed even to acknowledge that anyone had questioned the calculation method. And when the Hospitals requested more information about the calculation, the Secretary arbitrarily and capriciously refused the request, then claimed that errors in the calculation of budget neutrality were "not within the scope of this rulemaking." 72 Fed. Reg. 47130, 47330 (Aug. 22, 2007) (final rule).

The only action that the Secretary has taken in this area since the Hospitals' protest simply perpetuates his error.  For fiscal year 2008 and going forward, he intends to use a different budget neutrality adjustment method, but will still employ a base payment rate that for the most part maintains all of the improper, duplicative "budget neutrality" adjustments from past years – thereby locking in an improperly reduced payment level for years to come.  Moreover, even if the Secretary had accomplished those prior year adjustments in a manner consistent with the statute (which is indisputably <u>not</u> the case), his 2008 rule would still violate the statute.  That is because, while his new method requires that he reverse the budget neutrality adjustment made in the prior year (2007) before taking a new adjustment in 2008, he is using a base payment rate that continues to reflect all of the adjustments made before 2007.  The Secretary has made it impossible to "zero out the books," as his new method requires, and that undisputed fact is apparent on the face of the Federal Register notice explaining the 2008 rule.

The plaintiff Hospitals bring this challenge to the legality of the payment rates under the Administrative Procedure Act, 5 U.S.C. § 706(2), as those rates violate the BBA and are otherwise arbitrary, capricious, and unlawful.  <u>See</u> Parts III.A-D, <u>infra</u>. Because the Secretary's administrative tribunal that hears Medicare payment disputes is bound by the rules reflecting the disputed rates, the Hospitals requested that the tribunal make a determination that it lacks authority to adjudicate their claim, which would then give them a right to expedited judicial review pursuant to 42 U.S.C. § 1395oo(f)(1).  The Board effectively made that determination on the grounds that review of this type of

Medicare payment question was precluded by Medicare statute and regulation, and this suit followed.

Admitting the administrative tribunal's legal error with respect to preclusion of review, the Secretary now claims, despite the clear dictates of Medicare's statutory expedited judicial review provisions, that this challenge to a "final decision" of the Secretary should be returned to the administrative tribunal that has been given no power to grant the relief sought, and has no obligation to undertake any further proceedings in an expeditious fashion. That approach violates the plain language and manifest intent of the expedited judicial review provisions as previously interpreted by this Court, see Methodist Hosps. of Memphis v. Sullivan, 799 F. Supp. 1210, 1215-16 (D.D.C. 1992), rev'd on other grounds sub nom. Adm'rs of Tulane Educ. Fund. v. Shalala, 987 F.2d 790 (D.C. Cir. 1993), and should not be accepted by this Court. See Part III.E, infra.

For these reasons, this Court should grant Plaintiff's Motion for Summary Judgment and deny Defendant's Motion to Dismiss and Remand.

## II.    FACTS[1]

### A.    Medicare Payment for Inpatient Hospital Services

The Federal Medicare program provides health insurance to the aged, blind and disabled. 42 U.S.C. §§ 1395 et seq. Since 1983, most hospitals – including the plaintiff Hospitals – have been reimbursed on a prospective basis for services they provide to Medicare patients. Under the Prospective Payment System, or "PPS," hospitals are paid

---

[1]    None of the material facts in this case is a matter of genuine dispute, and based on these facts, Plaintiffs are entitled to judgment as a matter of law pursuant to Fed. R. Civ. P. 56. Pursuant to Local Rule 56.1, Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Dispute ("Pl. Stmt.") accompanies this motion. Summarized here are the undisputed facts, set forth in that document, based on the evidence in Plaintiffs' Partial Administrative Record ("PAR"), which is being filed herewith.

on the basis of a prospectively established base rate for each patient discharge, called the "standardized amount." 42 U.S.C. § 1395ww(d); 71 Fed. Reg. 47870, 47875-76 (Aug. 18, 2006) (PAR 584) (final PPS rule for 2007). The standardized amount is adjusted for, among other things, geographic differences in the prevailing wage levels. The Secretary calculates and assigns a "wage index" value to each hospital reflecting the relative wage levels in the hospital's geographic area, then adjusts the labor-related portion of the standardized amount accordingly. See 71 Fed. Reg. at 48005 (PAR 585) (discussing the wage index for 2007); 71 Fed. Reg. 59886, 59903-68 (Oct. 11, 2006) (PAR 613, 615-80) (listing the wage indexes assigned to all hospitals for 2007). If average wages in an area are 25 percent higher than national average wages, for example, then the wage index for hospitals in the area would be 1.25, and the standardized amount for those hospitals would be adjusted accordingly.

### B.    The "Rural Floor" Adjustment

This case concerns an aspect of the wage index known as the "rural floor." In 1997, Congress enacted legislation providing that the wage index for a hospital located in an urban area may not be less than the wage index for hospitals located in rural areas in the same State. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4410(a) ("BBA"), 42 U.S.C. § 1395ww note. The 1997 legislation states, in part:

(a) IN GENERAL. –For purposes of section 1886(d)(3)(E) of the Social Security Act (42 U.S.C. 1395ww(d)(3)(E)) for discharges occurring on or after October 1, 1997, the area wage index applicable under such section to any hospital which is not located in a rural area . . . may not be less than the area wage index applicable under such section to hospitals located in rural areas in the State in which the hospital is located.

Id.  This statutory "rural floor," which is effective for all fiscal years after the fiscal year ended September 30, 1997, assures that the wage indexes for urban hospitals are not lower than the wage indexes for rural hospitals in the same State.  Accordingly, it yields payments to some urban hospitals that are greater than the payments that otherwise would have been made to those hospitals absent the rural floor.

The 1997 legislation also required the Secretary to adjust the wage index for all hospitals to account for the budget impact of the application of the rural floor to some urban hospitals.  BBA § 4410(b).  The statute states, in pertinent part:

> (b) IMPLEMENTATION. –The Secretary of Health and Human Services shall adjust the area wage index . . . in a manner which assures that the aggregate payments made under [the PPS] in a fiscal year for the operating costs of inpatient hospital services are not greater or less than those which would have been made in the year if this section did not apply.

Id.  This part of the statute requires the Secretary to adjust the wage index as necessary to ensure that the rural floor is implemented in a budget-neutral fashion, meaning that any increases in the wage indexes for urban hospitals due to the rural floor must be offset by reductions in the wage indexes for all hospitals so that aggregate Medicare payments are no greater and no less than they would have been had the rural floor never been implemented.  In other words, Congress intended to keep the "pie" the same size, so to speak, while the rural floor alters the relative size of the "slices" among all hospitals.

From 1998 through 2007, the Secretary adjusted the standardized amount to account for greater payments made to some urban hospitals due to the effect of the rural floor.[2]  Each year's budget neutrality adjustment was factored into the standardized

---

[2]     See 71 Fed. Reg. at 48145-47 (PAR 610-12) (final rule for 2007); 70 Fed. Reg. 47278, 47491-93 (Aug. 12, 2005) (final rule for 2006); 69 Fed. Reg. 48916, 49273-75 (Aug. 11, 2004) (final rule for 2005); 68 Fed. Reg. 45346, 45474-76 (Aug. 1, 2003) (final rule for 2004).

amount, after which that same standardized amount is further adjusted in the next year for the effect of the rural floor.  See 71 Fed. Reg. at 48147 (PAR 612) ("We do not remove the prior year's budget neutrality adjustments . . . for updated wage data"); 70 Fed. Reg. at 47492 (same); 69 Fed. Reg. at 49274 (same); 68 Fed. Reg. at 45475 (same).

For 2007 and prior years, the Secretary stated that the simulation model used to determine each year's budget neutrality adjustment to the standardized amount operated by comparing (1) the projected aggregate payments resulting from the next year's wage indexes, e.g., 2007, with (2) the aggregate payments resulting from applying the prior year's wage indexes, e.g., 2006.  The Secretary described the simulation model as follows in the interim final rule for 2007:

> [W]e used FY 2005 discharge data to simulate payments and compared aggregate payments using the FY 2006 relative weights and wage indexes to aggregate payments using the FY 2007 relative weights and wage indexes.  The same methodology was used for the FY 2006 budget neutrality adjustment.
>
> . . .  These budget neutrality adjustment factors are applied to the standardized amounts without removing the effects of the FY 2006 budget neutrality adjustments.

71 Fed. Reg. at 48147 (PAR 612) (emphasis added).[3]

An adjustment calculated as described in the Federal Register notices – what the Secretary has called a "cumulative" adjustment (72 Fed. Reg. at 47330, PAR 766) – would isolate the incremental impact of the rural floor from one year to the next and, for budget neutrality purposes, only that incremental amount would be removed from the

---

[3]    The Secretary gave similar descriptions for prior years.  See 70 Fed. Reg. at 47493; 69 Fed. Reg. at 49275; 68 Fed. Reg. at 45475-76.  The PPS rules did not address the specific data or methodology that CMS employed in the calculation of the budget neutrality adjustment.  See 71 Fed. Reg. at 48147 (PAR 612); 70 Fed. Reg. at 47493; 69 Fed. Reg. at 49275; 68 Fed. Reg. at 45475-76.

standardized amount (which would already reflect all of the budget neutrality adjustments from prior years).  For example, if the effect of the rural floor on projected aggregate payments were $3 in one year and $4 the next year, the appropriate "cumulative" adjustment to the standardized amount in the latter year would be $1. But the Secretary did not calculate the rural floor budget neutrality adjustment in this way.

In 2006, a hospital consultant learned additional critical details about the method the Secretary actually used to calculate the budget neutrality adjustment.  In email correspondence with the consultant in May 2006 (while the proposed PPS rule for 2007 was pending), the Secretary's staff disclosed that the agency actually compared (1) estimated payments resulting from the application of the next year's wage data with the rural floor, to (2) estimated payments resulting from the application of the prior year's wage data without the rural floor.  See Pl. Stmt. ¶¶ 24-29.[4]  In other words, the Secretary did not look to the actual "FY 2006 . . . wage indexes,"[5] which would have reflected the application of the rural floor, in calculating the 2007 budget neutrality adjustment.  See, e.g., 71 Fed. Reg. at 48147 (PAR 612).  Instead, the Secretary used the prior year's "wage data" with no rural floor applied and compared projected payments resulting from the application of that unadjusted wage data with projected payments that would result from application of the current year's wage data with the rural floor applied.  And, as the

---

[4]    The email message conveying this information was sent by CMS employee Nora Fleming in response to an email query from a consultant, Theodore Giovanis, directed to Marc Hartstein, then the Deputy Director of CMS' Divison of Acute Care.  Hartstein referred the query to Fleming, who copied Hartstein on her response.

[5]    The only "wage indexes" listed in each year's rule reflect the wage indexes after application of the rural floor.  See, e.g., 70 Fed. Reg. at 47508-572 (preamble to final rule for 2006, listing in Table 2 the wage indexes that will be applied to determine payments to each hospital).

Secretary stated, the "same methodology" was used for years prior to 2007.  See id. and supra n.3 and accompanying text.

The effect on the budget neutrality adjustment from proceeding in this way is dramatic.  Applying the Secretary's method to the previous example, see supra pp. 7-8, when determining the Year 2 budget neutrality adjustment to the standardized amount, CMS would ignore the fact that the $3 rural floor effect in Year 1 had already been removed.  Failing to account for the prior year's adjustment increases the budget neutrality adjustment made in Year 2 from **$1** (i.e., the incremental change in effect from Year 1 ($3) to Year 2 ($4)) to **$4** (i.e., the full effect of the floor as compared to no floor).  Under the Secretary's method, then, the standardized amount for all hospitals thus would be reduced by $4 in Year 2 after having already been reduced by $3 in Year 1 – $7 total – to account for a rural floor provision that has only a $4 effect on payment.  Because each year's budget neutrality adjustment to the standardized amounts was factored into that rate and then carried forward from year to year, we know that three quarters of the $4 adjustment made in Year 2 duplicates amounts taken out of the base rate in Year 1.

As a result of the apples-to-oranges comparison that the Secretary actually employed to calculate the budget neutrality adjustment, aggregate Medicare payments to all hospitals did not remain the same, as the BBA requires, but shrunk.  As a result, the Secretary's method was not "cumulative" and incremental at all, but rather duplicative and compounding.

Moreover, the Secretary's method for calculating the budget neutrality adjustments for 2007 and prior years would produce negative adjustments to the standardized amount even if there was <u>no change</u> in the impact of the rural floor from one year to the next. This problem can be illustrated in a simple example assuming a universe of just one hospital with the following unadjusted wage data, rural floor-adjusted wage data, and assumed number of patient discharges, all of which remain unchanged for each of three successive years, where the first year is not subject to the floor and the next two are:

| Year | Unadjusted Wage Data | Rural Floor-Adjusted Wage Data | Standardized Amount | Number of Discharges | Total Payment |
|------|------|------|------|------|------|
| 1 | 1.0 | N/A | $1,000 | 10 | $12,500 |
| 2 | 1.0 | 1.25 | $800 | 10 | $10,000 |
| 3 | 1.0 | 1.25 | $640 | 10 | $8,000 |

As illustrated in this example, even though the assumed wage data, rural-floor adjusted wage data, and number of discharges remain constant from Year 1 to Year 3, the standardized amount and the total Medicare payment steadily decline from Year 1 to Year 3. As described in CMS' 2006 email to Giovanis (PAR 579), the rural floor budget neutrality adjustment for Year 2 would be calculated first by multiplying Year 1 wage data with no floor applied (1.0 in the above example) by the standardized amount that would be carried forward from Year 1 to Year 2 (which at this point is $1,000), by the number of assumed discharges (10). The product of that calculation is $10,000. That figure is then compared with the product of the Year 2 wage data <u>with</u> the floor applied (1.25), multiplied by the same standardized amount ($1,000) and the same assumed number of discharges (10). The product of that calculation is $12,500. Dividing the first projected payment amount ($10,000) by the second ($12,500) results in a budget

neutrality adjustment factor of 0.8 (a 20% reduction). That factor reduces the Year 2 standardized amount from $1,000 to $800. The application of the same calculation method to derive the budget neutrality adjustment factor for Year 3 yields a further reduction to the standardized amount (from $800 to $640), even though nothing at all has changed in this example from Year 1 to Year 3.[6]

## C.    The Fiscal Year 2007 Rulemaking

The hospital consultant who discovered this problem responded to CMS the same day, explaining that the agency's method of calculating the budget neutrality adjustment appeared to be seriously wrong. See Pl. Stmt. ¶ 28. Giovanis asked: "[W]hy doesn't this [method] duplicate in some respect the carve out of the application of the floor?" PAR 579. See Pl. Stmt. ¶ 28. CMS never responded. See Pl. Stmt. ¶ 29.

In the following month, Giovanis timely submitted formal comments on the Secretary's proposed rule for 2007 and copied those comments to the two CMS representatives with whom he had the email exchange the month before. See Pl. Stmt. ¶¶ 31-35. At that time, Giovanis notified CMS again that, through erroneous duplication of adjustments, its budget neutrality calculation was improperly reducing Medicare payments to hospitals. He requested that that CMS remedy its error in the final rule for 2007, stating, in pertinent part:

---

[6]    A more detailed example of the problem with the manner in which the Secretary calculated his budget neutrality adjustments for 2007 and prior years was attached to each of the requests for expedited judicial review ("EJR") that the Hospitals' filed with the PRRB in their appeals from the 2007 rule. See, e.g., PAR 50-56.

> Based on information recently provided to us by CMS staff, we have learned that each year <u>CMS uses payment variables (including the [rural floor adjusted wage indexes]) for the rural floor [budget neutrality] adjustment that measure the total annual estimated effect of the application of the rural floor, not the incremental year to year change of the rural floor impact.</u> This would be appropriate if, in applying the current year's rural floor [budget neutrality] adjustment, CMS backed out of the calculation the prior year's rural floor [budget neutrality] adjustment. CMS does not do this, however, and instead permanently locks in the rural floor [budget neutrality] adjustment into the standardized amount. <u>As a result, most of the rural floor [budget neutrality] adjustment is improperly duplicated each year, with compounding effect.</u> This duplication over-adjusts the standardized amount for the effect of the rural floor, and <u>has the effect of improperly lowering payments to all hospitals through a [budget neutrality] adjustment that is too large.</u>

PAR 581-82 (emphasis added); <u>see</u> Pl. Stmt. ¶ 34.

The Secretary's final rule for 2007 did not acknowledge or address Giovanis' comment or the error described in the comment. <u>See</u> 71 Fed. Reg. 47870-48351, 59886-60043.[7] Nor did the rule indicate that the Secretary changed the manner in which CMS calculated the budget neutrality adjustment. <u>Id.</u> On the contrary, the final rule said that CMS used the "same method" that it used in prior years. 71 Fed. Reg. at 48147 (PAR 612).

## D.    <u>The Fiscal Year 2008 Rulemaking</u>

Last year, the Secretary published a proposed rule setting Medicare payment rates for 2008. 72 Fed. Reg. 24680 (May 3, 2007) (PAR 681). In that notice, the Secretary proposed to implement the rural floor budget neutrality adjustment through an annual adjustment to the *wage index* rather than through an adjustment to the <u>standardized amount</u>. <u>Id.</u> at 24791-92 (PAR 686-87). The Secretary did not articulate any reason for the proposed change, however, and did not mention any error in the method that CMS had used to calculate the rural floor budget neutrality adjustments for 2007 and prior

---

[7]    CMS did not reply directly to Giovanis, either.

years. Id. at 24787-93 (PAR 682-88). The Secretary's proposed rule for 2008 listed a one-time positive "Rural Floor Adjustment" to the standardized amount, in the amount of 1.002214 (or .2214 percent) for 2008. Id. at 24839 (PAR 689). The Secretary did not offer any reason for this adjustment or explain how he calculated the adjustment, nor explain the relationship, if any, between that proposed adjustment to the standardized amount and the proposed change in the method for implementing the rural floor budget neutrality requirement through an annual adjustment to the wage index. Id.

The plaintiffs' counsel sent a letter to CMS, within the period allowed for comments on the proposed rule for 2008, explaining that the proposed rule for 2008 and the final rules for prior years did not provide sufficient information to afford hospitals adequate notice of, or a meaningful opportunity to comment on, the Secretary's proposed change in implementation of the rural floor budget neutrality requirement. See Pl. Stmt. ¶¶ 53-55. When the agency declined to provide any of the requested information (PAR 712), the Hospitals' counsel timely submitted further comments on the proposed rule for 2008. PAR 713-42.

The Secretary published the final rule for 2008 in August 2007. 72 Fed. Reg. 47130 (PAR 743). The preamble states that the rural floor budget neutrality adjustment was applied to the wage index (rather than the standardized amount) for 2008 and that this adjustment is now "non-cumulative." 72 Fed. Reg. at 47330 (PAR 766) (emphasis added). By "non-cumulative," CMS meant that the adjustment made to the wage index for 2008 is supposed to account for the full effect of the rural floor for 2008 (as compared to no floor), and not just the incremental change in the effect of the floor from 2007 to 2008. See id. at 47329 (PAR 765) (providing an example of calculation of the budget

neutrality adjustment to the wage index for the effect of the rural floor as applied to three hypothetical hospitals).

While acknowledging that "[m]any commenters requested additional information as to the purpose" of the proposed change in implementation of the rural floor budget neutrality adjustment, 72 Fed. Reg. at 47330 (PAR 766), the Secretary did not provide that information in the final rule. In the preamble, the Secretary acknowledged a comment that the methodology for applying the rural floor budget neutrality adjustment for prior years was flawed because it created an "inappropriate duplicating effect" to be "permanently built into the standardized amount." Id. But, the final rule did not acknowledge or address plaintiffs' comment that the proposed change in implementation of the budget neutrality requirement would not fix problems for prior, current, or future fiscal years stemming from errors in CMS' prior calculations of the budget neutrality adjustments to the standardized amounts in prior years. Id. The Secretary asserted instead that such errors, if any, were beyond the scope of the final rule for 2008 and that the agency would decline to correct them in any event:

> With regard to alleged errors in FYs 1999 through 2007, our calculation of budget neutrality in past fiscal years is not within the scope of this rulemaking. Even if errors were made in prior fiscal years, we would not make an adjustment to make up for those errors when setting rates for FY 2008.

Id.

The Secretary also announced in the final rule for 2008 that his "one-time 1.002214 adjustment [to the standardized amount for 2008] is meant to address a single year transition to a noncumulative system of budget neutrality adjustment." Id. In an appendix 121 pages later, the Secretary also noted that the one-time adjustment was meant to "remove[] the effect of the budget neutrality adjustment applied in FY 2007 to

14

the standardized amount for application of the rural floor." <u>Id.</u> at 47421 (PAR 781). The Secretary did not explain why he chose to restore the effect of only the prior year's adjustment to the standardized amount for 2008, and not to fully account for, and restore, all prior-period amounts that were taken out of the standardized amount to account for the effect of the rural floor in those prior years. Nor did he explain how he calculated this 2007 "add-back."

To see the ongoing impact of the Secretary's 2008 rule, recall the simple example, provided earlier, illustrating the problem with Secretary's prior method as applied to just one hospital when nothing changed from year to year. <u>See</u> <u>supra</u> pp. 9-11. That example shows how the Secretary's prior method would have reduced the standardized amount from $1,000 to $800 in Year 2 and from $800 to $640 in Year 3. Under the 2008 rule, if adopted in Year 4, CMS would have put back only the $160 that was taken out of the standardized amount in Year 3 and not the $200 that was taken out in Year 2. So, the standardized amount, after the add-back, would stand at only $800, which is $200 short of what that rate would be if the rural floor had never applied. Meanwhile, under the 2008 rule, the rural floor-adjusted wage index for Year 4 would also be reduced (by 20% – 1.0/1.25 ) to capture the full effect of the rural floor as compared to no floor. Thus, the 2008 rule perpetually understates Medicare payments by locking in an understated standardized amount that was not properly "trued up" when the Secretary transitioned to his new budget neutrality calculation method in the 2008 rule.[8]

---

[8]    Another more detailed example of the problem with the 2008 rule was attached to the EJR request for the 2008 appeal to the PRRB. PAR 317-36.

E.    **The Hospitals' Appeals**

All five of the plaintiff Hospitals timely appealed the Secretary's final determination of the payment rates for 2007 to the Secretary's Provider Reimbursement Review Board ("PRRB") pursuant to 42 U.S.C. § 1395oo(a).  PAR 1-14, 115-28.  Two of them also appealed the Secretary's final payment rule for 2008.  PAR 254-61, 439-50.  In the proceedings below, the Hospitals requested that the Board render a determination as to its authority to decide the legality of the Secretary's implementation of the rural floor budget neutrality requirement for 2007 and 2008, pursuant to the EJR provisions of the Medicare Act, 42 U.S.C. § 1395oo(f)(1).  PAR 17-56, 131-70, 253-336, 437-516.   After reviewing those requests, the Board determined incorrectly that the Secretary's budget neutrality determinations are precluded from review.  PAR 108, 246, 431, 571.  The Hospitals timely commenced this action within 60 days of those determinations pursuant to 42 U.S.C. § 1395oo(f)(1).

III.   **ARGUMENT**

A.    **Standard of Review**

Jurisdiction over this action lies under 42 U.S.C. § 1395oo(f)(1), which provides that the case "shall be tried pursuant to the applicable provisions under" the Administrative Procedure Act ("APA").  The applicable provisions of the APA provide that the Court must set aside the Secretary's budget neutrality determinations in the final payment rules for 2007 and 2007 if they are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law.  5 U.S.C. § 706(2).

It is well-established that an agency's interpretation of a statute or regulation is not entitled to deference and must be set aside when it is inconsistent with the plain

language or manifest intent of the statute or regulation.  United States v. Mead Corp., 533 U.S. 218, 227-31 (2001); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Chevron, U.S.A, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984).

The agency's implementation of its statutory responsibilities also must not be arbitrary and capricious.  The scope of review under the arbitrary and capricious standard entails a careful, searching inquiry as to whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

### B.    The Secretary's Budget Neutrality Adjustment Methods Violate the Express Requirements of the BBA

The Secretary's statutory responsibility under BBA § 4410(b) is plainly stated in that section, which provides in pertinent part that:

> The Secretary . . . shall adjust the area wage index . . . in a manner which assures that the aggregate payments made under [the PPS] in a fiscal year for the operating costs of inpatient hospital services are not greater or less than those which would have been made in the year if this section did not apply.

Id. (emphasis added).  In contravention of the statute's clear command that aggregate payments must stay the same as they would have been had Congress never required a rural floor adjustment, the Secretary calculated budget neutrality adjustments for the effects of the rural floor in a manner that systematically reduces aggregate payments from year to year, and would do so even in the event that the rural floor either did not exist or produced no wage index impact at all in that time interval.

In 2007 and prior years, the Secretary achieved this budget-shrinking result by comparing apples to oranges in his methodology for calculating the rural floor adjustment. In particular, the Secretary compared aggregate payments that would be made using the prior year wage "data" <u>without</u> the rural floor, on the one hand, with anticipated payments to be made in the subject year using the next year's wage data <u>with</u> the rural floor applied, on the other. PAR 579-80. As illustrated in the examples provided earlier, this calculation method is fatally flawed because each year's adjustment to the standardized amount was factored into that base rate and carried forward from one year to the next,[9] and because each year's adjustment measured not just the incremental change in the effect of the floor from one year to the next, but the entire effect of the floor as compared to no floor at all (i.e., by comparing payments resulting from the prior year's wage data without the floor with payments resulting from the next year's wage data with the floor applied). Consequently, the Secretary's calculation resulted in duplication of adjustments from year to year and would produce a negative (downward) adjustment to Medicare payments even when nothing changed from one year to the next. <u>See</u> PAR 50-56. As a result, Medicare payments were reduced inappropriately because of duplicative "budget neutrality" adjustments that were overstated and repeated year after year.

The BBA expressly requires that aggregate payments in a given fiscal year be the same as they would have been "if this section did not apply," that is, if there were no rural floor. The Secretary's calculation for years prior to 2008 violated that requirement because it produced aggregate payments to hospitals that were less than the payments that

---

[9]    <u>See</u> 71 Fed. Reg. at 48147 (PAR 612); 70 Fed. Reg. at 47492; 69 Fed. Reg. at 49274; 68 Fed. Reg. at 45475.

would have been made if no rural floor ever applied. Pl. Stmt. ¶¶ 76-77. This is not a situation where the parties are quibbling over factual assumptions used in a formula; rather, this is a situation where the Secretary's methodology has a fatal flaw – the methodology <u>will necessarily</u> produce a result inconsistent with the statutory mandate for budget neutrality.

For reasons he declined to articulate, the Secretary changed his methodology beginning with 2008, but the statutory violation persists. Under the Secretary's near method, the standardized amount will no longer be adjusted for the effect of the rural floor, and instead the wage index itself will reflect the budget neutrality adjustment on a "non-cumulative" basis, meaning that the total impact of the rural floor will be captured in each annual adjustment to the wage index rather than the year-to-year incremental change in the effect of the floor.[10] So far, so good.[11] The problem is that the Secretary's transition to the new calculation method in the final rule for 2008 permanently "locks in" prior, excessive adjustments that were made to the standardized amount for the effect of the rural floor for years prior to 2007.

In particular, the standardized amount that the Secretary is applying for 2008, and plans to apply for future years, reflects duplicated "budget neutrality" adjustments for

---

[10]    Properly applied, a non-cumulative adjustment to the wage index would measure the full effect of the rural floor for each year, and each year's adjustment would remove an amount corresponding to the total projected increase in payment that otherwise would result from the application of the rural floor for that year.

[11]    The fact that the Secretary changed his methodology and reversed his 2007 reduction in the standardized amount is an acknowledgement of the problems that Giovanis noted in the final payment rule for 2007, especially given the Secretary's refusal to explain his reasons for doing so. <u>See</u> Pl. Stmt. ¶ 70. After all, if the Secretary didn't think his simulation model was broken, there would have been no need to try to fix it. It is clear from the statute, moreover, that the budget neutrality adjustment was always supposed to be accomplished through the wage index, not the standardized amount. *See* section 4410(b) of the BBA.

19

1998 and 2006 and every year in between. The Secretary's only potentially corrective measure is a one-time, 0.2214 percent upward adjustment (or 1.002214 adjustment) in the standardized amount, but the Secretary's final rule for 2008 admits that this one-time adjustment put back into the standardized amount only what had been taken out of that base payment rate in the final rule for 2007. See Pl. Stmt. ¶¶ 68-69. The Secretary did not put back what was taken out of the standardized amount in the final rules for years 1998 through 2006. Id. It is clear that all of the duplicative prior year (1998-2006) adjustments out of the standardized amount were not restored, and as a result, the Secretary's final rule for 2008 rule sets in concrete a base payment rate that is less than it should be and less than it would be if Congress had never enacted the rural floor. Pl. Stmt. ¶¶ 68-70. Because the rural floor adjustment to the wage index for 2008 removed the full effect of the rural floor, 72 Fed. Reg. at 47329, PAR 765, and because the add-back to the standardized amount restored less than the full amount previously removed from that payment rate, aggregate payments for 2008 and all subsequent years are and will be less than the payment that would be made if the rural floor had not been established. This clearly violates section 4410(b) of the BBA.

Indeed, and this is critical, the Secretary's rule for 2008 would still violate the budget neutrality mandate of the BBA even if the Secretary had correctly calculated the budget neutrality adjustments for 1998 to 2007, and this error is plain on the face of what the Secretary has said in the Federal Register. There can be no genuine dispute about this fatal error in the 2008 calculation method. First, the Secretary has made very clear that the adjustments made to the standardized amount in 1998 through 2006 were not reversed. See supra n.3 and accompanying text. Second, when the Secretary changed

20

his calculation method in 2008, he acknowledged that his one-time adjustment only restored what was removed from the standardized amount for 2007 (see Pl. Stmt. ¶¶ 68-69).  Third, the Secretary acknowledges that the budget neutrality adjustment to the wage index in 2008 is a "non-cumulative" adjustment that should remove the full effect of the rural floor (as compared to no floor) and not just the incremental change in the effect of the floor from 2007 to 2008 (see Pl. Stmt. ¶ 63).  As a result, under the 2008 method, even if the "cumulative" adjustments for prior years had been calculated in the proper manner, the negative effect of those prior adjustments carries over to 2008 and beyond. Regardless of how the Secretary did the calculation for prior years, unless the Secretary restores all adjustments to the standardized amount back to the first year of the rural floor, the standardized amount will always be too low, and Medicare payments will always be less than payments would have been if the rural floor had never applied.  This is a clear violation of law.

The Secretary's determinations of the rural floor budget neutrality adjustments in the final payment rules for 2007 and 2008 therefore violate section 4410(b) of the BBA. The budget neutrality adjustments made in those rules were not budget-neutral at all, but instead resulted in payments that are less than payments would have been if the rural floor had never been implemented.  Moreover, because of the "non-cumulative" method to be applied beginning in 2008, and because prior year adjustments to the standardized amount for the most part were not reversed before the shift in methodology, the Secretary is making underpayments to all hospitals, in violation of the BBA, for Medicare patients currently being treated in 2008 and these underpayments will be perpetuated for every future year unless and until this problem is corrected.

C.    **The Secretary's Handling Of The Budget Neutrality Adjustment Is Arbitrary And Capricious**

Not even the most reasonable of agency conduct can save an agency from reversal if, as here, that conduct cannot be squared with plain statutory requirements. Here, however, compounding his statutory errors, the Secretary has acted in an arbitrary and capricious manner when it comes to his budget neutrality adjustments.

The Secretary has failed, for instance, to consider important aspects of the matter before him. State Farm, 463 U.S. at 43. The fundamental flaw in the Secretary's method should have been apparent to anyone within the agency who had access to the details of the method actually applied in making those budget neutrality adjustments – a straightforward failure to assure that upward adjustments in one variable determining Medicare payments (rural floor-related increases in the wage index) matched corresponding downward adjustments in another variable (the standardized amount).

To make matters worse, the agency mis-described the actual method it used to calculate the rural floor budget neutrality adjustments in the promulgated final payment rules for 2007 and all prior years. PAR 698-711. The rules said that the agency was calculating this adjustment using a simulation model that looked to the prior year "wage indexes" and the current year "wage indexes." See 71 Fed. Reg. at 48147 (PAR 612); see supra n.4    But, we now know that CMS did not use the actual "wage indexes" listed in each year's payment rule – those "wage indexes" are the indexes that are applied for payment purposes after application of the rural floor. See, e.g., 70 Fed. Reg. at 47508-572 (preamble to final rule for 2006, listing in Table 2 the wage indexes that were to be applied to determine payments to hospitals for discharges of Medicare patients in 2006). What CMS actually used in its calculation, as the agency admitted in the 2006 email to

22

Giovanis (PAR 579), was the prior year's wage data without the rural floor applied compared to the next year's wage data with the floor applied. This apples-to-oranges comparison resulted in the duplicative adjustments that Giovanis spotted immediately once the agency disclosed to him in an email that this was how it was actually calculating the budget neutrality adjustment for the effect of the rural floor. If the Secretary had fully and properly described his calculation method earlier, public comment surely would have identified the agency's mistake years ago.[12] One of the functions of public comment is to assist the agency in assuring that its proposed action is well-informed and sound.[13] The Secretary effectively chose not to invoke this important "check" on the reasonableness and lawfulness of his intended action, and hospitals suffered as a result while the Medicare program enjoyed budgetary gain in a manner expressly proscribed by Congress. That was arbitrary and capricious as well as in excess of the Secretary's statutory authority and in violation of the APA's notice and comment rulemaking requirements.

The Secretary's unreasonable course of conduct continued after his errors finally surfaced in the email exchange with Giovanis during the fiscal year 2007 rulemaking

---

[12]    See supra n.3. Plaintiffs' Counsel's May 21, 2007 comments on the proposed rule for 2008 included a 14-page single-spaced appendix reviewing in detail the Secretary's prior year rulemaking statements as they appeared in the Federal Register. PAR 698-711. As that appendix demonstrates, "none of the preambles to the prior IPPS rules for FYs 1998-2007 describe or illustrate important details of the calculation of the budget neutrality adjustments that were made to the standardized amounts in order to implement the budget neutrality requirements of section 4410 of the BBA." PAR 693. The most "important" of those "details," of course, was the fact that, despite his public statements to the contrary, the Secretary was not actually using prior year "wage indexes" (with rural floor applied) to perform his purportedly "cumulative" adjustment to the standardized amount in those years.

[13]    See National Tour Brokers Ass'n v. United States, 591 F.2d 896, 902 (D.C. Cir. 1978) (purpose of the notice-and-comment procedure is "to allow the agency to benefit from the expertise and input of the parties who file comments . . . and . . . to see to it that the agency maintains a flexible and open-minded attitude towards its own rules").

process. Confronted with the problem through specific comments, both formal and informal, the Secretary simply ignored it when he announced his final payment rule for that year. The Secretary's final rule did not acknowledge Giovanis' comment at all, and the Secretary admittedly did not change his approach to meet the substance of the comment. Matters improved very little in the fiscal year 2008 rulemaking a year later.

The Secretary received extensive comments about his budget neutrality adjustment in the 2008 rulemaking, but the Secretary did not acknowledge or react to at least one comment regarding the duplicative budget neutrality adjustments that had systematically shrunk aggregate Medicare payments to all hospitals. The Secretary did change his method in the 2008 rule, as discussed above, but the basis and purpose for the change was unexplained and the change itself plainly was inadequate. The Secretary did not offer reasons for his decision to begin using the wage index rather than the standardized amount to reflect his annual budget neutrality adjustments and neither explained why he was reversing only the 2007 adjustment to the standardized amount nor supported his calculation of what that amount was. All of that violated APA rulemaking requirements and was arbitrary and capricious as well.[14]

---

[14]     "The statement of basis and purpose [required under 5 U.S.C. § 553(c)] must respond to the major comments received, explain how they affected the new regulation, and, where an old regulation is replaced, explain why the old regulation is no longer desirable." Crowley's Yacht Yard, Inc. v. Pena, 863 F. Supp. 18, 20 (D.D.C. 1994) (emphasis added); Amoco Oil Co. v. EPA, 501 F.2d 722, 739 (D.C. Cir. 1974) ("basis and purpose" statement "must be sufficiently detailed and informative to allow a searching judicial scrutiny of how and why the regulations were actually adopted").

In short, there is no doubt that the Secretary did not engage this problem in the careful and reasoned manner required by the APA, and that as a result, the Hospitals were underpaid for 2007, are being underpaid for 2008, and will be underpaid going forward until the Secretary's errors are corrected.[15]

### D.    The Secretary Is Legally Required To Correct His Prior Year Budget Neutrality Adjustment Errors

In the preamble to the final rule for 2008, the Secretary expressly refused to address the current effect of errors made in prior fiscal years.[16]  72 Fed. Reg. at 47330 (PAR 766).  There is no legal merit to that position.

There is no inherent inconsistency between the Prospective Payment System and the correction of errors made under that system.  Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1232 (D.C. Cir. 1994).  In fact, the Secretary has stipulated in other cases to the availability of retrospective relief to correct errors in prior year wage indexes.  See Sarasota Mem'l Hosp. v. Shalala, 60 F.3d 1507, 1513-14 (11th Cir. 1995).  The few cases in which retrospective relief has been denied are ones in which it is clear that the Secretary used the best data available to him at the time.  In Methodist Hospital of Sacramento, for instance, the parties agreed that the wage data available to the Secretary at the time he published the wage indexes for the year in question was "the

---

[15]    Thus, the delay that would necessarily follow from the remand the Secretary seeks here will serve to compound this continuing injury to plaintiff Hospitals and other Medicare-participating hospitals (most of which are paid under the same PPS rates), while making the essential correction of this error all the more disruptive to hospitals. The time to fix this problem is now, not at some indefinite time in the future when or if further proceedings before the Board are complete on the remand the Secretary hopes to get here.

[16]    Of course, if the Secretary had fixed the problem in the final rule for 2007 or 2008, in response to comments raising problems with the proposed rules, no retrospective relief would be required for 2008 or future years.

most reliable data available to the Secretary at the time of publication." 38 F.3d at 1230. The Secretary took the position that, under these circumstances, where the agency had done the best it could at the time with the imperfect data available to it, the interests of finality and avoidance of undue administrative burden prevailed over the concerns about accuracy that come to light only later, with new and better information not previously available to the agency. The Court agreed. 38 F.3d at 1235.

A different result follows, however, when the error results from something other than the agency's reasoned choice among necessarily imperfect alternatives. In <u>Sarasota Mem'l Hospital</u>, for example, the Secretary agreed that retrospective relief would be available to correct prior year wage indices tainted by a legal error. 60 F.3d at 1511, 1513 (Secretary agreed to correct prior year wage index affected by her legally incorrect decision to treat hospital employees' FICA contributions as fringe benefits rather than wages). Likewise, in <u>County of Los Angeles v. Shalala</u>, 192 F.3d 1005 (D.C. Cir. 1999), the Secretary decided to use obsolete patient length-of-stay data to calculate Medicare outlier payments at a time when concededly more accurate data was available. The D.C. Circuit held that, in these circumstances, the Secretary was required either to recalculate the prior year outlier payments using the better data or offer a reasonable explanation for her choice not to use such data at the time. 192 F.3d at 1023.[17]

---

[17]    Accord <u>Alvarado Cmty. Hosp. v. Shalala</u>, 155 F.3d 1115 (9th Cir. 1998), <u>amended by</u> 166 F.3d 950 (9th Cir. 1999), in which the Secretary was similarly required to use final 1984 length-of-stay data to adjust prior year outlier thresholds. In <u>Alvarado</u>, the Ninth Circuit distinguished <u>Mt. Diablo Hosp. v. Shalala</u>, 3 F.3d 1226 (9th Cir. 1993), as a case in which retrospective relief was denied based on the Secretary's reasoned choice in the prior year to choose "one imperfect database over another." <u>Alvarado</u>, 155 F.3d at 1125.  <u>See also</u> <u>Georgetown Univ. Hosp. v. Bowen</u>, 862 F.2d 323 (D.C. Cir. 1988) (invalidating a CMS rule providing for prospective-only correction of a hospital-specific PPS payment rate); <u>Riverside Methodist Hosp. v. Thompson</u>, No. C2-02-94, 2003 U.S.

No "best available data" defense relieves the Secretary of his obligation to correct the Medicare payments made to the plaintiff Hospitals in this case. The Secretary did not make a reasoned choice among unavoidably imperfect courses of action. Instead, the Secretary chose to employ a budget neutrality adjustment method that plainly does not accomplish budget neutrality as the statute requires, but rather systematically erodes total Medicare payments without regard to implementation of the rural floor. Nothing compelled that choice and the error here did not arise from a choice among imperfect data. The problem at issue here is a simple math error.

The relief sought in this case is as much in the nature of current and prospective relief as it is purely retrospective relief.[18] The standardized amount paid for 2007 must be corrected to eliminate the Secretary's duplicated budget neutrality adjustments going back to 1998, and this corrected standardized amount must be used to determine the additional payments due the plaintiff Hospitals for Medicare inpatients treated in fiscal year 2007. That same corrected 2007 standardized amount (less the one-time .2214 add-back that was put in place under 2008 rule) can then be used to determine additional payments due to the plaintiff Hospitals for 2008 and going forward, without regard to any budget neutrality adjustments attributable to the rural floor, as the Secretary has now decided to make those adjustments directly to the wage index.

---

Dist. LEXIS 15163, at *36 (S.D. Ohio July 31, 2003) (requiring the Secretary to retrospectively correct his final determination regarding the PPS payment adjustment for a hospital's indirect medical education costs); Centra Health, Inc. v. Shalala, 102 F. Supp. 2d 654, 659-61 (W.D. Va. 2000) (granting retrospective relief from the calculation of the PPS wage index that was not based on the best data available).

[18]   The hospitals could not have known about and challenged the Secretary's prior year errors at the time they occurred. Only during the fiscal year 2007 rulemaking did it become clear that the Secretary was not making a truly cumulative budget neutrality adjustment each year, as he had publicly claimed.

### E.    The Court Should Deny The Secretary's Motion To Dismiss And Remand

Notably, the Secretary's motion to dismiss does not stand on the language or intent of the Medicare statute governing actions like this one for expedited judicial review ("EJR"), 42 U.S.C. § 1395oo(f)(1), or this Court's construction of that statute in Methodist Hosps. of Memphis v. Sullivan, 799 F. Supp. 1210, 1214-16 (D.D.C. 1992), rev'd on other grounds sub nom. Administrators of Tulane Educational Fund v. Shalala, 987 F.2d 790 (D.C. Cir 1993).  The Secretary's motion instead seeks shelter from the force of these controlling authorities in any port the Secretary can find: in general principles of administrative law that are not applicable here (Motion at 1-4); in the Secretary's own EJR regulations (id. at 5), which this Court in Methodist Hospitals of Memphis found to be in conflict with the EJR statute in dicta from a D.C. Circuit opinion on a wholly unrelated issue (id. at 5); and, in unpersuasive decisions from other district courts in two factually distinguishable cases (id.).  This is all overcome by the plain language and intent of the EJR statute as construed and applied by this Court.

The statute required the Board to render a determination as to its authority to decide the validity of the Secretary's final PPS payment rules within 30 days after its receipt of the plaintiff Hospitals' fully-documented requests for such a determination.  42 U.S.C. § 1395oo(f)(1)  (5th sentence).  The Board determined that it lacked authority to decide the question.  Regardless of any defects in that determination now perceived by the Secretary, the Hospitals are entitled to bring this civil action "with respect to the matter in controversy" in the appeals they filed with the Board, id. (6th sentence), and this action "shall be tried pursuant to the applicable provisions" of the APA.  Id. (7th sentence).

### 1. The EJR Statute and Appeals from the Secretary's PPS Payment Rate Determinations

When it enacted the PPS in the Social Security Amendments of 1983, Congress amended section 1395oo of the Medicare statute to provide hospitals the right to appeal a determination of the Secretary as to the amount of payment under the PPS. See Social Security Amendments of 1983, Pub. L. No. 98-21, § 602(h)(1), amending 42 U.S.C. § 1395oo(a). See also Washington Hosp. Ctr. v. Bowen, 795 F.2d 139, 142, 144-48 (D.C. Cir. 1986); D.C. Hosp. Ass'n Wage Index Group Appeal, reprinted in MEDICARE & MEDICAID GUIDE (CCH) ¶ 41,025 (Jan. 15, 1993). These appeals are taken in the first instance to the PRRB; but, because the Secretary's Board is bound by the Secretary's substantive rules,[19] section 1395oo(f)(1) provides that hospitals

> shall also have the right to obtain judicial review of . . . a question of law or regulations relevant to the matters in controversy whenever the Board determines . . . that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received.

---

[19] The PRRB lacks authority to decide the validity of the Secretary's substantive rules and regulations, like the final rules establishing the PPS rates for 2007 and 2008. See Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 406 n.4 (1988). See also 42 C.F.R. § 405.1867 (the Board is bound by CMS regulations issued under title XVIII of the Act); Sarasota Mem'l Hosp., 60 F.3d at 1509 (noting the Board's recognition that "it is bound by Medicare regulations, including the . . . [PPS] wage index published by the Secretary"); Hunterdon/Somerset 2001 Wage Index Group v. Riverbend Gov't Benefits Adm'r, PRRB Dec. No. 2004-D13, 2004 WL 2066675 (Apr. 14, 2004) (granting EJR where the PRRB was without power to change the Secretary's policies used to calculate PPS wage indices).

42 U.S.C. § 1395oo(f)(1) (3rd sentence).[20]   Thus, a hospital "may file a request for a

determination by the Board of its authority to decide the question of law or regulations

relevant to the matters in controversy."  Id. (4th sentence).  The Board has 30 days to

render such a determination, which is a final decision of the Secretary.  Id. (5th sentence).

If the Board fails to render such a determination within that 30-day period, then the

hospital may initiate a civil action in this Court "with respect to the matter in

controversy" in the appeal.  Id. (6th and 7th sentences).  Congress' intent in establishing

---

[20]     The relevant text of the Medicare EJR statute is found in the third through seventh sentences of section 1395oo(f)(1), which read as follows:

> **[3rd Sentence]** Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received.  **[4th Sentence]**  If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination).  **[5th Sentence]**  The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary.  **[6th Sentence]**  If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing.  **[7th Sentence]**  Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5 notwithstanding any other provisions in section 405. . . .

42 U.S.C. § 1395oo(f)(1).

this provision for "expedited judicial review" was to eliminate administrative delay in cases where the Board plainly has no role to play. H.R. Rep. No. 96-1167, at 394 (1980), reprinted in 1980 U.S.C.C.A.N. 5526, 5757.

This Court has construed the Medicare statute's EJR provisions (all but ignored in the Secretary's motion) in a very similar case (not cited in the Secretary's motion). In Methodist Hosps. of Memphis, six hospitals filed appeals with the PRRB contending, first, that a Medicare rule was invalid, and, second, that the audit determinations made pursuant to that rule were otherwise improper even assuming the validity of the rule itself. 799 F. Supp. at 1213 n.6. The hospitals then filed petitions for expedited judicial review of the threshold issue concerning the validity of the Secretary's rule. Within 30 days of its receipt of those petitions, the Board denied the requests for expedited review, concluding that there were factual issues in the case for the Board to decide. Id. at 1215.

The hospitals then filed an action in this Court for judicial review of the Secretary's rule pursuant to section 1395oo(f)(1), contending that jurisdiction was proper because the Board had failed, within the mandatory 30-day period, to render a determination as to its authority to decide the validity of the Secretary's rule. As in this case, the Secretary moved to dismiss, contending that jurisdiction was lacking under the agency's EJR regulations, which purported to require the Board to determine that there are no facts in dispute before rendering a determination as to its authority to decide a question of law or regulations. See 799 F. Supp. at 1213; see also 42 C.F.R. § 405.1842(d)(1)(ii) & (g)(2).

This Court (per Judge Pratt) concluded that jurisdiction was proper and denied the Secretary's motion to dismiss on the ground that his interpretation of the EJR statute was

"strained" and could not be squared with its plain requirements.  799 F. Supp. at 1213-16.

Following the plain language of section 1395oo(f)(1), the Court ruled that a hospital may

commence an action in this Court with respect to the matter in controversy in an appeal to

the PRRB if the Board denies the hospital's request for expedited judicial review without

determining, within the statute's 30-day period, whether it has authority to decide the

validity of a rule adopted by the Secretary.  Id. at 1216.

Because "the PRRB did *not* determine that it had authority to decide the validity

of the Secretary's reaudit regulation," id. at 1215, the Court's exercise of jurisdiction over

the action was consistent with the plain language of the sixth sentence of section

1395oo(f)(1), and the legislative intent of the expedited judicial provision as a whole.  Id.

at 1215-16.   As the Court put it, the Board's statutory obligation to render a

determination as to its authority to decide the validity of a rule "is mandatory, not

discretionary."  Id. at 1215.

The Court explained that Congress enacted the EJR statute "to reduce the delay

associated with futile appeals to the PRRB, when it did not have authority to determine

the validity of [a] regulation or law."  Id. at 1216.  In particular, and quoting from the

House Report that accompanied the legislation adding the provision for expedited judicial

review, the Court found that Congress intended to eliminate unnecessary delays that

occurred when providers were required "to pursue a time-consuming and irrelevant

administrative review merely to have the right to bring suit in a U.S. District Court."  Id.

at 1216 (quoting H.R. Rep. No. 96-1167, at 394, 1980 U.S.C.C.A.N. at  5757).

The Secretary's construction of the statute in his regulations, the Court held,

"would introduce the very problem of delay that Congress sought to avoid with its

amendment of the Social Security Act to provide for EJR." Id. at 1215-16. Under the

Secretary's regulations, his Board could

> refuse to reach a determination of its authority if it believes that there are
> factual issues within its jurisdiction to decide, and defendant argues that
> such a determination by the PRRB is unreviewable. It is difficult to see
> how this would be much of an improvement over that which existed prior
> to the EJR amendments.

Id. at 1216.

Although the Secretary appealed the Court's decision in Methodist Hosps. of

Memphis on the merits of the Medicare rule at issue there, see Administrators of Tulane

Educational Fund v. Shalala, 987 F.2d 790 (D.C. Cir. 1993), neither the Secretary nor the

Court of Appeals questioned this Court's exercise of jurisdiction pursuant to section

1395oo(f)(1). See 987 F.2d at 794 n.4.[21]

### 2.    The Board Issued A Final Decision Granting Expedited Judicial Review By Determining It Lacked Authority To Decide The Legal Question Before It

In the proceedings below, the Board determined, based on an erroneous

interpretation of the statutory and regulatory provisions precluding review of certain PPS

---

[21]    From the fact that it noted the Secretary's failure to appeal Judge Pratt's jurisdictional decision and took no action on it, it is clear that the court of appeals had no question regarding this Court's exercise of jurisdiction. Indeed, the court of appeals is required to assure itself that jurisdiction is proper regardless of whether the parties contest it. See Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) ("courts…have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party"); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 95 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." (internal quotation marks and citation omitted)); Blackman v. Dist. of Columbia, 456 F.3d 167, 174 (D.C. Cir. 2006) ("It is well established that a court of appeals must first satisfy itself of its own jurisdiction, sua sponte if necessary, before proceeding to the merits." (internal quotation marks and citation omitted)). See also Gardner v. United States, 211 F.3d 1305, 1310 (D.C. Cir. 2000); Common Cause v. Fed. Election Comm'n, 108 F.3d 413, 416 (D.C. Cir. 1997) (per curiam).

determinations not involved here, that it did not have authority to grant the plaintiff Hospitals' requested relief from the incorrect rural floor budget neutrality adjustment. PAR 108 ("review of budget neutrality adjustments is precluded by the statute and regulations"); PAR 246 (same); PAR 431 (same); PAR 571 (same). Notwithstanding the Board's pro forma "denial" of the Hospitals' EJR requests, the Board's decision that it lacks authority to decide the legal question before it was a determination that the Board lacks authority to decide the validity of the rules at issue. Now, the Secretary has concluded that the Board was incorrect in this regard, and asks this Court to give the Board another chance to derail the Hospitals' legal challenge to the Secretary final payment rules – rules that that the Board has no authority to undo.[22] This approach is clearly inconsistent with the plain language of the EJR statute, 42 U.S.C. § 1395oo(f)(1), and this case should not be pointlessly delayed through remand.

Under the statute's EJR provisions, "a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy" is a "final decision" of the agency. 42 U.S.C. § 1395oo(f)(1) (5th sentence). As such, unlike other decisions of the Board, it is not subject to review by the Secretary. Id. In the proceedings below, the Board made a determination that it lacked authority to decide the legal question posed by the Hospitals (PAR 108, 246, 431, 571), after which the Hospitals timely brought this action (PAR 1-14, 115-28, 254-61, 439-50). The Secretary simply does not get a second bite at the apple now. Cf. Methodist Hosps. of Memphis,

---

[22]    See, e.g., Bethesda Hosp. Ass'n, 485 U.S. at 406 n.4 (noting that section 1395oo(f)(1) "does not allow Board decisions with regard to the validity of rules or regulations, . . . and provides for *judicial* review of a challenged regulation when the Board determines it is 'without authority to decide the question'").

799 F. Supp. at 1215-16 (Board's failure to determine that it *had* authority to decide the validity of a regulation does not deprive court of jurisdiction over hospitals' challenge to that regulation pursuant to the Medicare EJR provisions).

The Secretary's motion provides no legitimate basis for departing from the dictates of the EJR statute here. The first four pages of the Secretary's five-page motion discuss general principles of administrative law under which a reviewing court must ordinarily remand to an administrative tribunal once it has determined that the administrative appeal was improperly denied for lack of jurisdiction before the agency reached the merits. The Hospitals have no quarrel with that dissertation. But none of it is relevant here.

This is not a garden variety action for review of an administrative tribunal's decision, before reaching the merits of issues that the agency has authority to decide, that it lacks jurisdiction to decide a dispute. In this instance, the PRRB lacks authority to decide questions of law or regulations, like the validity of the Secretary's final payment rules at issue, and Congress has established a statutory expressway to judicial review of such questions. The EJR statute imposes a mandatory obligation on the Board to render a determination as to its authority to decide such a question within a prescribed period, which is the Secretary's "final decision" on the matter. U.S.C. § 1395oo(f)(1) (5th sentence). It also provides for commencement of a civil action "within sixty days of the date on which notification of such determination is received." Id. (3rd sentence). Despite whatever the Secretary might like to change about the Board's determination on the Hospitals' requests for EJR, the Secretary may not undo that "final decision." Both the Secretary and this Court are bound by the statute's command.

3.      **Even If The Board Had Not Made A Determination That It Lacked Authority To Decide Plaintiff Hospitals' Appeal, Remand Would Violate The EJR Statute**

Even assuming <u>arguendo</u> that the Board did not reach the question of its authority to decide the validity of Secretary's budget neutrality adjustments – and the Board plainly did decide (albeit incorrectly) that it lacks authority to decide that question – the EJR statute still provides for jurisdiction over this action, and remand to the Board is improper. The Hospitals filed complete petitions for a Board determination as to its authority to decide the validity of the final PPS rules at issue. The controlling statute required the Board to render such a determination within 30 days of its receipt of each petition. If the Board failed to render that determination within the 30-day period mandated by the statute, then jurisdiction over this action is granted by the sixth and seventh sentences of 42 U.S.C. § 1395oo(f)(1). Under the EJR statute, whatever else may be going on in the appeal, if 30 days elapse from the filing of an EJR petition without a determination that the Board has authority to decide the "question of law or regulations" presented, the hospital is entitled to come to court. This Court confronted much the same situation and reached the same conclusion in <u>Methodist Hospitals of Memphis</u>, which the Secretary did not appeal, and neither discusses nor even cites in his motion to dismiss.

To the extent the Secretary's <u>regulations</u> require reconsideration by the Board, as the Secretary suggests, those regulations are invalid. It is axiomatic that an agency's regulations are invalid to the extent that they conflict with the plain language and intent of the statute: "A reviewing court 'must reject administrative constructions of [a] statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that

Congress sought to implement.'"  Washington Hosp. Ctr., 795 F.2d at 144 (quoting

Securities Indus. Ass'n v. Bd. of Governors, 468 U.S. 137 (1984)).

The Secretary's motion (at 5) says that his EJR regulations toll the 30-day period

in which the PRRB must render a determination as to its authority to decide a question of

law or regulations until such time as the Board decides to accept jurisdiction over a case.

Indeed, the EJR regulations purport to create the fiction that a properly filed request for

the Board to render a determination as to its authority to decide a matter is not "filed,"

and thus the 30-day period required for such a determination can never begin to run, until

such time as the Board gets around to deciding to "accept[] jurisdiction."  42 C.F.R.

§ 405.1842(b)(3).  But, nothing in the EJR regulations, or any other regulations of the

Secretary, imposes any finite period, let alone a short one, for the Board to "accept"

jurisdiction.  So, the Secretary's regulations would establish a convenient means of

escaping the statute's mandatory duty to render a prompt determination as to the Board's

authority to decide a matter, in contravention of Congress' intent to relieve hospitals of

the delay and expense of pursuing meaningless proceedings before the Board merely to

eventually have a chance for judicial review.  See Methodist Hosps. of Memphis, 799 F.

Supp. at 1215-16.  Through the simple artifice of refusing ever to decide to affirmatively

"accept" jurisdiction (or even just neglecting to do so given the press of other business),

the Board could put a perpetual hold on the clock for the period in which it must make

the determination that the EJR statute requires.  This gaping loophole runs square afoul of

the intent of the EJR statute to provide for expedited judicial review.[23]

---

[23]    Thus, while the Secretary's Motion now concedes (at 2) that the Board was wrong
in concluding that review of the budget-neutrality adjustments at issue is precluded by the
Medicare statute and regulations, the Secretary's position here would permit the Board to

Moreover, nothing in the plain language of the statute itself compels or permits the Secretary's "strained" reading of it.  Methodist Hosps. of Memphis, 799 F. Supp. at 1214.  The fourth sentence of section 1395oo(f)(1) provides that the EJR process begins with the filing of a request for EJR by a provider that has also requested a hearing before the Board.  There was an argument (which the Secretary now expressly abandons) that there is no provision for review of the budget neutrality determinations at issue, but the Secretary certainly does not claim that the Hospitals failed to perfect their requests for hearings before the Board.  With the filing of the EJR request, the fifth sentence of the statute imposes a mandatory obligation upon the PRRB to render a determination as to its authority to decide the legal question presented with 30 days of that request.  The sixth and seventh sentences allow a hospital to initiate a civil action in this Court on the merits of the appeal if the Board does not discharge its mandatory duty to render the required determination.  Nothing in those sentences of the statute permits the Board to defer its EJR determination unless and until the Board affirmatively determines to accept jurisdiction over the appeal.  Indeed, strictly speaking, nothing in the text of these provisions even requires the Board to "accept jurisdiction" at all.

But, even if the statute may permissibly be read to require or permit the Board to make a determination as to its jurisdiction over an appeal, it does not follow that where the statute says (in the fourth sentence) that the Board "shall render" an EJR determination within 30 days of its receipt of request for such a determination, it really means that the Board may not render such EJR determination within that 30-day period and need not ever render such a determination unless or until the Board affirmatively

---

effectively preclude review of this issue forever by simply failing ever to decide whether there are any "additional jurisdiction issues."  Id. at 4.

decides to accept jurisdiction at some indefinite point in time.  As this Court previously
noted, the Secretary's strained construction of the EJR statute raises "serious doubts
about the validity of the Secretary's EJR regulations."  <u>Methodist Hosps. of Memphis</u>,
799 F. Supp. at 1216 n.10.

### 4.    The Secretary's Cases Are Not Controlling or Persuasive Authority

The cases the Secretary cites in support of his EJR regulations (Motion at 5) are
neither controlling Circuit precedent nor persuasive, and should not be followed in this
case.

For example, the Secretary's reliance on a couple statements lifted out of the D.C.
Circuit's decision in <u>Tuscon Medical Center v. Sullivan</u>, 947 F.2d 971, 980 (D.C. Cir.
1991), is misplaced.  <u>Tuscon</u> did not present a challenge as to the meaning or validity of
the Secretary's EJR regulations.  The statements the Secretary relies upon here are mere
<u>obiter dicta</u>, in that the Court of Appeals merely cited the Secretary's regulations, without
examining their meaning or validity, as shorthand confirmation of a determination that
the Court already made that the providers had an amount in controversy in the case, and
the case was not moot, at the time the complaint was filed in the district court.[24]  Those
matters were not disputed in <u>Tuscon,</u> and Court's decision in that case carries no
precedential weight as to those matters.  <u>See</u> <u>Time Warner Entm't Co. v. FCC</u>, 144 F.3d
75, 79  (D.C. Cir. 1998) ("Our reasoning reflects our experience as judges that unless an

---

[24]    <u>Tucson</u> was decided before this Court's 1992 decision in <u>Methodist Hospitals of Memphis</u> and the court of appeals' 1993 review of that decision in <u>Tulane</u>, and, again, did not address the validity of the Secretary's EJR regulations or his interpretation of section 1395oo(f)(1).

issue is squarely presented in a case, any discussion of the question in the opinion (*dicta*) is only a preliminary view and therefore not to be given precedential weight.").

The two district court decisions cited in the Secretary's Motion (at 5), provide no more precedential authority for the Secretary's position here. <u>Alexandria Hosp. v. Bowen</u>, 631 F. Supp. 1237 (W.D. Va. 1986); <u>San Francisco Gen. Hosp. v. Shalala</u>, No. C 98 00916 SI, 1999 WL 717830 (N.D. Cal. Sept. 8, 1999). Each of those cases is factually distinguishable in a material respect. In both cases, the providers had submitted incomplete requests for EJR to the PRRB, the Board then asked for more information before the expiration of the 30-day period for its EJR determination, and the providers subsequently initiated actions in federal court premised on the Board's failure to render a determination within the 30-day period. <u>Alexandria Hosp.</u>, 631 F. Supp. at 1239, 1241; <u>San Francisco Gen. Hosp.</u>, 1999 WL 717830, at *1-*2. That is not the case here. There is no question that the Hospitals' requests for EJR determinations were complete when submitted to the PRRB.

Moreover, neither decision sets forth a sufficiently compelling rationale to justify a departure from the established precedent in this Circuit. The <u>San Francisco General</u> decision merely adopted the rationale of the 1986 decision in <u>Alexandria Hospital</u>, and the rationale for the decision in <u>Alexandria Hospital</u> does not hold up nearly as well as Judge Pratt's well-reasoned consideration of the EJR statute and its legislative intent in <u>Methodist Hosps. of Memphis</u>. The district court in <u>Alexandria Hospital</u> concluded, for example, that it would be unreasonable to require the Board to determine whether it has jurisdiction over an appeal within the same 30-day period in which it is required to render a determination as to its authority to decide it. But, the decision in that case provides no

40

satisfactory reason why this is so, particularly insofar as Congress <u>mandated in the EJR</u> <u>statute</u> that the Board <u>must</u> act within 30 days upon a request for determination as to its jurisdiction to decide a question of law or regulations in an appeal.  <u>See</u> <u>Methodist Hosps.</u> <u>of Memphis</u>, 799 F. Supp. at 1215 (the statute's requirement that the Board render a determination as to its authority to decide a question in an appeal "is mandatory, not discretionary.").

Even if the Board may reasonably construe section 1395oo(f)(1) to mean that it must determine jurisdiction under 1395oo(a) when it is called upon to render an EJR determination under section 1395oo(f)(1), it does not follow that the latter determination – one that the statute commands the Board to make within a specified time period – must yield to the former.  Nor does it follow that the latter, statutorily-mandated EJR determination may be put off indefinitely until such time as the Board gets around to making a determination as to whether a provider has otherwise met the requirements for an appeal to the Board under section 1395oo(a).  All of these questions are jurisdictional in nature.  <u>Methodist Hosps. of Memphis</u>, 799 F. Supp. at 1215.  There is no basis for privileging one jurisdictional question over another, save one:  The EJR statute commands that the EJR determination be made within 30 days, without exception for any other question the Board may be presented with, jurisdictional or otherwise.

Even assuming that the Secretary or the Board could properly construe the statute to implicitly require the Board to make a jurisdictional finding with respect to the appeal requirements in section 1395oo(a), the logical conclusion is that this determination should be made together with the EJR determination and within the period required for the EJR determination.  The EJR determination is itself a decision as to the Board's

"jurisdiction" to decide a particular question of law or regulations, <u>Methodist Hospitals of Memphis</u>, 799 F. Supp. at 1215, and the statute mandates that this determination must be made within the prescribed 30-day period. <u>Id.</u> Moreover, this is the only construction of the statute that is fully consistent with Congress' intent to provide for expedited review of legal issues that the Board lacks jurisdiction to decide.

To the extent that the Secretary's EJR <u>regulations</u> would require a different result, as the Secretary's motion (at 5) says they do, the regulations are invalid because they cannot be squared with the plain statutory command for expedited judicial review.

### 5.    Remand Would Undermine the Clear Purpose of the EJR Statute

Remand to the Board at this juncture would only delay this proceeding – for an <u>indefinite</u> period – in contravention of the manifest intent of the statutory provision authorizing <u>expedited</u> judicial review of an issue, like the validity of the Secretary's final PPS rules, that the Board lacks the power to decide. 42 U.S.C. § 1395oo(f)(1).

As in <u>Methodist Hosps. of Memphis</u>, the Secretary's motion to dismiss this case would result in the very sort of unnecessary delay that Congress intended to eliminate when it amended the Medicare statute by adding the provision for expedited judicial review in section 1395oo(f)(1). There are no material facts in dispute here, and the Court may resolve the parties' dispute as a matter of law.[25] And, even if there were some genuinely disputed factual issue (and there is none), the Court would properly decide

---

[25]    Even if there were any genuine factual issue as to how the Secretary calculated the budget-neutrality adjustments at issue (and there is none), expedited review by the Court would still be appropriate because the Board lacks authority to overturn the Secretary's final PPS rules. <u>See</u> <u>Methodist Hosps. of Memphis</u>, 799 F. Supp. at 1216 n.10 (noting "serious doubts about the validity of the Secretary's EJR regulations" to the extent that those regulations could be applied to deny expedited judicial review of the validity of a rule that the Board lacks authority to overrule); <u>see</u> <u>supra</u> n.19.

such an issue based upon its review of the administrative record for each of the rules at issue, including all information that was before the agency when it promulgated those rules, which the Secretary, of course, is required to produce to this Court.[26]  Unlike the Court, however, the Board has no effective means of compelling the Secretary to produce his rulemaking record and any other evidence concerning his calculation of the budget-neutrality adjustments.[27]  And, therein lies what in all likelihood is the real motivation underlying the Secretary's motion – continuation of the delay tactics that the agency has deployed since the problem with his calculation of the budget-neutrality adjustments was

---

[26]    See, e.g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420 (1971) (the court's review of agency action under the APA "is to be based on the full administrative record that was before the Secretary at the time he made his decision"), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977); Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C.Cir. 1984) (the reviewing court should have "neither more nor less information than did the agency when it made its decision").

[27]    The Secretary maintains that his agency is not a party to proceedings before the PRRB, and he asserts, therefore, that his agency is not subject to the sorts of discovery requests that may be made to a party in an appeal before the PRRB.  Moreover, while the Board has subpoena power, the Secretary maintains that his agency is not required to respond to them, and he refuses to allow the Board to take action to enforce its subpoena against a federal agency.  See Order of the Administrator, Baystate Med. Ctr. v. Mutual of Omaha, PRRB Case Nos. 96-1822, 97-1579, 98-1827, 99-2061 (July 29, 2004) (copy attached as Pl. Exh. 1).  The Secretary's resistance to Board orders and requests that the agency produce evidence relating to its calculation of the Medicare payment at issue in the Baystate case is now pending before this Court.  See Pl. Stmt. ¶¶ 80-91, Baystate Med. Ctr. v. Leavitt, No. 06-cv-01263, Docket Item 15 (D.D.C. Feb. 1, 2007).  That case was bogged down for years in discovery disputes at the PRRB before the case finally made its way to this Court, id., where the Secretary is now defending his final decision that the hospital is not entitled to relief from undisputed errors in the agency's calculation of the Medicare payment at issue there because, he says, the hospital failed to obtain sufficient evidence from the Secretary to prove that that agency's errors had a sufficient financial impact to warrant correction.  See Decision of the Administrator, Baystate Med. Ctr. v. Mutual of Omaha Ins. Co., reprinted in MEDICARE & MEDICAID GUIDE (CCH) ¶ 81,506 (May 11, 2006) (copy attached as Pl. Exh. 2).

first discovered and presented to the Secretary by Giovanis in 2006.  <u>See</u> Pl. Stmt. ¶¶ 31-35.

There is nothing but delay to be accomplished by the Secretary's request for remand to the agency now.  The Secretary's Motion suggests (at 5-6) that on remand to the Board, the PRRB might give consideration to "the development of additional jurisdictional issues, if any," or it might at some indefinite time in the future consider requests for expedited judicial review that the Hospitals filed last year, or it might engage in "further proceedings on the merits."  All hokum.  There is absolutely no question that the Hospitals' timely appeals from the Secretary's final PPS payment rate determinations easily met the simple, straightforward requirements for an appeal to the PRRB under section 1395oo(a).[28]  And the Secretary has not even attempted to contend that the Board has the authority to grant the relief requested by the Hospitals.  Any "proceedings on the merits" before the Board would amount precisely to the pointless exercise in futility that the EJR statute was meant to eliminate; the Board simply does not have the authority to decide the validity the Secretary's PPS rules at issue here.  As this Court has previously found, Congress enacted the provision for expedited judicial review in order to relieve hospitals of the need "to pursue a time-consuming and irrelevant administrative review merely to have the right to bring suit in U.S. District Court."  <u>Methodist Hosps. of</u>

---

[28]    There is no question that the Hospitals timely appealed from the Secretary's final determinations of the PPS rates for the periods at issue and that their appeal notices expressed the hospitals' dissatisfaction with those determinations and stated amounts in controversy substantially in excess of the statutory minimum.  Compl. ¶¶ 103, 104, 109; PAR 1-14, 115-28, 254-61, 439-50.  There is also no dispute that the Hospitals presented properly documented petitions for expedited judicial review of the validity of the PPS rules at issue. PAR 17-56, 106-14, 131-70, 244-52, 254-336, 428-36, 437-516, 568-76.

Memphis, 799 F. Supp. at 1216 (quoting H.R. Rep. No. 96-1167, at 394, reprinted in 1980 U.S.C.C.A.N. at 5757).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss, grant their motion for summary judgment, declare invalid the Secretary's budget neutrality adjustments in the final Medicare payment rules for fiscal years 2007 and 2008, and remand to the Secretary with instructions to conform his adjustments to BBA § 4410(b) and to make additional payments due the plaintiff Hospitals as a result.

Respectfully submitted,

/s/ Christopher L. Keough
Christopher L. Keough
  DC Bar No. 436567
Stephanie A. Webster
  DC Bar No. 479524
John M. Faust
  DC Bar No. 433553
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiffs

February 8, 2008

UNITED STATES DISTRICT COURT<br>
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CAPE COD HOSPITAL, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 07-1883 (RCL) |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, SECRETARY | ) | |
| United States Department of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS<br>
AS TO WHICH THERE IS NO GENUINE DISPUTE**

**I.    PARTIES**

1.    Plaintiffs are the following five non-profit hospitals that participate in the Medicare program:

a.    Cape Cod Hospital, Medicare provider number 22-0012 ("Cape Cod"), an affiliate of Cape Cod Healthcare, Inc.;

b.    Falmouth Hospital Association, Inc., doing business as Falmouth Hospital, Medicare provider number 22-0135 ("Falmouth"), an affiliate of Cape Cod Healthcare, Inc.;

c.    Flushing Medical Center, Inc., Medicare provider number 33-0193 ("Flushing"), an affiliate of Medisys Health Network, Inc.;

d.    Brookdale University Hospital Medical Center, Inc., Medicare provider number 33-0233 ("Brookdale"), an affiliate of Medisys Health Network, Inc.; and

e.    The Jamaica Hospital Medical Center Diagnostic and Treatment Center Corp., Medicare provider number 33-0014 ("Jamaica"), an affiliate of Medisys Health Network, Inc.

2.    Defendant Michael O. Leavitt (the "Secretary") is Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program.  References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

3.    The Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program.

## II.    MEDICARE PAYMENT FOR INPATIENT HOSPITAL SERVICES

4.    The Federal Medicare program provides health insurance to the aged, blind and disabled.  See 42 U.S.C. §§ 1395 *et seq.*

5.    Medicare Part A covers inpatient hospital services. See 42 U.S.C. §§ 1395d(a)(1).

### A.    Prospective Payment System (PPS)

6.    The Social Security Amendments of 1983 instituted a new prospective payment system for the operating costs of inpatient hospital services, referred to hereinafter as the "PPS." Pub. L. No. 98-21, § 601, 42 U.S.C. § 1395ww(d).  See Georgetown Univ. Hospital v. Bowen, 862 F.2d 323, 324 (D.C. Cir. 1988).

7.    Under PPS, Medicare pays prospectively-established rates for each patient discharge.  42 U.S.C. § 1395ww(d); see, e.g., 71 Fed. Reg. 47870, 47875-76 (Aug. 16, 2006) (final PPS rule for 2007).

8.    For the periods at issue, the PPS payment per discharge is based on a standardized amount, as adjusted by a wage index value reflecting labor costs in the hospital's area that is

applied to the labor-related share of the standardized amount. To determine payment, the wage-adjusted standardized amount is multiplied by a weighting factor determined by the Secretary for the diagnosis-related group ("DRG") assigned to the patient's illness or condition. See generally 71 Fed. Reg. at 47875-76.

**B.    Standardized Amount**

9.    The standardized amount is the base payment rate per discharge under the PPS. 42 U.S.C. § 1395ww(d)(3).

10.    The standardized amount is divided into a labor-related share and a nonlabor-related share. See 42 U.S.C. § 1395ww(d)(3)(E); 71 Fed. Reg. at 47876.

**C.    DRGs**

11.    The Secretary has established a system for classifying inpatient hospital discharges by DRGs and adjusting PPS payment rates to account for relative differences in resources required to care for patients in different DRGs. See 42 U.S.C. § 1395ww(d)(4); 71 Fed. Reg. at 47879 (describing DRGs for 2007).

12.    For example, for 2007, the Secretary established more than 500 DRGs, and assigned a weighting factor to each DRG. See 71 Fed. Reg. at 47879, 48167-203 (describing and listing the DRG weights applied for 2007).

**D.    Wage Index**

13.    The Secretary adjusts the labor-related portion of the standardized amount for differences in hospital wage levels by a factor reflecting relative hospital wage levels in different geographic areas. See 42 U.S.C. § 1395ww(d)(3)(E).

14.    To accomplish the relative wage-level adjustment, the Secretary calculates and assigns a wage index value to each hospital reflecting the relative wage levels in the hospital's geographic area. See 71 Fed. Reg. at 48005 (discussing the wage index for 2007), Plaintiffs'

Partial Administrative Record ("PAR")  585; 71 Fed. Reg. 59886, 59903-68 (Oct. 11, 2006), PAR 613, 615-80 (listing the wage indexes assigned to all hospitals for 2007).  For example, a hospital located in an area with hospital wage levels that are 25 percent in excess of the national average level would have a wage index of 1.25.

###### E.    <u>Wage Index Rural Floor</u>

15.    In 1997, Congress enacted legislation providing that the wage index for a hospital located in an urban area may not be less than the wage index for hospitals located in rural areas in the same State.  Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4410(a) ("BBA"), 42 U.S.C. § 1395ww note.  The 1997 legislation states, in part:

> (a)  IN GENERAL. –For purposes of section 1886(d)(3)(E) of the Social Security Act (42 U.S.C. 1395ww(d)(3)(E)) for discharges occurring on or after October 1, 1997, the area wage index applicable under such section to any hospital which is not located in a rural area . . . may not be less than the area wage index applicable under such section to hospitals located in rural areas in the State in which the hospital is located.

<u>Id.</u>

16.    The above-quoted provision, establishing what is referred to as the "rural floor," yields payments to some urban hospitals that are greater than the payments that otherwise would have been made to those hospitals.

17.    The rural floor is effective for all Federal fiscal years after the fiscal year ended September 30, 1997.  <u>Id.</u>

18.    The 1997 legislation also required the Secretary to adjust the PPS wage index to account for the effect of the rural floor.  BBA § 4410(b).  The statute states, in pertinent part:

> (b) IMPLEMENTATION. –The Secretary of Health and Human Services shall adjust the area wage index . . . in a manner which assures that the aggregate payments made under [the PPS] in a fiscal year for the operating costs of inpatient hospital services are not greater or less than those which would have been made in the year if this section did not apply.

Id.

19.     The above-quoted provision requires the Secretary to adjust the wage index as necessary to ensure that the rural floor is implemented in a budget neutral fashion, i.e., PPS payments "are not greater or less" than they would have been if there were no rural floor.

## III.     ERRORS IN THE PPS PAYMENT DETERMINATIONS AT ISSUE

### A.     Method Used to Calculate the Rural Floor Budget Neutrality Adjustment for 2007

20.     In establishing the PPS standardized amount for 2007, and for prior fiscal years, the Secretary adjusted the standardized amount downward to account for greater payments made to some hospitals due to the effect of the rural floor.  See 71 Fed. Reg. at 48145-47 (final rule for 2007), PAR 610-12; 70 Fed. Reg. 47278, 47491-93 (Aug. 12, 2005) (final rule for 2006); 69 Fed. Reg. 48916, 49273-75 (Aug. 11, 2004) (final rule for 2005); 68 Fed. Reg. 45346, 45474-76 (Aug. 1, 2003) (final rule for 2004); see also PAR 698-711.

21.     The rural floor budget neutrality adjustment for each fiscal year through 2007 was factored into the standardized amount that was carried over to and applied in subsequent years. See 71 Fed. Reg. at 48147, PAR 612 ("We do not remove the prior year's budget neutrality adjustments . . . for updated wage data"); 70 Fed. Reg. at 47492 (same); 69 Fed. Reg. at 49274 (same); 68 Fed. Reg. at 45475 (same).

22.     In establishing the standardized amount for 2007, and for prior fiscal years, the Secretary used a payment simulation model to determine each year's "budget neutrality" adjustment to the standardized amount to account for the effect of the rural floor.  See 71 Fed. Reg. at 48147, PAR 612; 70 Fed. Reg. at 47493; 69 Fed. Reg. at 49275; 68 Fed. Reg. at 45475-76.

23.     In the final rule for 2007, the Secretary described the simulation model and the calculation of the resulting "budget neutrality" adjustment as follows:

> [W]e used FY 2005 discharge data to simulate payments and compared aggregate payments using the FY 2006 relative weights and <u>wage indexes</u> to aggregate payments using the FY 2007 relative weights and <u>wage indexes</u>.  The same methodology was used for the FY 2006 budget neutrality adjustment.
>
> . . . These budget neutrality adjustment factors are applied to the standardized amounts without removing the effects of the FY 2006 budget neutrality adjustments.

71 Fed. Reg. at 48147, PAR 612 (emphasis added).

24.     The Secretary provided similar descriptions of the simulation model and the calculation of the resulting budget neutrality adjustment for the effect of the rural floor in the preambles to the final PPS rules for prior fiscal years subject to the rural floor.  <u>See</u> 70 Fed. Reg. at 47493; 69 Fed. Reg. at 49275; 68 Fed. Reg. at 45475-76; <u>see also</u> PAR 698-711.

25.     More detail regarding the method that was used to calculate the budget neutrality adjustment for the effect of the rural floor was communicated by CMS to a hospital consultant in a May 3, 2006 email message regarding the proposed PPS rule for 2007.  PAR 579-80.

26.     On May 3, 2006, the consultant, Theodore Giovanis, sent an email to Marc Hartstein (of CMS' Division of Acute Care), inquiring about the calculation of budget neutrality in determining PPS rates.  PAR 579-80.

27.     Another CMS staff member, Nora Fleming, responded to Giovanis' email on May 3, 2006.  <u>Id.</u>  Fleming's response said that the payment simulation model used to compute the budget neutrality adjustment for the effect of the rural floor compares simulated payments derived by applying an updated standardized amount first to "the <u>old wage data with no floor applied</u>" and then to "the <u>new wage data with the rural floor applied</u>."  <u>Id.</u>  (Emphasis added.)

- 6 -

28. Giovanis replied to Fleming's May 3, 2006 email message later that same day, raising a concern that the calculation method described in Fleming's email results in duplicating adjustments to the standardized amount for effect of the rural floor. Id.

29. Neither Fleming nor Hartstein replied to Giovanis' May 3, 2006 email expressing concern about the apparent duplicating effect of the method used to calculate the rural floor budget neutrality adjustment to the standardized amount. Id.

**B.    2007 Rulemaking**

30. Comments on the proposed PPS rule for 2007 were allowed through June 12, 2006. 71 Fed. Reg. 23996 (Apr. 25, 2006), PAR 577.

31. In a letter that was hand-delivered to CMS on June 9, 2006, within the period allowed for comments on the proposed rule for 2007, Giovanis submitted a comment on the proposed rule for 2007. PAR 581-83.

32. The June 9, 2006 comment letter (PAR 581-83) was properly addressed to CMS as provided in the Secretary's notice of the proposed PPS rule for 2007. 71 Fed. Reg. at 23996, PAR 577.

33. Copies of the June 9, 2006 comment letter were sent to both Hartstein and Fleming, PAR 581-83, and CMS acknowledged receipt of the letter. Id.

34. The June 9, 2006 comment letter notified CMS that its calculation of the budget neutrality adjustment for the effect of the rural floor is erroneous and has a negative effect on all hospitals subject to the PPS, stating in pertinent part:

> Based on information recently provided to us by CMS staff, we have leaned that each year CMS uses payment variables (including the [rural floor area wage indexes]) for the rural floor [budget neutrality] adjustment that measure the total annual estimated effect of the application of the rural floor, not the incremental year to year change of the rural floor impact. This would be appropriate if, in applying the current year's rural floor [budget neutrality] adjustment, CMS backed out of the calculation the prior year's rural floor [budget neutrality]

adjustment.  CMS does not do this, however, and instead permanently locks in the rural floor [budget neutrality] adjustment into the standardized amount.  As a result, most of the rural floor [budget neutrality] adjustment is improperly duplicated each year, with compounding effect.  This duplication over-adjusts the standardized amount for the effect of the rural floor, and has the effect of improperly lowering payments to all hospitals through a [budget neutrality] adjustment that is too large.

PAR 581-82.

35.    The June 9, 2006 comment letter requested that CMS remedy the above-described error in the final PPS rule for 2007.  PAR 582.

36.    CMS never responded to Giovanis about the problem discussed in his June 9, 2006 comment letter.

37.    The Secretary published notice of a final rule for 2007 in the Federal Register on August 18, 2006.  See 71 Fed. Reg. 47870-48434.

38.    The final rule for 2007 neither acknowledged nor addressed Giovanis' June 9, 2006 comment letter nor the error alleged and described in that comment.  See 71 Fed. Reg. 47870-48434.

39.    On October 11, 2006, the Secretary published notice in the Federal Register of the Secretary's determination of the final PPS payment rates for 2007.  71 Fed. Reg. 59886, PAR 613.

40.    The October 11, 2006 notice neither acknowledged nor addressed Giovanis' June 9, 2006 comment letter nor the error alleged and described in that letter.  See 71 Fed. Reg. 59886-60043.

41.    Nothing in the August 18, 2006 final rule or in the October 11, 2006 notice of the final PPS rates for 2007 reflects that the Secretary changed the method, described in Fleming's May 3, 2006 email, that CMS used to calculate the rural floor budget neutrality adjustment or

corrected the error identified in the June 9, 2006 comment letter in calculating the final PPS payment rates for FFY 2007.

### C.    Error in the Determination for 2007

42.    The Secretary has said that for 2007 and prior years, his agency accounted for the effect of the wage index rural floor through a "cumulative" adjustment to the standardized amount.  72 Fed. Reg. at 47330, 47130 (Aug. 22, 2007), PAR 766.

43.    Properly applied, in the first year of the rural floor, a cumulative adjustment to the standardized amount should reduce that base payment rate by an amount corresponding to the total projected increase in payment that otherwise would have resulted from the application of the rural floor.  For subsequent years, the adjustment should account only for the incremental change in the effect of the floor from one year to the next since the starting point, the prior year's standardized amount, already reflects the impact of the rural floor in the prior year.  Id. at 47329, PAR 765.

44.    Because the Secretary calculated the rural floor budget neutrality adjustment for 2007 using the method described in Fleming's May 3, 2006 email to Giovanis, the Secretary's adjustments for those years reduced the standardized amount by an amount reflecting the full effect of the rural floor for each year, and not just the incremental change in the effect of the floor from year to year.  See PAR 50-56.  As a result, each adjustment made for a year after the first year to which the rural floor applied duplicated prior-period adjustments made for effect of the rural floor in prior years.  Id.

45.    The Secretary's budget neutrality adjustment for 2007, therefore, results in aggregate PPS payments that are less than those which would have been made in the year if the rural floor did not apply.

### D. Proposed Change in Implementation for 2008

46.     On May 3, 2007, the Secretary published notice in the Federal Register of a proposed PPS rule for 2008.  72 Fed. Reg. 24680, PAR 681.

47.     In the proposed rule for 2008, the Secretary proposed a change in the agency's implementation of the budget neutrality requirement with respect to the wage index rural floor for 2008 and subsequent years.  72 Fed. Reg. at 24787-93, PAR 682-88.

48.     The proposed rule would implement the rural floor budget neutrality adjustment through an annual adjustment to the wage index, not through an adjustment to the standardized amount as in prior years.  Id. at 24791-92, PAR 686-87.

49.     The proposed rule did not state a reason for, or the purpose of, the proposed change in the method for implementing the rural floor budget neutrality requirement for 2008 and subsequent years.  Id. at 24787-93, PAR 682-88.

50.     The proposed rule did not expressly acknowledge any error in the method that CMS used to implement the rural floor budget neutrality requirement in the PPS rules for fiscal years prior to 2008.  Id.

51.     The proposed rule said that CMS would make a positive adjustment to the standardized amount, which was labeled as a "Rural Floor Adjustment."  Id. at 24839, PAR 689.

52.     The proposed rule provided no explanation of the basis for, or purpose of, the proposed "Rural Floor Adjustment" to the standardized amount, nor for the relationship, if any, between that proposed adjustment to the standardized amount and the proposed change in the method for implementing the rural floor budget neutrality requirement.  See id.

### E. Comments on Proposed Rule for 2008

53.     The Secretary accepted comments on the proposed PPS rule for 2008 through June 12, 2007.  72 Fed. Reg. at 24680, PAR 681.

- 10 -

54.    Within the period allowed for comments on the proposed rule, the plaintiffs' counsel sent a letter dated May 21, 2007 to Hartstein, who was at the time the Deputy Director of CMS' Division of Acute Care, specifically requesting detailed information about:  (i) the basis and purpose of the agency's proposed change in the method for implementing the rural floor budget neutrality requirement for 2008 and subsequent years; (ii)  the data and data variables that would be used to compute the adjustment to the wage index under proposed method; (iii) the basis and purpose of the proposed "Rural Floor Adjustment" to the standardized amount for 2008; (iv)  the rural floor budget neutrality adjustments that had been made to the standardized amounts for prior fiscal years; and (v)  the data and data variables that had been used to calculate those prior-year adjustments to the standardized amount.  PAR 690-711.

55.    The May 21, 2007 letter to Hartstein and the accompanying attachments to that letter explained that the proposed rule for 2008 and the final PPS rules for prior years did not provide sufficient information to afford hospitals with adequate notice of, or a meaningful opportunity to comment on, the Secretary's proposed change in implementation of the rural floor budget neutrality requirement.  PAR 690-711.

56.    Hartstein replied to the request for additional information by letter dated June 1, 2007.  PAR 712.

57.    Hartstein's reply declined to provide further information.  PAR 712.

58.    By letter dated June 11, 2007, plaintiffs' counsel timely submitted further comments on the proposed PPS rule for FFY 2008.  PAR 713-42.

59.    The June 11, 2007 comment letter was properly addressed to CMS as provided in the Secretary's notice of the proposed rule for 2008.  See PAR 713.

60.    The June 11, 2007 comment letter (PAR 713-42) stated, <u>inter alia</u>:

a.    CMS should explain the basis, purpose and reason for the proposed change in implementation of the rural floor budget neutrality requirement;

b.    CMS should disclose known errors in the agency's prior calculations of the rural floor budget neutrality adjustment and identify the impact of those errors on the current standardized amount that would applied under the final rule for 2008;

c.    The proposed change would not fix problems for prior, current or future fiscal years stemming from errors in CMS' prior calculations of the rural floor budget neutrality adjustments to the standardized amounts in prior years;

d.    CMS should explain the basis, purpose and calculation of the proposed "Rural Floor Adjustment" that would increase the standardized amount by 0.2214 percent for 2008;

e.    The proposed "Rural Floor Adjustment" appeared too low to properly and fully account for, and restore, prior-period adjustments that were taken out of the standardized amount for the effect of the rural floor for more than one year; and

f.    CMS should correct the standardized amount for the effects of known errors in its calculation of the rural floor budget neutrality adjustment in prior-periods and pay affected hospitals the additional sums due as result of such correction.

## F.    Final Rule for 2008

61.    On August 1, 2007, the final PPS rule for 2008 was posted on the CMS website. <u>See</u> PAR 254-55, 276-296. The rule was published in the Federal Register on August 22, 2007. 72 Fed. Reg. 47130, PAR 743.

62.    The preamble to the final PPS rule for 2008 states that CMS applied the rural floor budget neutrality adjustment to the wage index. 72 Fed. Reg. at 47330, PAR 766.

- 12 -

63.    The preamble to the final rule for 2008 also states that the rural floor budget neutrality adjustment to the wage index is non-cumulative, 72 Fed. Reg. at 47330, PAR 766, meaning that the adjustment made to the wage index for 2008 accounts for the full effect of the rural floor for 2008 (as compared to no floor) and not just the additional incremental effect of the floor from 2007 to 2008.  See id. at 47329, PAR 765 (example of calculation of the budget neutrality adjustment to the wage index for the effect of the rural floor as applied to three hypothetical hospitals).

64.    The preamble to the final PPS rule for 2008 acknowledged that "[m]any commenters requested additional information as to the purpose" of the proposed change in implementation of the rural floor budget neutrality adjustment.  72 Fed. Reg. at 47330, PAR 766. The preamble, however, does not state the basis, purpose, or reason for the proposed change in implementation of the rural floor budget neutrality requirement.  See id.

65.    The preamble to the final PPS rule for 2008 acknowledged the June 11, 2007 comment, PAR 713-42, that the methodology for applying the rural floor budget neutrality adjustment for prior years was flawed because it created an "inappropriate duplicating effect" to be "permanently built into the standardized amount."  72 Fed. Reg. at 47330, PAR 766.  The preamble indicates that the comment letter attributed the problem not to the use of the wrong data variables in the method that had been applied by CMS to calculate the prior rural floor budget neutrality adjustments, as was stated in the comment letter (see PAR 766), but to the fact that the prior adjustments to the standardized amount were "cumulative" adjustments that were not reversed before the next year's adjustment is made.  72 Fed. Reg. at 47330, PAR 766.

66.    Concerning errors in the prior calculations of the "cumulative" budget neutrality adjustments that were made to the standardized amount, the preamble to the final rule for 2008 stated:

> With regard to alleged errors in FYs 1999 through 2007, our calculation of budget neutrality in past fiscal years is not within the scope of this rulemaking. Even if errors were made in prior fiscal years, we would not make an adjustment to make up for those errors when setting rates for FY 2008.

72 Fed. Reg. at 47330, PAR 766.

67.    The preamble to the final rule for 2008 neither acknowledged nor addressed the comment, PAR 713-42, that the proposed change in implementation of the rural floor budget neutrality requirement would not fix problems for prior, current or future fiscal years stemming from errors in CMS' prior calculations of the rural floor budget neutrality adjustments to the standardized amounts in prior years.  See 72 Fed. Reg. at 47330, PAR 766.

68.    The preamble to the final rule for 2008 stated that "the one-time 1.002214 adjustment [to the standardized amount for 2008] is meant to address a single year transition to a noncumulative system of budget neutrality adjustment."  72 Fed. Reg. at 47330, PAR 766.

69.    An addendum to the rule states that the one-time Rural Floor Adjustment to the standardized amount for 2008 (0.2214%) "removes the effect of the budget neutrality adjustment applied in FY 2007 to the standardized amount for application of the rural floor."  Id. at 47421, PAR 781.

70.    Neither the preamble nor the addendum to the final rule addresses why the Secretary chose to restore the effect of only the prior year's adjustment to the standardized amount for 2008, and not to fully account for, and restore, all prior-period amounts that were taken out of the standardized amount to account for the effect of the rural floor in all prior years.  See 72 Fed. Reg. at 47330, 47421, PAR 766,781.

G.     **Corrected Rule for 2008**

71.     On October 10, 2007, the Secretary published a rule correcting the rates previously established through the final PPS rule for 2008.  72 Fed. Reg. 57634, PAR 785.

72.     The correction notice states that revision to the 2008 rates was necessary to rectify errors made in calculating the rates for two particular categories of hospitals called sole community hospitals and Medicare-dependent hospitals.  Id.

73.     Through the October 10, 2007 correction notice, the Secretary modified the 2008 standardized amount and the 2008 rural floor budget neutrality adjustment.  See 72 Fed. Reg. at 48162-63, 48165, PAR 782-84; 72 Fed. Reg. at 57635, 57734, PAR 786-87.

74.     The October 10, 2007 correction notice does not claim to have changed the method used to calculate the rural floor budget neutrality adjustment as described in the final rule that was published in the Federal Register on August 22, 2007.  See 72 Fed. Reg. at 57634-738.

H.     **Error in the Final Determinations for 2008**

75.     Because budget neutrality adjustments to the standardized amount for fiscal years before 2007 were not reversed, and amounts that were taken out of the standardized amount before 2007 were not restored to the standardized amount through the positive Rural Floor Adjustment to the standardized amount for 2008, see 72 Fed. Reg. at 47421, PAR 781, the standardized amount determined by the Secretary for 2008 is lower than the standardized amount that would be applied for 2008 if the rural floor had never been established.  See PAR 317-36.

76.     Because the rural floor budget neutrality adjustment to the wage index for 2008 accounts for the full effect of the rural floor for 2008, 72 Fed. Reg. at 47329-30, PAR 765-66, that adjustment duplicates the rural floor budget neutrality adjustments that were taken out of the standardized amount for fiscal years prior to 2007, which were not added back to the

standardized amount through the positive Rural Floor Adjustment to the standardized amount for 2008. 72 Fed. Reg. at 47421, PAR 781.

77.    As a result of that duplication, aggregate PPS payments made for discharges in 2008, and all subsequent years, are, and will be, less than aggregate payments that would be made for discharges in all those years if the rural floor had never been established. See PAR 317-36.

## IV.    PROCEEDINGS BELOW

### A.    Plaintiffs' Appeals for 2007

78.    Cape Cod and Falmouth filed a group appeal to the PRRB from the Secretary's final determination of the PPS payment rates for 2007 by letter dated January 25, 2007. PAR 1-14. The PRRB acknowledged that appeal and assigned it PRRB case number 07-0705G. PAR 15-16. That appeal was timely filed within 180 days of the Secretary's publication of notice in the Federal Register on October 11, 2006 of the Secretary's final determination of PPS payment rates for 2007. PAR 1-14. The appeal stated an amount in controversy substantially in excess of $50,000. Id.

79.    Flushing, Brookdale, and Jamaica filed a group appeal to the PRRB from Secretary's final determination of the PPS payment rates for 2007 by letter dated January 26, 2007. PAR 115-28. The PRRB acknowledged that appeal and assigned it PRRB case number 07-0729G. PAR 129-30. That appeal was timely filed within 180 days of the Secretary's publication of notice in the Federal Register on October 11, 2006 of the Secretary's final determination of PPS payment rates for 2007. PAR 115-28. The appeal stated an amount in controversy substantially in excess of $50,000. Id.

80.    On July 27, 2007, each of the plaintiff hospitals submitted requests to the PRRB in case numbers 07-0705G and 07-0729G for expedited judicial review of the validity of the

determination of the Secretary in the final PPS rule for 2007 of the rural floor budget neutrality adjustment and the standardized amount for 2007. PAR 17-105, 131-243.

81.     By letter dated August 24, 2007, PAR 106-14, the PRRB denied the requests for expedited judicial review in PRRB case numbers 07-0705G and 07-0729G, concluding that the Board "lacks jurisdiction over the appeal [sic] because review of budget neutrality adjustments is precluded by statute and regulations." PAR 108-11.

82.     The five hospitals in PRRB case numbers 07-0705G and 07-0729G timely commenced this action within 60 days of the Board's August 24, 2007 determination pursuant to 42 U.S.C. § 1395oo(f)(1).

**B.     Appeals for 2008**

83.     Cape Cod and Falmouth timely filed a group appeal to the PRRB from the Secretary's final determination of the PPS payment rates for 2008 by letter dated August 15, 2007. PAR 253-61. The PRRB acknowledged that appeal and assigned it PRRB case number 07-2562G. PAR 426-27. That appeal was timely filed within 180 days of the Secretary's final determination of the PPS payment rates for 2008, which were posted on the CMS website on August 1, 2007. PAR 253-61. The appeal stated an amount in controversy substantially in excess of $50,000. Id.

84.     On August 15, 2007, Cape Cod and Falmouth submitted a request in case number 07-2562G for expedited judicial review of the validity of the determination of the Secretary in the final PPS rule for 2008 of the standardized amount, the positive Rural Floor Adjustment to the standardized amount, and rural floor budget neutrality adjustment to the wage index for 2008. PAR 253-425.

85.     By letter dated September 12, 2007, the PRRB denied the request for expedited judicial review in PRRB case number 07-2562G, concluding that the Board "lacks jurisdiction

- 17 -

over the appeal because review of budget neutrality adjustments is precluded by statute and regulations." PAR 428-36.

86.     The hospitals in PRRB case number 07-2562G timely commenced this action within 60 days of the Board's September 12, 2007 determination pursuant to 42 U.S.C. § 1395oo(f)(1).

87.     By letter dated November 6, 2007, Cape Cod and Falmouth timely filed a group appeal to the PRRB from the Secretary's October 10, 2007 notice of his corrected determination of the PPS rates for 2008.  PAR 437-565.  That appeal was assigned PRRB case number 08-0184G.  PAR 566-67.  The appeal stated an amount in controversy substantially in excess of $50,000. Id.

88.     On November 6, 2007, Cape Cod and Falmouth submitted a request in case number 08-0184G for expedited judicial review of the validity of the Secretary's corrected determination of the PPS rates for 2008.  PAR 437-565.

89.     By letter dated November 28, 2007, the PRRB denied the request for expedited judicial review in PRRB case number 08-0184G, concluding that the Board "lacks jurisdiction over the appeal because review of budget neutrality adjustments is precluded by the statute and regulations." PAR 568-76.

90.     Pursuant to 42 U.S.C. § 1395oo(f)(1), the hospitals timely challenged the Board's November 28, 2007 determination by amending the complaint in this action within 60 days of the Board's determination.

Respectfully Submitted,


_____/s/_____

Christopher L. Keough
  DC Bar No. 436567
Stephanie A. Webster
  DC Bar No. 479524
John M. Faust
  DC Bar No. 433553
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiffs

Dated: February 8, 2008

# Exhibit 1

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

AUG - 3 2004

Christopher L. Keough, Esquire
Vinson & Elkins LLP
The Willard Office Building
1455 Pennsylvania Avenue, NW
Washington, DC 20004

Stephanie Webster, Esquire
Powers, Pyles, Sutter & Verville, P.C.
Twelfth Floor
1875 Eye Street, N.W.
Washington, DC 20006-5409

Re:  Baystate Medical Center, PRRB Case Nos. 96-1822, 87-1579

Dear Mr. Keough & Ms. Webster:

Enclosed is a copy of the Administrator's order in the above case.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

Cc:  Mr. Terry Gouger, Intermediary's Representative
     Michael G. Gallagher, Esquire, SSA OGC
     Susanne Cochran, Esquire, PRRB Chairman
     Office of the General Counsel, CMS Division, DHHS
     Center for Medicare Management, CMS

6640

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Order of the Administrator*

In the case of:

BAYSTATE MEDICAL
CENTER

|                                    | Review of: Request to
Enforce Board's Subpoena
Orders |

                **Provider**

   vs.

MUTUAL OF OMAHA

               **Intermediary**

PRRB Case Nos. 96-1822,
97-1579, 98-1827, 99-2061

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the Provider Reimbursement Review Board's May 28 2004 decision to request that the Office of the General Counsel (OGC) Department of Health and Human Services (DHHS) enforce the Board's June 5, 2003 and February 7, 2002 administrative subpoenas. The review is during the 60-day period in Section 1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)) and 42 CFR 405.1875.

<u>BACKGROUND AND ISSUES</u>

By notice dated May 28, 2004, the Board considered the Provider's request for expedited judicial review (EJR) with respect to the following question of law:

> Whether the [Social Security Administration (SSA)] should be compelled, subject to an appropriate protective order, to produce the [Social Security Income (SSI)] eligible data described in the Board's subpoenas to SSA in order to give effect to the provider's due process rights under 42 USC 1395oo in connection with the appeals pending before the Board for the Provider's fiscal years 1993 through 1996.

6641

2

The Provider asserted that it met the requirements of 42 CFR 405.1842(d)(2) and Section 1878(f)(1) of the Social Security Act (42 USC 1395 (f)(1)) for EJR of this issue. The Provider maintained that, while the statute and regulation empowered the Board to issue subpoenas, the Board cannot issue compulsory process or impose any penalty for refusal to comply. Rather, the statute authorizes the Board to file an action for enforcement of its subpoena in Federal district court under sections 205(d) and (e) of the Social Security Act. (42 USC 405(d) and (e))

The Board denied the Provider's request as the Board had not formally sought enforcement of its June 5, 2003 subpoena. However, the Board stated that it would now request to have the Office of the General Counsel/DHHS enforce both the February 7, 2002 and June 5, 2003 administrative subpoenas.

The Office of General Counsel, CMS Division/DHHS, submitted comments to the Administrator, dated June 2, 2004, stating that the decision to seek judicial enforcement of a PRRB administrative subpoena rests with the Administrator. By letter dated June 8, 2004, the Provider objected to the Office of General Counsel's comments, stating that the Board has its own subpoena power, separate from the Secretary, but has suggested that the Administrator could facilitate a resolution of this issue.[1]

The Board subsequently issued a notice, dated June 21, 2004, setting out the history of the subpoena enforcement attempts and the legal requirement for enforcement of a subpoena. The Board cited to <u>Powell v. United States</u>, 379 U.S. 48, 57-58 (1964). The court set out three requirements for the enforcement of administrative subpoenas. An administrative agency must prove that: 1) the investigation will be conducted pursuant to a legitimate purpose and the inquiry may be relevant to the purpose, 2) the information sought is not already in the agency's possession; and 3) the administrative steps required by the agency issuing the subpoena have been followed. The Board concluded that the information sought and the procedures followed met the foregoing requirements.

The Board also found that its discovery orders were final, under 42 CFR 405.1853(b). In addition, there was no authority in the statute, or regulations, for the Administrator to block evidence from being sought or presented that the Board had determined was essential to a matter in dispute. This authority, coupled with the inherent conflict of interest in the Office of General Counsel's representation of both the Board and CMS' interest, should weigh heavily in favor of honoring the Board's legitimate request.

---

[1] The Provider also objected that the Administrator cannot review an EJR decision, however, the Administrator has limited his review to the subpoena order.

6642

The Board also concluded that failure to assist the Board in enforcement of its subpoena was also inconsistent with judicial economy as any court remand would likely be required to permit full development of the case after the evidence was obtained. Thus, the Board requested the Office of General Counsel's enforcement of the subpoenas of June 5, 2003 and February 7, 2002. The Board requested that action be taken by July 6, 2004, or that the Board be notified in writing of the Office of General Counsel's refusal to do so.

The parties were notified of the Administrator's intention to review the Board's request for enforcement of the subpoenas by notice dated July 1, 2004. As the facts presented were a matter of first impression, comments were requested addressing the following:

1) Whether the decision to seek judicial enforcement of a PRRB administrative subpoena rests with the Administrator, acting on behalf of the Secretary.
2) Whether the Administrator should seek enforcement of the PRRB's June 5, 2003 and February 7, 2002 administrative subpoenas.
3) Whether, pursuant to Section 1878(d) of the Social Security Act, the PRRB has the authority to subpoena a Federal government agency such as the Social Security Administration (SSA); in particular, whether sovereign immunity precludes the enforcement of such administrative subpoenas against SSA, including whether, if applicable, there has been any waiver of sovereign immunity.
4) Whether the words "individual" and "person" referenced in Section 205(d) and (e) of the Social Security Act, intends to include the "sovereign" and, by way of extension, a Federal agency, or whether such language precludes the sovereign and, thus, enforcement of a subpoena against a Federal agency, such as SSA.
5) Whether the United States Attorney General would play any role in the enforcement/defense of any administrative subpoena.
6) If SSA may be subject to an administrative subpoena pursuant to Section 205 and 1878(d) of the Act, under what standard would the enforcement of the administrative subpoenas be reviewed. Please discuss whether that standard has been met in light of SSA's arguments regarding the Privacy Act, Section 1106 of the Social Security Act and SSA's Touhy regulations.
7) Suggestions on how his matter may be resolved through an administrative resolution.

## COMMENTS

The Provider commented, stating first that the dispute could be resolved through a simple proposal that both the Provider and SSA have agreed would be acceptable.

4

The Provider asserted, with respect to the merits of the subpoena, that CMS' calculations are systemically understated because the calculations were based on "contaminated" MEDPAR records that incorrectly excluded "stale" SSI entitlement records. The Provider's data match proposal would require CMS to perform a new match of updated (and corrected) inpatient hospital stay records from SSA. The match of records would be run on alternative matching criteria using identifiers that the Provider has offered to supply and would be performed by an independent third-party contractor of CMS.

Further, the Provider, responding to the issues raised in the Administrator's notice of review, argued that the Administrator lacks the authority to determine whether to seek judicial enforcement of the Board's subpoenas. The Provider stated that the statute and implementing regulations do not grant the Secretary or Administrator jurisdiction to review a Board decision to initiate judicial action to enforce a Board subpoena. Congress granted the Secretary only limited jurisdiction to view a "final" decision of the Board. The Board's decision to seek enforcement of a subpoena is "interlocutory in nature" and therefore is not subject to immediate review by the Administrator. Thus, the decision whether to seek judicial enforcement of the Board's subpoenas rests exclusively with the Board, not with the Secretary or the Administrator.

Moreover, the Provider argued that the Department of Justice (DOJ) need not play a role in the enforcement of an administrative subpoena issued by the Board. The Provider claimed that the Board's statutory subpoena authority falls into the first enforcement category as described by DOJ; namely, statutes authorizing an agency official to apply directly to a Federal court for enforcement. Thus, the Provider concluded that the Board has sole discretion to decide whether to seek enforcement of its subpoenas without interference from the Administrator. The Provider further stated that the Board's subpoenas for essential records would be enforced. The Provider pointed out that, without the subpoenaed records, the Board could not develop a complete administrative record on the errors in CMS' calculation of the Provider's SSA percentages. Thus, there should be no doubt that the subpoenas would be enforced by a Federal court.

In addition, the Provider argued that sovereign immunity would not preclude enforcement of the Board's subpoenas issued to the Commissioner of SSA. The Provider stated that its position is clear from the Board's subpoena authority as reflected in the regulation, the statute, decisions of Courts regarding sovereign immunity under the Administrative Procedure Act, 5 USC 702. The Provider also stated that regarding the use of the word "person" or "individual" in the statute, that issue is moot as such terms are absent from the regulation at 42 CFR 405.1857. The Provider stated that CMS' interpretation of the Board's statutory subpoena power, reflected both in the existing regulation and the proposed

6644

5

clarifications attaches no significance to the term "individual" or "person" as it is used in the statute. The statutory source of the Board's subpoena power governs provider reimbursement appeals. Under the relevant statute, a provider is the only party that is granted procedural due process rights and grants "the provider" the right to "introduce evidence" and to "examine and cross-examine witnesses." Further, to give effect to those rights, the statute also grants the Board "full power and authority to make rules and establish procedures." Congress has also granted the Board the power to issue subpoenas for the production of relevant and material evidence. Thus, it is inconceivable that Congress intended to preclude the Board from issuing a subpoena compelling a Federal agency, such as SSA or CMS, from producing relevant and material evidence.

The Provider stated that SSA's current objections would not prevent judicial enforcement of the Board's subpoenas. The Provider maintains that SSA's Touhy regulation does not apply to agency requests for records without testimony. Instead SSA's regulations implementing the Privacy Act and Section 1106 of the Social Security Act and the Freedom of Information Act (FOIA) govern the request. The Privacy Act permits disclosure of otherwise protected records pursuant to the order of a court of competent jurisdiction. 5 USC 552a(b)(11). The Provider also maintained that, neither the Privacy Act, nor the exemption 6 of the FOIA, relieve SSA of its obligation to produce the subpoenaed records in the first place especially with respect to the Provider's now deceased patients. Likewise, if the SSA Commissioner is a party to a court order proceeding, the FOIA and Privacy requirements are met for release of the information. In sum, the Provider concluded that notwithstanding any invocation of SSA rules governing release of agency records, an action to enforce the Board subpoenas would allow the Provider to obtain the "essential" evidence pertinent to the matter is dispute.

CMS' Centers for Medicare Management (CMM) Division of Acute Care (hereafter referred to as CMM) commented, responded to the Administrator's notice of review. CMM argued that a reading of the relevant Board statute to permit the Board to enforce a subpoena and limit the Administrator's interference with such enforcement is anomalous given the Administrator's role as the Secretary's designee as the final authority on Medicare matters. That the Administrator may reverse a Board decision on the merits, but must stand by while the Board sought enforcement action that the Administrator may believe was inconsistent with the law contravenes the well-established principle that the Administrator, on review of Board actions, has all the powers that he would have in making the initial decision. Thus, CMM concluded that it is reasonable to read the statute as providing that the Board has the right to seek enforcement of its subpoenas provided that the Secretary through the Administrator agrees that enforcement should be sought. However, CMM explained that, even if the statute

6

allowed the Board to bypass the Secretary to enforce a subpoena, such enforcement effort would have to proceed through the Department of Justice.

Moreover, the CMM argued that the Administrator should not seek enforcement of the Board's subpoenas to SSA. Based on the principles of sovereign immunity, the statutory subpoena authority does not extend to compelling the production of information by other Federal agencies.   In addition, case law supports the argument that waivers of sovereign immunity are to be construed narrowly.  A waiver cannot be implied, but must be unequivocally expressed.  In this case, there is no indication in the statutory language that Congress intended to make the United States or one of its agencies a defendant in an action to enforce a subpoena.  The fact that the party seeking to enforce the subpoena would be a Federal agency makes it even more unlikely that Congress intended to waive sovereign immunity in section 205(e) of the Act.

CMM also noted that the use of the words "individual" and "person" in the statute reinforces its argument that the subpoena and enforcement authority does not extend to SSA. Case law generally defines the term person as not including the sovereign.  The CMM also stated that the DOJ should be involved in any case in which enforcement of a subpoena is contemplated, especially if that action is taken against another Federal agency.

CMM argued that if the Administrator finds that the Board generally has authority to issue subpoenas to SSA, the Administrator should remand the case to the Board for further explanation as to why the Board believes that SSA has the authority to comply with the subpoenas in this case.  In addition, the CMM noted that the Administrator should remand for a Board finding as to whether the information is unavailable by other means and is reasonably necessary for the full presentation of the case.  CMM concluded that, SSA's position that it does not have the authority to release the subpoenaed information, pursuant to statute and its regulations, appears correct.

Finally, the CMM argued that there seems to be little purpose in engaging in the proposed data match, based on the evidence to date in this case.  Although the Provider has received thousands of records from SSA, the Provider has claimed only a minuscule discrepancy between the number of SSA/Medicare days that appear on the MEDPAR and the additional days that the Provider claims are associated with patients who were entitled to SSI during their stays. [2]

---

[2] The Provider submitted two further sets of comments requesting that CMM's comments be struck, inter alia, because they were untimely; they were not requested; and the statements contained therein on the merits of the Provider's document request were inaccurate.  The Administrator first notes that the

6646

SSA, as an interested party, also commented. SSA, referring to an attached letter, stated that it believed that the contents of the subject letter may facilitate a resolution in this matter. SSA explained that the letter described a business solution whereby SSA would provide certain data to CMS if certain conditions were met.

## DISCUSSION AND EVALUATION

The record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments timely received have been considered and included in the record.

The initial issue is whether the decision to seek judicial enforcement of a PRRB administrative subpoena rests with the Administrator, acting on behalf of the Secretary. This issue may be addressed pursuant to the Administrator's general authority to administer the Medicare program pursuant to the delegation of the Secretary's general authority under Title XVIII or the authority set forth at section 1878 of the Act and 42 CFR 405.1875.

The Secretary of the Department of Health and Human Services has delegated to the Administrator of CMS the general authority to administer Title XVIII.[3] The

---

comments are presumed to have been submitted within the 15 day time period. Unlike the Provider's and the Intermediary's notice of review which is sent to the named representatives, as CMM is a large organization with varied responsibilities, CMM's copy is not sent via facsimile, but rather a hard copy is sent internally, for which a one day receipt is reasonable. If the 15th day falls on a non-working day, the comments would be due the first Federal work day. CMM's submission of comments would also be consistent with the procedures set out under 42 CFR 405.1875 allowing CMM to submit comments, although CMM receives notice that the Administrator will review only as a "cc" to the provider and intermediary's letter. This notice indicates that only SSA and the PRRB were being sent "courtesy copies." The Provider does not object to SSA's submission. Finally, generally, only privileged information is struck or redacted from the record, such as patient identifiers. Thus, regarding CMM's comments, the Administrator will include them in the record as they do not contain privileged information, however, they may be evaluated for relevancy in light of the Provider's motion challenging their accuracy and fairness. All substantive comments and communications from the Provider, CMM, and SSA are included in the administrative record.

[1] See e.g. 42 Fed. Reg. 13262 (March 9, 1977) "Department of Health, Education, and Welfare, Health Care Financing Administration: Statement of Organization,

8

Secretary has not published any limitations on the delegations from the Secretary to review or issue subpoenas. With respect to the Secretary's authority, Section 1872 of the Act provides that:

> The provisions of sections 206 and 216(j), and of subsections (a), (d), (e), (h), (i), (j), (k) and (l) of section 205 shall also apply with respect to this title, to the same extent as they are applicable with respect to Title II, except that in applying such provisions with respect to this title, any reference therein to the Commissioner of Social Security or the Social Security Administration shall be considered a reference to the Secretary or the Department of Heath and Human Services, respectively.

Section 205 of the Act states in pertinent part that:

> (d) For purpose of any hearing, investigation, or other proceeding authorized or directed under this title, or relative to any matter within the [Secretary's] jurisdiction, hereunder, the [Secretary] shall have the power to issue subpoena's requiring the attendance and testimony of witnesses and production of any evidence that relates to any matter under investigation or in question before the [Secretary] .....Subpoenas of the [Secretary] shall be served by anyone authorized by the [Secretary] (1) by delivering a copy thereof to the individual named therein, or (2) by registered mail or certified mail addressed to such individual at his dwelling place or principal place of business. A verified return by the individual so serving the subpoena setting forth the manner of service, or, in the case of service by registered or certified mail, the return post-office receipt therefore served, shall be proof of service.....

> (e) In case of contumacy by, or refusal to obey a subpoena duly served upon, any person, any district court of the United States for the judicial district in which said person charged with contumacy or refusal to obey is found or orders or transacts business, upon application by the [Secretary], shall have jurisdiction to issue an order requiring such person to appear and give testimony, or to

---

Function and Delegations of Authority"; 42 Fed. Reg. 3071 (June 29, 1977); 42 Fed. Reg. 57351 (Nov 2, 1977); 49 Fed. Reg. 35247 (September 6, 1984 ("F.30 Except as provided in sections AA.3, F.40, and F.50 of this statement, the Administrator, Health Care Financing Administration, shall exercise:....E. The authority vested in the Secretary under Title XVIII of the Social Security Act."

appear and produce evidence or both; any failure to obey such order of the court may be punished by said court as contempt.

Moreover, Section 205 (l) of the Act, made applicable to the Secretary pursuant to Section 1872 of the Act, provides that:

> The [Secretary] is authorized to delegate to any member, officer, or employee of the [DHHS] designed by him any of the powers conferred upon him by this section, and is authorized to be represented by his own attorneys in any court in any case or proceeding arising under the provisions of subsection (e).

Thus, the Administrator acts on behalf of the Secretary on most matters related to the administration of the Medicare program including the enforcement of adjudicatory subpoenas.[4] While the Board has the power to issue administrative subpoenas, it must rely on the Secretary of DHHS and his Office of the General Counsel (like it, an office, under the Secretary's umbrella), for enforcement of such a subpoena in court. A review of the Act shows that the Board has no independent power to seek enforcement in district court.

Thus, in such instances, the Office of General Counsel looks to the Administrator, as the designee of the Secretary's powers relating to the Medicare program, on instructions and authority to proceed under Section 205 of the Act.[5] The power to request district court enforcement of the subpoena, under Section 1872 of the Act, as it incorporates Section 205(l), rests exclusively with the Administrator as the Secretary's designee.

In addition, under the provisions of Section 1878 of the Social Security Act, as amended, the Secretary may affirm, reverse and modify any final decision of the Board. The Secretary has delegated this authority to the Administrator of the Centers for Medicare & Medicaid Services. The regulation at 42 CFR 405.1875 further states that the Administrator may review any final decision of the Board,

---

[4] The Administrator, in turn, has issued a blanket delegation of authority to the Deputy Administrator for "all of the program and administrative authorities which have been, or will be, delegated to the Administrator without regard to the source of the authority." See, e.g. Administrator's Blanket Delegation of HCFA Program and Administrative Authorities, dated July 11, 1994, to the Deputy Administrator.

[5] In other matters, the regulation has stated that the Administrator of CMS "is the real party of interest in any litigation involving the administration of the Medicare program." 42 CFR 421.5(b); 42 CFR 405.372(a)(4); United States v. Erika, 456 U.S. 201, 206 (1980).

10

including a decision under 42 CFR 405.1873 about the Board's jurisdiction granting a hearing.

In addition, the Administrative Procedure Act (APA) at 5 USC 557(b) provides that the Administrator on review will have all of the powers that he would have in making the initial decision, except as limited by rule. In addition, reviewing bodies are generally considered to have certain inherent powers.[6] While a discovery order subsumed in the final decision on the merits of a case is subject to Administrator review, the statute and regulations are silent as to the administrative review of interlocutory orders. The rules governing Federal appeals may be instructive under such circumstances.

Under general case law addressing appeals in the Federal court, discovery orders are usually considered interlocutory in nature and, hence, not immediately subject to review.[7] However, as the Provider has pointed out, there are number of instances before the Federal courts where interlocutory orders are considered final and immediately subject to review.[8]

In addition, the Federal courts have recognized the distinction in the law between the enforcement of discovery orders directed at parties and the enforcement of discovery orders directed at disinterested third parties with respect to the timing of appeal. The Supreme Court has noted that:

---

[6] See, e.g., Gulf Coast Home Health Services v. Califano, No. 77-1507 (D.C.D.C.1978) (Examining the federal courts' inherent powers, the court found similarly that: "[A]lthough Administrator felt that a remand was not within his powers under the statute which instructs him to reverse, affirm, or modify the initial decision...the court can find no such impediment in the language or spirit of the review provisions. Reviewing bodies are generally considered to have inherent powers to remand to the initial decision maker, and administrative reviewers should not be deemed to lack such power, absent an explicit statutory bar."); adopted by HCFAR –79-17c. See also Degen v. United States, 517 U.S 820, 829 (1996)("A court's inherent power is limited by the necessity giving rise to its exercise.")

[7] See,e.g.Federal Trade Commission v. Invention Submission Corporation, 965 F. 2d 1086 (D.C. Cir. 1992)(an agency, in issuing a subpoena has undertaken no final administrative action; a subpoena becomes an appealable final order only after the subpoenaed party refuses to comply and the agency requests and receives judicial enforcement.)

[8] For example, the Provider cites to Chase Manhattan Bank, N.A. v. Turner & Newell, PLC, 964 F 2d 159, 162 (2d Cir 1992) and Marrese v. American Academy of Orthopedic Surgeons, 692 F. 2d 1083, 1087 (7th Cir. 1982).

As a general rule, a district court's order enforcing a discovery request is not a final order subject to appellate review. A party that seeks to present an objection to a discovery order immediately to a court of appeals must refuse compliance, be held in contempt, then appeal the contempt order. See United States v. Ryan. 402 U.S. 530...(1971). However, under the so-called Perlman doctrine, see Perlman v. United States, 247 U.S. 7... (1918), a discovery order directed at a disinterested third party is treated as an immediately appealable final order because the third party presumably lacks a sufficient stake in the proceedings to risk contempt by refusing compliance. Ibid. [9]

Consequently, under the Federal court rules, an administrative subpoena order involving a disinterested third party may be subject to immediate review. In this particular administrative proceeding, SSA is in the similar position of being a disinterested third party subject to a Board subpoena. Such facts may provide justification for immediate administrative review by the Administrator prior to a contempt enforcement action being taken in Federal court.[10] Weighing the Secretary's general authority to administer the Medicare program and the specific authority to review Board decisions, through his designee the Administrator, the Administrator concludes that the review of the Board's administrative subpoena orders against SSA is appropriate at this time.

To determine the appropriateness of the enforcement of the administrative subpoena order against SSA in the Federal courts under Section 205 of the Social

---

[9] Church of the Scientology of California v. United States, 506 U.S. 9 at n.11 (1992)

[10] While the Administrator recognizes that the following case is not procedurally on point, the court makes an observation in SEC v. Martha Stewart, 2004 U.S. App. Lexis 13821 (2nd Cir. July 6, 2004) relevant to this case. In discussing court jurisdiction over a SEC mandamus action, the court noted that: "[T]here is a marked difference between requiring a private litigant to submit to a contempt order before seeking appellate relief and requiring executive agency officials to do so; the latter case raises the prospect of 'serious repercussions for the relationship between two co-equal branches of government." In re FDIC 58 F. 3d 1055, 1060 n. 7 (5th Cir. 1995)(quoting In re United States 985 F. 2d 510, 513 (11th cir.)...") Such rationale for allowing an immediate appeal is also presented to justify an immediate administrative appeal in this case which is further complicated by the fact that the Board, who is subsumed under the Department of Health and Human Services, a cabinet level executive branch department, seeks to have a subpoena enforced against the co-equal cabinet level executive branch SSA.

12

Security Act, the Administrator requested certain issues be addressed. The Administrator first requested the issue of whether the principle of sovereign immunity barred the Board's subpoena of SSA and, if so, had sovereign immunity been waived. The Provider responded that, under the APA, the government has waived sovereign immunity and hence it was not a bar in this case. CMM pointed to other case law it contended was more on point to the facts of this case to support that sovereign immunity did bar the Board's subpoena.

Generally, the United States as sovereign is immune from suit except as it consents to be sued.[11]  In addition, waivers of sovereign immunity are to be construed narrowly.[12]  Subpoena proceedings fall within the protection of sovereign immunity even where they are technically against the Federal employee and not against the sovereign.[13]

The Provider cites to Linder v. Calero-Portocarrero, 251 F. 3d 178 (2001), which holds that sovereign immunity does not insulate the Federal government from complying with a Fed. R. Civ. P. 45 subpoena, because in Federal court the government has waived its sovereign immunity for actions "seeking relief other than money damages" in 5 USC 702. Id. at 181. The Administrator agrees that case law generally holds that the APA provides for  a waiver of sovereign immunity where applicable.  However, the facts in the case presently under review are not on "all fours" with the facts presented in those cases supporting the APA waiver theory.

Generally, it appears that for the APA waiver to be applicable in a discovery order against the sovereign there must be an underlying Federal suit against the United States as set forth under 5 USC 702.[14] That is, the APA waiver of immunity under

---

[11] See, e.g., Lehman v. Nakshian, 453 U.S. 156, 160 (1981).

[12] Irwin v. Department of Veteran Affairs, 498 U.S. 89, 94 (1990).

[13] Boron Oil Co. v. Downie, 873 F. 2d 67, 71 (4th Cir. 1989);cited by Comsat Corp. v. National Science Foundation, 190 F 3d 269 (4th Cir. 1999).

[14] See 5 USC  702 (The United States has waived its immunity "for an action in a court of the United States seeking relief other then money damages.")  Houston Business Journal Inc. v. Office of the Comptroller of the Currency, 86 F. 3d 1208 (D.C. Cir. 1996) ("When a litigant seeks to obtain documents from a non-party federal governmental agency, the procedure varies depending on whether the underlying litigation is in federal court or in state court.  In state court the federal government is shielded by sovereign immunity, which prevents the state court from enforcing a subpoena." Id. at 1211.)  See also id. at 1212 ( "A federal court litigant, on the other hand, can seek to obtain the production of documents from a federal agency by means of a federal subpoena,  In federal court, the federal government has waived its sovereign immunity."; Id. at 1213 ("If a district court

13

5 USC 702 applies where a Federal court has subject matter jurisdiction over the underlying action, or in certain circumstances where an action is cognizant in Federal court. Cf. Fed R Civ P. 27(a). As the Supreme Court explained in United Catholic Conference v. Abortion Rights Mobilization, Inc.,487 U.S. 72(1988):

> [T]he subpoena power of a court cannot be more extensive than its jurisdiction. It follows that if a district court does not have subject matter jurisdiction over the underlying action, and the process was not issued in aid of the determining that jurisdiction, then the process is void... · [15]

Other courts have concluded that 5 USC 702 does not afford a grant of jurisdiction, but only makes clear that sovereign immunity will not be a defense in actions in which jurisdiction does exist[16].

The facts of this case are closer to those presented by Houston Business Journal, Inc. v. Comptroller of the Currency, 86 Fed. 3d 1208 (D.C. Cir. 1996), where the underlying suit against the sovereign was in state court not Federal court. Similarly, in this case, there is no underlying suit pending in Federal court at this time which would arguably invoke the waiver provided by the APA.[17]

---

lacks jurisdiction to issue a subpoena when a federal court has erroneously asserted jurisdiction over the underlying action, as Catholic Conference [487 U.S. 72 (1988)] holds, it follows that the district court is similarly without power to issue a subpoena when the underlying action is not even asserted to be within federal court jurisdiction." )

[15] Id. at 487 U.S. 72, 76 (1988).

[16] Estate Of Arthur K. Watson v. Blumenthal, 586 F. 2d 925 (1978).

[17] See also Laundry v. Federal Bureau of Investigation, 1997 U.S. Dist. LEXIS 9850 (D.C. E.D. La. 1997) Bank plaintiff requested and obtained ALJ administrative subpoena duces tecum seeking all of the FBI 's investigatory file relating to certain individuals. The court observed that: "The plaintiff sought summary enforcement of the subpoena duces tecum and does not appear to rely on the APA as a vehicle to obtain review of the FBI's decision to deny plaintiff access to its documents under the APA.... Thus, the APA's limited waiver of sovereign immunity does not apply to plaintiff's independent summary enforcement action." Id, at 4-5. The court found the proper way of challenging agency's decision to withhold testimony was a direct action pursuant to the APA. The court also noted that the FDIC regulations do not waive the government's sovereign immunity as to the FBI. See U.S v James, 980 F. 2d 1314, 1320 (9th Cir.1997) (release of documents by one department of tribe does not constitute the waiver of tribal sovereign immunity of another department of that tribe.") Id. at 6.

6653

14

However, the Administrator concludes that the issue of whether a Board subpoena of SSA is enforceable may be decided on the more narrow grounds presented by the specific language of section 205(d) and (e) of the Act.  Section 1878(e) of the Act states that:

> The Board shall have full power and authority to make rules and establish procedures, not inconsistent with the provisions of this title or regulations of the Secretary, which are necessary or appropriate to carry out the provisions of this section. In the course of any hearing the Board may administer oaths and affirmation.  The provision of subsections (d) and (e) of section 205 with respect to subpoena shall apply to the Board to the same extent as they apply to the Secretary with respect to Title II.

The regulation at 42 CFR 405.1857 sets out the procedures for the Board to issue subpoenas, but only refers to section 205(d) of the Act and, significantly, does not incorporate the enforcement provisions of section 205(e) of the Act, nor set out enforcement procedures for the Board.[18]

The provisions of subsection 205 (d) as set forth in full above refers to the serving of a subpoena upon an "individual" stating that: "Subpoenas of the [Secretary] shall be served by anyone authorized by the [Secretary]  (1) by delivering a copy thereof to the individual named therein, or (2) by registered mail or certified mail addressed to such individual at his dwelling  place  or principal place of business."(Emphasis added.)

 In addition, Section 205(e) of the Act refers to enforcement of a subpoena duly served upon a "person" stating that: "In case of contumacy by, or refusal to obey a subpoena duly served upon, any person, any district court of the United States for the judicial district in which said person charged with contumacy or refusal to obey is found or orders or transacts business, upon application by the [Secretary], shall have jurisdiction to issue an order requiring such person to appear and give testimony, or to appear and produce evidence or both; any failure to obey such order of the court may be punished by said court as contempt." (Emphasis added.)

---

[18] A regulation cannot exceed the authority of its enacting statute. The regulation does not address the enforcement of subpoenas in Federal district court. Thus, contrary to the Provider's contention, the fact that the regulation does not use the word "person" or "individual" is not dispositive of the issue. In addition, the proposed rule does not address the authority of the Board to subpoena parties, such as CMS, but rather only ensures such parties have the opportunity to comment.

15

Relevant to this discussion, the Supreme Court noted in <u>Clinton v. The City of New York,</u> 524 U.S 417 (1998) that:

> Although in ordinary usage both 'individual' and 'person' often refer to an individual human being, see, e.g., Webster's Third New International Dictionary 1152, 1686 (1986) ('individual' defined as a 'single human being'; 'person' defined as 'an individual human being'), 'person' often has a broader meaning in the law, see, e.g, 1 USC 1 ("person" includes corporations, companies, associations, firms partnerships societies, and joint stock companies, as well as individuals.)[19]

In that case, the Supreme Court found that in the context of the entire section of 2 USC 692(a)(1), Congress undoubtedly intended the word "individual" to be construed as synonymous with the word "person."[20] The Administrator finds that Congress similarly undoubtedly intended the word "individual", as set forth at section 205(d), is to be construed synonymously with the word "person", as set forth in section 205(e) of the Act.

Further, the Supreme Court stated in <u>International Primate Protection League and its Members v. Adminstrators of Tulanes Educational Fund,</u> 500 U.S 72 (1991) that:

> As we have often noted "in common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it " <u>Will v. Michigan Dept. of State Police,</u> 491 U.S. 58, 64...(1989).....This court has been especially reluctant to read "person" to mean the sovereign where, as here, such a reading is decidedly awkward.
>
> Nevertheless, "there is no hard and fast rule of exclusion" of the sovereign, <u>United States v. Cooper Corp.,</u> 312 U.S. 600, 604-605...(1941), and our conventional reading of person may therefore be disregarded if "the purpose, the subject matter, the context, the legislative history [or] executive interpretation of the statute....indicates an intent, by use of the term, to bring state or nation within the scope of the law. <u>Id.</u> at 605 ......[21]

---

[19] <u>Clinton v. The City of New York,</u> 524 U.S 417, n. 13 (1998).
[20] <u>Id.</u> at 428.
[21] <u>International Primate Protection League and its Members v. Adminstrators of Tulanes Educational Fund,</u> 500 U.S 72, 82-83 (1991).

The court again addressed the issue in Vermont Agency of Natural Resources v. United States, 529 U.S. 765, 781 (2000) and invoked its "longstanding interpretative presumption that 'person' does not include the sovereign." Although the court acknowledged that "the presumption is, of course, not a 'hard and fast rule of exclusion,' " it said the principle "may be disregarded only upon some affirmative showing of statutory intent to the contrary." [22]

The Supreme Court has confirmed, in Will v. Michigan Department of State Police , 491 U.S. 58 (1988), that a suit against a government official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.[23]  As such, it is not different from a suit against the government itself.[24]  The court found no reason to adopt a different rule in the present context, especially when such a rule would allow the petitioner to circumvent congressional intent.[25]

The Administrator finds that a review of the statutory language of section 205 of the Act, the legislative history of that provision and case law, supports a finding that Congress, in using the word "individual" and "person" in section 205(d) and (e) intended to exclude the sovereign and by way of extension a Federal agency. There is no affirmative showing of statutory intent indicating that Congress intended otherwise. Consequently, the Administrator finds that Section 205(d) and (e) does not authorize the enforcement of an administrative subpoena against SSA in the Federal courts.[26]  Thus, the Administrator finds that it is not

---

[22] The United States Court of Appeals for the District of Columbia found in Al Fayed v. Central Intelligence Agency, 229 F. 3d 272 (D.C. Cir. 2000), that 'person' as used in 28 USC 1782, which gives district courts the power to issue subpoenas for documents for use in foreign or international proceedings, does not include the sovereign. The same court in Linder v. Calero-Portocarrero, 251 F. 3d 178 (D.C. Cir. 2001), stated that: "[w]hether [Fed. R. Civ. P.] 45's use of the word 'person' should exempt the federal government, as Al Fayed held in regard to section 1782, is purely a question of statutory interpretation, a question the government did not raise before the district court. We therefore decline to decide it...." Id. at 182.

[23] Id. at 71 citing to Brandon v. Holt, 468 U.S. 464, 471 (1985).

[24] Id. at 71 citing to Kentucky v. Graham, 473 U.S. 159, 165-166 (1985).

[25] Will v. Michigan Dept. of State Police, 491 U.S. 58, 69-70 (1989).

[26] Congress has reserved to the Attorney General "except as otherwise authorized by law, the conduct of litigation in which the United States, an agency or officer thereof is a party or is interested and securing evidence therefore" see 5 USC 516, and subject to the same exception, has required the Attorney General to "supervise all litigation to which the United States, an agency, or officer thereof is a party." 5 USC 516; 519 (see, e.g., Federal Trade Commission v. Claire Furnace

17

appropriate to seek Federal district court enforcement of the Board's administrative subpoenas in this case.

As section 205 of the Social Security Act does not authorize the SSA subpoena action, whether the subpoena order would otherwise meet the criteria for enforcement in district court need not be addressed. The inquiry must be within the authority of the agency.[27]

The Provider has suggested that the Administrator may either cooperate with its proposed administrative resolution, or the Administrator can give the appearance of trying to block the Provider's access to relevant evidence. The Administrator finds that there are not two exclusive choices in this case as the Provider suggests. A finding that the Board does not have the authority to subpoena SSA does not preclude an administrative resolution of this matter. Nor does the Provider's alternative suggestion have relevance if the foregoing determination is supported by the law.

Comments were requested on whether this matter could be administratively resolved.   The Provider and SSA have provided separate proposals for an administrative resolution and CMM has raised certain concerns. While the parties have not apparently reached any compromise as a result of sharing proposals and concerns, this process has allowed the parties to better define the problems each must address in coming to a possible reasonable administrative solution for the data release.

---

Company, 274 U.S. 160 (1927). Section 205(l) of the Social Security Act, as applicable to the Secretary pursuant to section 1872 of the Act, suggests that the Secretary could proceed to court without the counsel of the Office of the Attorney General.   At least one case suggests otherwise Federal Trade Commission v. Guignon, 390 F. 2d 323, 329-330 (1968)("In support of his position, the Attorney General calls attention to the fact that the enforcement provisions for other agencies, such as: ...Secretary of Health, Education and Welfare (in social security investigations)(section 405 (e)...."). In the least, prudence would counsel for the legal advice of the Office of the Attorney General through the DHHS Office of the General Counsel   However, in light of the failure of Section 1878(e) to reference section 205(l), there is no support for the Provider's suggestion that that the Board could exclusively move to enforce a subpoena in Federal district court.

[27] See United States v. Morton Salt Co., 338 U.S. 632, 652 (1950).

## ORDER

The Administrator finds that the Board does not have the authority to subpoena SSA under section 205 (d) and (e) of the Social Security Act. Thus, the Administrator will not request that the OGC seek enforcement of the Board subpoenas in Federal district court.


Date: 7/29/04

Leslie V. Norwalk, Esq.
Deputy Administrator
Centers For Medicare & Medicaid Services

Exhibit 2

CMS-DEC, MED-GUIDE, ¶81,506, Baystate Medical Center v. Mutual of Omaha Ins. Co., *CMS Administrator Decision*, (May 11, 2006)

© 2008, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Baystate Medical Center v. Mutual of Omaha Ins. Co.**

*CMS Administrator Decision*, May 11, 2006.

**Medicare: DSH Calculation**

**Prospective payment systems --Disproportionate share hospital adjustment --Computation of DSH percentage. --**
A hospital was not entitled to a recalculation of the Medicare fractional component of its disproportionate share (DSH) percentage because the errorless-match standard proposed by the Provider Reimbursement Review Board (PRRB) was inconsistent with the inpatient prospective payment system (IPPS) and the efficient administration of the Medicare program. The PRRB held that the intermediary's determination of the hospital's Medicare fraction was incorrect because it was based on incomplete data and the match process was flawed. Contrary to the PRRB's conclusion, however, the Medicare fraction is not subject to revision pursuant to updated or corrected data once it is completed by CMS. No explicit provision for recalculation of the Medicare fraction based on corrected data is set forth in the statute or the regulation, and the Secretary, specifically limiting any calculations of the Medicare fraction to a yearly basis, has made policy decisions balancing the need to reduce administrative burdens against the need for timely, accurate data. Furthermore, instead of conducting a precise calculation of the Medicare fraction, CMS must only base the fraction on the "best available data" at the time, a policy that is consistent with other aspects of the IPPS methodology. In addition, despite alleged problems with CMS' lack of documentation of the oversight of its quality control methods, the policies and methods used by CMS resulted in an acceptable rate of error.

The hospital also challenged the use of Medicare Provider Analysis and Review (MEDPAR) data to compute the Medicare fraction and its effect on the denominator of the fraction. Because the Secretary stated through rulemaking that the June updates of the MEDPAR will be used to match the SSI data to calculate the Medicare fraction, the hospital was precluded from using any other data but the June MEDPAR data for calculating its SSI ratio. In addition, although the PRRB correctly determined that the denominator of the Medicare fraction must include covered days instead of paid days, the hospital failed to demonstrate by a preponderance of the evidence that any of the alleged flaws in the calculation of the Medicare fraction, including the use of stale records and the omission of retroactive determinations, suspensions, and holds, would have an adverse impact on its DSH payment.

See ¶4275.15.

**The decision of the PRRB (see ¶81,468) was modified.**

[Text of Decision]

**CENTERS FOR MEDICARE AND MEDICAID SERVICES**

*Decision of the Administrator*

In the case of: BAYSTATE MEDICAL CENTER Provider vs. MUTUAL OF OMAHA INSURANCE COMPANY Intermediary

Claim for: Reimbursement Determination for Cost Reporting Periods ending: 09/30/93, 09/30/94, 09/30/95 And 09/30/96

Review of: PRRB Dec. No. 2006-D20 Dated: March 17, 2006

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in §1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)). The Intermediary and the CMS' Center for Medicare Management (CMM) commented, requesting reversal of certain parts of the Board's decision. The parties were notified of the Administrator's intention to review the Board's decision. The Provider commented, requesting affirmation of the certain parts of the Board's decision and modification on other parts of the Board's decision. Accordingly, this case is now before the Administrator for final agency review.

## ISSUES AND BOARD DECISION

The issues, as stated by the Board, involve:

(1) whether the CMS' determination of the Provider's Medicare Part A/Supplemental Security Income (SSI) percentage, commonly known as the "Medicare fraction" component of the disproportionate share (DSH) percentage, is incorrect; and

(2) whether the Provider is entitled to (a) an order from the Board directing CMS to correct such determination and the Intermediary to implement and pay any additional amounts due the Provider as the result of such correction; or (b) an order from the Board granting other appropriate relief.

The Board, reversing the Intermediary's determination of the DSH Medicare percentage, remanded the case to the Intermediary to recalculate the DSH Medicare percentage consistent with the Board's decision. The Board found that the statute and regulations do not require the use of the June Medicare Provider Analysis and Review file (MEDPAR) following the end of the prior Federal fiscal year. The Board concluded that there is no statutory or regulatory impediment for recalculating the DSH percentage. In addition, the Board noted that the law requires that the DSH percentage calculation must be accurate. Moreover, the Board stated that the Provider did not waive its right to challenge CMS' DSH calculation on appeal because it failed to comment on proposed regulations regarding the calculation.

With respect to data, the Board found that the match process between CMS' MEDPAR and Supplemental Security Income (SSI) data file is flawed in several respects and the flawed match may deflate the DSH percentage. In addition, the SSI data used for the Medicare percentage numerator is incomplete because it omits several SSI eligible beneficiary records and incomplete SSA data tends to deflate the DSH percentage. The Board noted that the data used for the calculation of DSH is not the best available data. The Board found that the denominator of the Medicare calculation is inaccurate and the denominator of the Medicare fraction is to include utilized or covered days, not paid days only. In addition, health maintenance organization (HMO) days are required to be counted in the Medicare fraction. Further, the Provider Statistical & Reimbursement Report (PS&R) is not appropriate for determining the denominator because it does not include utilized days; MEDPAR is the data base required to be used. The Board also concluded that the Provider is not required to quantify the financial impact of each of the flaws identified, nor is it required to show an exact number of incorrectly counted days. Finally, the Board found that there is no significant administrative burden to redesigning the computer programs to capture accurate information and to accurately match SSI data with MEDPAR data.

## COMMENTS

### CMM COMMENTS

#### Recalculation of Medicare DSH DPP

CMM commented, requesting that the Administrator review the Board's decision. CMM argued that the Board erred in interpreting the regulations regarding recalculation of the DSH Disproportionate Patient Percentage (DPP). CMM noted that the regulation at issue provides that CMS will calculate a hospital's Medicare fraction based on hospital discharge data for a Federal fiscal year. However, that regulation also permits a hospital to choose to have its DPP calculated based on the hospital's cost reporting period. CMM further asserted that there is no provision for recomputing the DPP based on later or corrected data. CMM explained that the sole permissible recalculation process for Medicare DSH is the one specified in 42 CFR 412.106(b)(3) which permits calculating a hospital's Medicare fraction for a different time period, i.e., the hospital's cost period, rather than the Federal fiscal year, not for the purposes of using updated or corrected data. In supplemental comments, CMM

also pointed out that CMS has applied a similar policy in the context of outlier payment determinations, and that his policy has been upheld in several court cases.

Moreover, CMM argued that the regulations do not provide for the intermediary to calculate Medicare fractions. The Intermediary does not have access to either data set that is utilized for the calculation. Thus, the Board has neither the authority to order a recomputation based on updated or corrected data, nor to order the Intermediary to perform such a recomputation.

### Use of June Version of the MEDPAR

With respect to use of the June MEDPAR, CMM pointed out that for each of years at issue, as well as for prior years, CMS puts hospitals on notice each year, through the publication of the PPS rule, that the June update of the previous fiscal year was being used to derive payment information, including DSH entitlement. CMM noted, however, that no hospital including the Provider in this case, has ever complained that the Medicare fraction should be calculated on the basis of a later version of the MEDPAR. Thus, CMM maintained that the Provider should be precluded from complaining now that it was improper to use the June MEDPAR updates. CMM, citing to several court cases, stated that such a holding is consistent with case law.

### Section 1619(b) Individuals

With respect to individuals who fall under section 1619(b) of the Act, CMM asserted that the Board erred in its interpretation of the regulation. The regulation at 42 CFR 412.106(b)(2) provides that the Medicare fraction is the percentage of Medicare inpatient days associated with beneficiaries who were also entitled to SSI benefits. CMM pointed out that individuals who fall under section 1619(b) are not entitled to receive SSI benefits. CMM noted that section 1619(b) was enacted so that certain individuals whose eligibility for Medicaid is predicated on their eligibility for SSI would not lose Medicaid coverage. The DSH statute and regulations include in the numerator of the Medicare fraction individuals who were entitled to SSI, not individuals who were given a special SSI eligibility status despite not being eligible for SSI benefits. CMM pointed out that the Provider in this case is attempting to establish a new category of individuals it defines as eligible for SSI by saying that such individuals.

### Matching Process

### Retroactive SSI Awards

With respect to the matching process and data, CMM contended that, generally, the Provider was not able to quantify the effect of the claimed systematic errors on its Medicare DSH payments. Specifically, CMM noted, with respect to retroactive SSI awards, that not all retroactive grants or denials of SSI entitlement will be captured in the SSR that is used to calculate a particular hospital's Medicare fraction. However, the inclusion of retroactive grants and denials of SSI entitlement would have minimal impact on a hospital's Medicare fraction. Further, CMM argued that the Provider could not offer any documentation demonstrated the frequency with which manual or forced pay situations occur.

CMM argued that the Provider was attempting to demonstrate that there are a substantial number of retroactive awards of SSI eligibility to Medicare beneficiaries based on statistics concerning disability awards. CMM pointed out that disability appeals are not relevant to the issues of subsequent awards of SSI to Medicare beneficiaries. CMM stated that Medicare entitlement is based on attainment of age 65 or older, or disability, or end-stage renal disease (ESRD). In addition, SSI eligibility is based on attainment of age 65 or older, or disability, or blindness, and the requisite lack of income and resources. Thus, CMM reasoned that a situation where a Medicare beneficiary is in the hospital, not eligible for SSI at that time and not counted in the numerator, but then wins a disability appeal establishing SSI eligibility should occur very rarely.

CMM also pointed out that the great majority (approximately 87 percent) of Medicare beneficiaries are entitled on the basis of age. A Medicare beneficiary who is age 65 or older is eligible for SSI on the basis of age if the beneficiary has the requisite lack of income and resource. Thus, if the beneficiary has too much income/resources to qualify for SSI, filing for SSI on the basis of disability is not going to matter, as the income and resources test applies irrespective of whether someone is aged or disabled. Individuals pursing disability appeals for purposes of SSI are not aged individuals. In support, CMM claimed that although the Provider's witness testified that SSA will allow certain income of disabled individuals to be excluded from income/resource limits, the witness could not stated how many such individuals there were, how may individuals were Medicare beneficiaries or even how many patients of the Provider.

Moreover, CMM argued that the standards for establishing disability for Medicare purposes are essentially the same for establishing disability for SSI purposes. If an individual was entitled to Medicare on the basis of disability, the individual would be entitled to SSI on the basis of disability (assuming the income/resources requirements are met.) Thus, the individuals obtaining successful appeals of SSI disability denials are not Medicare beneficiaries. Finally, CMM acknowledged that some beneficiaries entitled to Medicare on the basis of ESRD could be pursuing appeals of SSI disability denials. However, ESRD Medicare beneficiaries represent only .002 percent of Medicare beneficiaries. Therefore, CMM concluded that the Provider has failed to demonstrate that retroactive awards of SSI eligibility will be significant and will outnumber retroactive disallowances of SSI eligibility.

### Manual or Forced Pay of SSI Benefits

CMM noted that the Provider claims that CMS' matching process is flawed because the process is unable to account for instances in which an SSI beneficiary receives payment as a result of a Social Security field office employee manually ordering the payment to be made and, thus, is not reflected in the social security record (SSR) However, CMM argued that the Provider offered no documentation to demonstrate the frequency with which manual or forced pay situations occur. In fact, the Provider's witness testified that she had never seen a forced pay situation and was only able to identify a one-day stay from its 1994 cost year, for which an SSI day was not counted and which involved a manual pay. Thus, CMM concluded that it is reasonable, given the small number of stays missed due to manual pays and given the prospective manner in which CMS handles other data corrections, to make any needed fix prospectively.

### Stale Records

The stale record problem involves the problem with respect to certain records not being transmitted from SSA once a person had been deceased for a certain time period. CMM pointed out that the Intermediary has demonstrated that the average number of stale records omitted for a given provider was not more than three or four records per year, per hospital. CMM explained that prior to 1996, SSA eliminated records (commonly referred to as "stale records") from the SSR for individuals who had subsequently passed away. However, beginning with the FY 1995 Medicare fractions, no stale records were omitted from any Medicare fraction calculation. Thus, the problem of stale records is limited to the Provider's 1993 and 1994 cost year.

When CMS realized the problem, it fixed the problem prospectively. CMS did not recalculate the Medicare fraction prior to 1995 because information at that time suggested that the problem did not significantly affect individual provider's DSH adjustment amounts. CMM stated that the evidence still supports this calculation. CMM argued that the Provider failed to provide evidence that the omission of such records significantly affected their Medicare DSH payments for those years. CMM stated that with respect to FYs 1993 and 1994, neither the specific versions of the MEDPAR used to calculate the Provider's Medicare fractions, nor any other pre-1996 version of the FYs 1993 and 1994 MEDPAR files exist.

CMMS pointed out that CMS matched updated SSI information with existing MEDPAR files that had no SSI days associated with them after taking the updated SSI information into account. (Exhibit P-64.) This data was updated data and not just the restored data so one cannot determine what portion of the record count was due to restored stale records and what portion was due to updates in individual SSI eligibility status. The record also contains unedited data for which about 4 percent would be legitimately dropped out each year. The MEDPAR versions used for matching were later versions of the original file and therefore could be expected to have more missing stale records than the version that was used to perform the actual calculation, The more time which elapsed between the hospital stay and the compilation of the SSA tapes increased the number of patients that may have died and or otherwise become inactive and eventually dropped from the SSA records.

However, based on the information contained in the record for FYs 1993 and 1994, CMM argued that the record reflects that the average sized hospital with the average SSI population would have had about four stale records omitted from its calculation for FY 1993. Moreover, the numbers for FY 1994 are even less significant and would be about three stale records each.

Supporting these findings is also the fact that the data for the Medicare fraction for all hospitals rose each year by about the same percentage. If a significant number of stale records had been omitted, one would have expected a large increase between FY 1994-1995 and then a steady rise from 1995 onward. But that is not shown from the statistics, further supporting the contention that the omitted records were not significant. Thus, CMM concluded that as the stale records problem was not significant, it was reasonable for CMS not to have recomputed the Provider's Medicare fractions to include any stale records consistent with its general IPPS practice of prospective

corrections.

### Beneficiaries without Title II Numbers

With respect to the Provider's argument that CMS failed to match SSI beneficiaries who do not receive Title II numbers to Medicare stays in the MEDPAR, CMM explained that CMS generates a Title II number from each social security number on the SSR tape. Thus, if a record on the SSR does not already contain a Title II number, CMS uses the Title II number it has created in the matching process. Finally, only one stay was identified which is less than 1/6 th of one percent of the sample.

### Burden of Proof

CMM argued that the Provider has failed to show that any of the alleged defects in the matching process had any material effect on its payments. For Medicare reimbursement purposes, a Provider always has the burden of proving entitlement to payment. In this case, the Provider has been unable to provide that it is entitled to additional DSH payments. Moreover, CMM noted that despite the Provider's selective request for updated SSI records, it found only 10 individuals, representing just 12 stays, who were not credited with SSI days in the MEDPAR data, but who, according to the updated SSI data, were eligible for SSI at the time of discharge. The Provider has failed to show that ny of the 12 stays should have been credited with SSI days but were not by CMS.

### Other Issues

Despite the Board's conclusion that CMS' process for determining the Medicare fractions produced estimates as opposed to accurate determinations, CMM argued that the Medicare fractions are not estimates. Rather, the Medicare fractions are approximations which are permissible and were achieved. An approximation equates with accuracy. Although an approximate calculation may not be 100 percent precise, it is accurate. Thus, CMM stated that the Medicare fractions are accurate.

Moreover, CMM argued that under the Board's decision, CMS would have to continually update the MEDPAR and maintain those versions forever. Such a requirement is not set forth in the statute, or regulations and should not be implied. To do so would be unreasonable and impose a significant administrative burden on CMS. Moreover, CMM argued that the Board's suggestion that only a minimal amount of work would be necessary for CMS to recomputed the Medicare fractions, transmit the information, recalculate payments and make any adjustments for changes to a hospital's Medicare fraction for all hospitals is misleading and underestimates CMS' responsibilities. Rather, the whole of CMS' PPS implementation scheme needs to be considered when evaluation administrative burden.

Finally, CMM concluded that in addition to the significant administrative burden, there is no evidence to support the contention that the use of updated or corrected data would produce more favorable results to either the Provider or any other hospital. CMM noted that when using updated data, the denominator could change as well as the numerator. Thus, in some instances, a hospital may actually lose entitlement to a DSH payment.

## INTERMEDIARY COMMENTS

### HMO Days

The Intermediary commented, requesting that the Administrator's review of the Board's decision. The Intermediary explained that it did not agree with the Board's findings on both the numerator and denominator of the Medicare fraction, but that it was addressing only the Board's decision on the denominator. The Intermediary argued that the Board erred in its finding that the MEDPAR count of total Medicare days for the denominator was unreliable since the Intermediary was unable to explain the discrepancies between the MEDPAR and the PS&R. The Intermediary explained that of the 47 stays with Medicare days included in the MEDPAR but not in the PS&R, 13 stays were partially paid by Medicare as the secondary payer (MSP), 22 stays related to Medicare HMO enrollees, five stays were denied payment by peer review and seven stays were denied payment because they were not timely billed.

With respect to Medicare secondary payer (MSP) stays, the Intermediary noted that the Provider contended that CMS reversed its position as to whether the MSP stays should be counted in the denominator. However, as the Intermediary's witness testified, MSP stays were properly counted MEDPAR based on the utilized days for the stays. Further, concerning HMO days, the Intermediary noted the Provider's assertion that CMS did not adequately notify providers that they were to bill no-pay bills in order to have Medicare HMO days included in the

DSH calculation. However, the Intermediary pointed out that section 411 of the Medicare Hospital Manual directs that a no-payment bill must be submitted for services provided to an HMO enrollee for which an HMO has jurisdiction for payment. Thus, contrary to the Board's finding, it is the Provider's responsibility to submit HMO and other no-pay bills in order to properly reflect the Medicare beneficiaries' inpatient hospital utilization. This no-pay bill will then be reflected in the MEDPAR file.

### Accuracy of MEDPAR

With respect to the accuracy of the MEDPAR, the Intermediary argued that, contrary to the Board's finding, the MEDPAR is extremely reliable. The Intermediary noted there were no differences in data between the two files for fiscal years ending (FYEs) 1993 and 1996, and that there were only 40 unexplained differences in FYEs 1994 and 1995. Thus, of the 35,000 stays for the four fiscal years, the Intermediary explained 34,960 stays which is 99.89 percent of the stays. The Intermediary argued that to the extent that the unexplained stays were erroneously excluded from the MEDPAR, these few stays clearly represent abnormal situations, not pervasive or systemic problems with the accumulation system.

Moreover, the Intermediary argued that it is impractical to require intermediaries and/or providers to explain every transaction on the cost report, including the Medicare fraction. Due to limited resources, intermediaries engage in sampling techniques to audit cost reports. Many cost reports are not reviewed due to materiality. Materiality is a judgmental concept which applies when differences between cost report years do not require further review, which claimed amounts are not significant and when resources do not permit further review. The Intermediary noted that the Board hears only cases that are within monetary limits. These limits are to reduce administrative burdens on entities due to limited resources. Likewise, the Intermediary should not be placed in the position of explaining every difference since this is not practical due to the age of the claims, a change of the intermediary that processed the claims, and the resources that would have to be expended.

Further, the Intermediary contended that the MEDPAR is extremely accurate. The Intermediary noted that filed and audited cost reports cannot be considered a perfect reflection of amounts due providers or amounts due Medicare, otherwise there be not need to file amended cost reports, or request reopenings and appeals. Thus, the standard for accuracy is not perfection. The lack of explanation for 40 differences cannot be considered to reflect inaccuracies in the denominator, as perfection is not the standard. The Intermediary asserted that under the Board's definition of accurate, the MEDPAR file must be absolutely perfect in order to be accurate, i.e., "free from mistake or error." However, the Intermediary argued that the entire Medicare payment and cost reporting scheme is predicated on the standard of "a degree of conformity of a measure of a standard." The Intermediary pointed out that in cost allocations, the cost reporting forms use B-1 statistics. By supplying good documentation, those statistics can certainly allocate costs accurately. However, they will not perfectly allocate these costs. For example, the Intermediary wrote it would be absurd to believe that the use of accumulated costs to allocate administrative and general costs (A&G) perfectly measures each department's utilization of A&G resources. However, this measure is certainly considered reasonable and accurate.

In sum, the Intermediary argued that, based on the statement of issue in this case, the focus of this case is whether the Medicare fraction is incorrect. The burden of proof is to be placed on the Provider. The Provider in this instance has not proven that the MEDPAR data is inaccurate (the synonym for incorrect). The Intermediary maintained that it was not its burden, but yet, the Intermediary in fact did prove that the MEDPAR data is accurate.

### PROVIDER'S COMMENTS

The Provider commented, requesting that the Board's decision be affirmed, in part, and modified/clarified, in part. The Provider argued that the Board's decision should be modified/clarified to reverse the Intermediary's determination regarding the Medicare/SSI fraction, to remand to CMS for recalculation, and to direct the Intermediary to apply the recalculated percentage in the revised DSH payment determination for each fiscal year at issue. In addition, the Provider asserted that the Board's decision should be modified/clarified to include only Medicare paid days in the denominator of the fraction and to exclude days after an individual has exhausted Part A benefits or days for which no Medicare payment is made. Finally, the Provider argued that the Board's decision should be modified/clarified to exclude Medicare HMO days from the denominator of the Medicare/SSI fraction.

### MEDPAR/SSI

With respect to the remaining portions of the Board's decision, the Provider urged that the Administrator affirm the Board's decision. The Provider argued that in the interest of justice and sound administrative policy, affirmation

would resolve this matter now without judicial intervention. The Provider asserted that contrary to CMS' argument, CMS has performed several recalculations of the fraction as part of a settlement in a prior case. The evidence showed that the Social Security Administration (SSA) reran SSI data for CMS after a Federal district court had ruled that a plaintiff hospital was entitled to obtain the data. Further, the Provider claimed that CMS' MEDPAR programmer testified that CMS performed MEDPAR runs and these runs are matched against annually updated SSI data. However, CMS has not used the later runs for purposes of establishing the Medicare/SSI fractions that are used to compute DSH payments in cost report settlements.

Further, the Provider claimed that recalculations should be performed because, if the errors and omissions in CMS' calculations are immaterial, as suggested, then CMS will be able to clear out the thousands of pending cases on this issue. Hospitals are not going to expend scarce resources to appeal and to pursue recalculations on an immaterial issue. However, if the problems with CMS' calculations are material, as the evidence showed, then it would be better to fix the problem now without necessity of court intervention. The Provider also argued that contrary to CMS' longstanding DSH policy of using the best data available, the record shows that CMS knew there were problems with the calculations.

### Stale Records

With respect to the specific data issues, the Provider argued that CMS knew it had a problem with the SSI data and failed to investigate or correct the source of the problem. Rather, CMS maintained that the SSI data was verified and correct. Further, the Provider alleged that CMS announced a change in the process for requesting recalculations and failed at that time to disclose problems with the SSI data. The Provider noted that CMS created "special" MEDPAR records that would include both the old and the new SSI days for the prior years. From these special files, CMS produced extracts showing the numbers of hospital stays in which the number of computed SSI days increased or decreased. The Provider claimed that CMS' witness testified that the intent of the special MEDPAR project to determine whether the differences were material. The Provider argued that the special MEDPAR files showed the impact of the omission of the stale SSI records by year, by hospital and by patient stay. However, CMS failed to disclose the omission of stale records and failed to ever pay hospitals additional DSH. Moreover, the Provider claimed that CMS has continually failed to provide specific SSI data to the Provider.

### Title II

With respect to the matching process, the Provider argued that, although CMS stated it uses individual social security numbers (SSN) in the match process, in fact, CMS has never used SSNs to match the SSI records against the inpatient hospital stay records. The Provider asserted that the testimony in the record reveals that unless SSA gives CMS all an individual's Title II numbers, CMS will never get the match right under the match process it currently uses. Further, the Provider claimed that CMS admitted that it was aware not later than February 1996 that there were flaws in its match process. Had a change been effected prior to 1996 it would have increased the numerator of the hospital's Medicare/SSI fraction. However, CMS did not correct the SSI fractions and did not disclose this problem to the hospitals.

### HMO Days

With respect to the Medicare days counted in the denominator, the Provider argued, citing several examples, that CMS has been inconsistent. CMS has stated that the Medicare/SSI fraction includes only Medicare "paid" days which is consistent with CMS' established interpretation of "entitled." However, CMS has been inconsistent as to the treatment of days attributable to Medicare beneficiaries who have exhausted Part A benefits. The Provider maintained that, likewise, CMS' treatment of Medicare HMO days has been inconsistent. The Provider stated that CMS issued a statement indicating that Medicare HMO days had been counted in the Medicare/SSI fraction since 1987. However, the Provider pointed out CMS knew as early as 1987 that the data it would need to count Medicare HMO days in the Medicare/SSI fraction was not being reported to CMS.

Finally, the Provider claimed that Medicare HMO days were counted in the MEDPAR only in cases when the HMO patient stays were billed under Part A fee-for-service and payment was denied. In fact, based on CMS' calculations of the Medicare/SSI fraction for the Provider only above one one-thousandth of the total Medicare days represent HMO days.

### DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position

papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

The Social Security Amendments of 1965[1] established Title XVIII of the Act, which authorized the establishment of the Medicare program to pay part of the costs of the health care services furnished to entitled beneficiaries. The Medicare program primarily provides medical services to aged and disabled persons and consists of two Parts: Part A, which provides reimbursement for inpatient hospital and related post-hospital, home health, and hospice care,[2] and Part B, which is supplemental voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A.[3] At its inception in 1965, Medicare paid for the reasonable cost of furnishing covered services to beneficiaries.[4] However, concerned with increasing costs, Congress enacted Title VI of the Social Security Amendments of 1983.[5] This provision added §1886(d) of the Act and established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries, other than physician's services, associated with each discharge. The purpose of IPPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding cost effective hospital practices.[6]

These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under IPPS, hospitals and other health care providers are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. Thus, hospitals are paid based on a predetermined amount depending on the patient's diagnosis at the time of discharge. Hospitals are paid a fixed amount for each patient based on one of almost 500 diagnosis related groups (DRG) subject to certain payment adjustments.

Concerned with possible payment inequities for IPPS hospitals that treat a disproportionate share of low-income patients, pursuant to Section 1886(d)(5)(F)(i) of the Act, Congress directed the Secretary to provide, for discharges occurring after May 1, 1986, "for hospitals serving a significantly disproportionate number of low-income patients...."[7]

There are two methods to determine eligibility for a Medicare DSH adjustment: the "proxy method" and the "Pickle method."[8] To be eligible for the DSH payment under the proxy method, an IPPS hospital must meet certain criteria concerning, inter alia, its disproportionate patient percentage or DPP. Relevant to this case, with respect to the proxy method, Section 1886 (d)(5)(F)(vi) of the Act states that the terms "disproportionate patient percentage" means the sum of two fractions which is expressed as a percentage for a hospital's cost reporting period. The fractions are often referred to as the "Medicare low-income proxy" or "Medicare fraction" and the Medicaid low-income proxy", respectively, and are defined as follows:

(I) the fraction (expressed as a percentage) the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act and the denominator of which is the number of such hospital's patients day for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this title.

(II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State Plan approved under title XIX, but who were not entitled to benefits under Part A of this title, and the denominator of which is the total number of the hospital patient days for such period. (Emphasis added.)

CMS implemented the statutory provisions at 42 CFR 412.106 (1994) and explains that the hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage. Relevant to this case, the first computation, the "Medicare fraction" is set forth at 42 CFR 412.106(b)(2)(1994). The regulation at 42 C.F.R. §412.106(b) provides that:

(b) *Determination of a hospital's disproportionate patient percentage. (1) General rule.* A hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage.

(2) *First computation: Federal fiscal year.* For each month of the Federal fiscal year in which the hospital's

cost reporting period begins, CMS --

(i) Determines the number of covered patient days that --

(A) Are associated with discharges occurring during each month; and

(B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;

(ii) Adds the results for the whole period: and

(iii) Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of patient days that --

(3) *First computation: Cost reporting period.* If a hospital prefers that CMS use its cost reporting period instead of the Federal fiscal year, it must furnish to CMS, through its intermediary, a written request including the hospital's name provider number, and cost reporting period end date. This exception will be performed once per hospital per cost reporting period, and the resulting percentage becomes the hospital's official Medicare Part A/SSI percentage for that period.

(4) *Second computation.* The fiscal intermediary determines, for the same cost reporting period used for the first computation, the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period.....

The Provider has challenged the calculation of its Medicare fraction in determining its DSH adjustment payment in this case.[9] The regulation provides for CMS to transmit the Medicare fraction for a provider to the Intermediary. A provider may elect to have the Medicare fraction calculated based upon the Federal fiscal year or its cost reporting period.

Of particular interest to the providers in this case was the social security records provided by SSA to CMS to conduct the calculation. The SSI file includes 42 months of data and is run for CMS on a yearly basis.[10] Each year, around early April, SSA sends to CMS a file that contains a list of all individuals who were entitled to SSI benefits for any month during the past 39 or 40-month period, or who are projected to be entitled to SSI for either or both of the next two or three months.[11] CMS identifies the Medicare beneficiaries from among the individuals listed on the SSA file, and matches the resulting file of Medicare/SSI beneficiaries against its Medicare patient stay information for the previous Federal fiscal year.[12] CMS then computes the Medicare fraction for all inpatient PPS hospital cost reporting periods that began during the previous FFY.[13]

The SSA tapes for the periods at issue are described as follows:[14] For each SSI recipient on the tape there is: truncated last name and first initial; social security number, date of birth, gender, social security number or railroad retirement program identification number (called a Title II number or CAN) if the SSI recipient received monthly social security or railroad retirement benefits; and 42 monthly indicators (one and zeros) denoting the payment or non-payment of the Federal SSI cash benefits during the period covered by the SSA tape.

For each of the years at issue, the providers received their Medicare DSH fractions based on June updates of the "MEDPAR."[15] The MEDPAR (Medicare Provider Analysis and Review) files contains data from claims for services provided to beneficiaries admitted to Medicare certified inpatient hospitals. The accumulation of claims from a beneficiary's date of admission to an inpatient hospital where the beneficiary has been discharged represents one stay. A stay record may represent one claim or multiple claims. Approximately 95 percent of inpatient stays involve a single claim. Prior to 1995, the stay records were based on the CMS Common working file.[16] Since 1995, the MEDPAR is drawn from the National Claims History data base.[17] The national claims history files contains "utilized days" The national claims history file is compiled from the common working file.[18] The common working file similarly contains utilized days.[19]

For each inpatient stay, the MEDPAR file contains the following data fields showing: 1) the hospital's

Medicare provider number; 2) the patient's health insurance claim account number, which is sometimes referred to as the HIC or HICAN, 3) the dates of admission to or discharge for the hospital, 4) the total length of the inpatient hospital stay, 5) the number of days in the stay that were covered under Medicare Part A, and 6) the number of days in the stay for which the patient was determined through the match process described above to be eligible for SSI.

The MEDPAR data and the subsequent SSI match is described as follows:[20] CMS attempts to match information from the SSI tape that it receives from SSA on the basis of Medicare Health Insurance Claim Numbers (HICANs)[21] CMS attempts to match the HICAN under which the patient stay is recorded with the HICAN that is provided by SSA in the "Title II field" of the SSI tape.[22] CMS also attempts to match the HICAN under which the patient stay is recorded with a HICAN from the SSI tape that is generated by CMS.[23] CMS generates this HICAN by taking the Social Security Number on the SSI record and appending a beneficiary identification code ("BIC").[24] The BIC that is added is an "N" which is later converted to an "A".[25] By matching based on two health insurance claim account numbers, CMS is able to match beneficiaries who are entitled to Medicare on the basis of someone else's account number (such as the account number of a spouse) as well as those who are entitled to Medicare on the basis of their own account.[26]

**I. The Medicare fraction is not subject to revision pursuant to updated or corrected data.**

The Board reasoned that a policy prohibiting the recalculation of the SSI ratio would be contrary to the statute as it would nullify providers' rights to appeal. In addition, the Board pointed to language in the preamble indicating that the Secretary recognized a right to challenge the SSI calculation and, hence, that the Medicare fraction could be recalculated. Consequently, the Board concluded that the regulation did not preclude the recalculation of the Medicare fraction. The Administrator finds that, as set forth below, the regulation does not provide for a recalculation of the SSI ratio based upon updated or later data once it is completed by CMS.

**A. The plain language of regulation does not provide for recomputation based on later data.**

The Administrator disagrees with the Board's conclusion that the regulation allows for a recalculation of the Medicare fraction for updated or later data. A review of the applicable law and regulations show that the Secretary did not intend for the DSH calculations to be recomputed or recalculated based upon later, or corrected, data.

On its face, the regulation does not allow for further recalculations of a provider's SSI ratio beyond that explicitly prescribed in the regulation. As the regulation shows, only a limited exception for recalculation of the Medicare fraction based upon a provider's cost reporting period is allowed. Notably, this limited exception was based on the explicit time period (a provider's cost reporting period) which was set forth in the statute. In contrast, no such explicit provision for recalculation of the Medicare fraction based on later, or corrected, data, is set forth in the statute, nor in the regulation.

The Secretary has consistently recognized the administrative burdens involved in calculating the Medicare fraction and has made policy decisions balancing the need to reduce administrative burdens and the need for timely, accurate data. The policy to consider the CMS calculated Medicare fraction not subject to updating is consistent with the sometimes competing interests of finality, timeliness, efficiency and accuracy in the administration of a large Federal program.

In arriving at this policy, the Secretary considered the administrative burdens associated with the calculation of the Medicare fraction. The Secretary necessarily examined these problems within the context of administering the entire Medicare program and not within the singular context of calculating a single hospital's DSH Medicare fraction. In implementing DSH provisions in 1986, the Secretary found that to match SSI eligibility records to Medicare bills on a Federal fiscal year on an annual basis was the most efficient approach given the scope of the program. Noting the 11 million billing records and 5 million SSI records, the Secretary specifically limited any calculations to a *yearly basis* stating that:

The data source for computation of the SSI/Medicare percentage include the Medicare inpatient discharge file which is compiled on a Federal fiscal year basis and includes approximately 11 million billing records (this compilation is done about three or four months after the close of the Federal fiscal year and is then updated periodically as additional discharge data are received) and the SSI file that lists all SSI

recipients for a 3 year period denotes the month during the period in which the recipient was eligible for SSI benefits (the SSI file includes over 5 million records.) In order to compute the SSI /Medicare percentage, the 11 million records from the discharge file must be individually matched by beneficiary number and month of hospitalization with the SSI recipient records. On a Federal fiscal year basis, this match would be performed *on a yearly basis*. (Emphasis added.)[27]

In balancing administrative efficiency and accuracy, the Secretary noted that:

> We do not believe that there are likely to be significant fluctuations from one year to the next in the percentage of patients served by hospitals that are dually entitled to Medicare Part A and SSI. Consequently, the percentage for a hospital's own experience during the Federal fiscal year should be reasonably close to the percentage specific to the hospital's cost reporting period.[28]

The Secretary, subsequently, compared the Medicare fraction based on a provider's cost reporting period and the Federal fiscal year and concluded, as predicated, that these two periods resulted in reasonably close percentages. The Secretary subsequently determined that he would afford hospitals the option to determine the number of patient days of those dually entitled to Medicare Part A and SSI for their own cost reporting periods. The Secretary concluded that:

> We do not believe Congress intended to impose cumbersome and costly administrative burden as that described above in implementing this provision. The Secretary has general rulemaking authority under section 1102 and 1871 of the Act to deal with problems of implementing and administering the Act in an efficient manner. Based on the above discussion, we believe that using the Federal fiscal year instead of a hospital's own cost reporting period is the most feasible approach to implementing provision terms of accuracy, timeliness and cost efficiency. In addition, we believe we have complied with the law by affording hospitals the option of having their SSI/Medicare percentages computed based on ... the cost reporting period.[29]

In allowing for this provision, the Secretary noted that:

> [I]f a hospital has its SSI/Medicare percentage recomputed based on its own cost reporting period, this percentage will be used for purpose of it disproportionate share adjustment *whether the result is higher or lower than the percentage computed based on the Federal fiscal year*." (Emphasis added.)[30]

That is, a provider cannot request such a recalculation and chose the higher Medicare fraction. The regulatory language plainly does not incorporate any procedures for revising the Medicare fraction based upon later data. Rather, the regulation provides for a provider's Medicare fraction to be final, once calculated by CMS, except in the instance where a provider has requested the computation be based on its cost reporting period.

Finally, in response to the specific commenters, the Secretary had the opportunity to specifically address this issue in the final rule to the FFY 2006 final rates.[31] The Secretary specifically rejected the use of updated SSI eligibility information (which the commenter argued may include retroactive approvals etc.), for use by CMS to revise calculations of hospital DSH Medicare fractions. Consequently the Secretary clearly had a policy of calculating the SSI fraction based upon specific data, within certain timeframes, and not subject to later revision.

**B. Policy is consistent.**

This policy is consistent with IPPS. Notably, where the Secretary has allowed for corrections of data underlying inpatient prospective payments or IPPS, the Secretary has set forth specific procedures and timeframes for doing so consistent with the aims of IPPS (e.g., wage index). In contrast, no process was implemented in the regulations at 42 CFR 412.106 for the recalculation of the CMS Medicare fraction.

Likewise, the Secretary has determined that the refusal to recalculate underlying IPPS data is also rational and consistent with the aims of the inpatient PPS. Specifically, the regulation for determining eligibility for the rural referral center status required the use of a provider's published 1981 case mix index (CMI). The Secretary refused to recalculate a provider's 1981 CMI for purposes of determining its eligibility for rural referral center status under IPPS.[32] The court in Board of Trustees of Knox County Hospital v. Shalala, 135

F 2d 493 (7th Cir. 1998), specifically addressed the provider's challenge to the Secretary's use of a published 1981 case mix index (CMI). The provider argued that CMS ought to accept a recalculated CMI because its study conducted by a nationally recognized consulting firm, was based on 100 percent of the provider's 1981 Medicare discharges. In contrast, the Secretary's calculation was based in large part on the MEDPAR file, which included information concerning only 20 percent of the Provider's 1981 discharges. However, the Court accepted that the Secretary's policy serves the interests of accuracy, uniformity and administrative convenience and concluded that the Secretary's policy of relying solely on her own calculation of a provider's 1981 CMI was not arbitrary and capricious.

The Secretary, as a matter of policy, also declined to recalculate the outlier payments to account for the difference between the estimated and actual outlier payments. *See* e.g., 49 Fed. Reg. 234, 265-66. In response to commenters, the Secretary pointed out that this policy applied regardless of whether the aggregate outlier payments resulted in more or less than the statutory five- six percent of the total projected DRG prospective payment. Such a policy promoted finality, efficiency and certainty in the process. The court in *County of Los Angeles v. Shalala*, 192 F. 2d 1005 (1999), upheld this policy observing that: "while we have recognized that retroactive corrections may not ultimately undermine PPS, we have emphasized that that `does not establish that a prospective-only policy is unreasonable.' *Methodist*, 38 F. 3d at 1232." *County of Los Angeles v. Shalala*, 192 F. 2d 1005, 1020 (1999).

Similarly, the Secretary's policy in this instance promotes administrative finality and certainty in the process. The Secretary's policy is neutral in that the SSI ratio remains the same regardless of whether a later recalculation would result in a higher or lower Medicare fraction. This neutrality ensures predictability in the process by preventing unexpected shifts in the payment rates based on later data. The agreement between the Provider and the Consultant acknowledges this possibility in providing for the Consultant to be liable for any decreases in the Provider's DSH payment as a result of litigation.[33]

Thus, the Administrator finds that the regulation precludes the recalculation of the Medicare fraction based on updated or corrected data. Further, as the Board is bound by the regulations, it is not authorize to order any recalculation of the SSI ratio based on updated or corrected data.

## C. Provider's appeal rights not nullified.

The Administrator also disagrees with the Board's conclusion that the Secretary could not have intended to adopt such a policy as it would nullify providers' appeal rights and that the Secretary had acknowledged providers' rights to challenge the SSI calculation and have its Medicare fraction recalculated in preamble language. The fact that the Secretary acknowledges the providers' rights to appeal the SSI calculation does not negate the Secretary's policy that the SSI ratio is not intended to be corrected with later data. The Secretary explicitly released the data for providers' challenging the Medicare fraction on appeal. Notably, the data was not released in order to allow providers the option of having its Medicare fraction recalculated based on corrected or later data.

The provider in *Methodist Hospital of Sacramento*, 38 F. 3d 1225 (1994), also argued that the right to appeal necessarily assumes the right to have corrections implemented retroactively in its case. A policy of prospective only corrections in that case, the provider argued, was not consistent with the appeal provisions. However, the court noted that:

Congress' decision to retain certain appealable review procedures from a prior reimbursement regime does not necessarily imply congressional intent to maintain identical remedies. In PPS, Congress created a radically new method for determining Medicare reimbursement. *Georgetown II*, 862 F. 2d at 239, as well as a new method for handling reimbursement payments. *See Washington Hosp. Center v Bowen*, 254 U.S. App. D.C. 94, 795 F. 2d 139, 146 (D.C. Cir. 1986). Here the Secretary decided to alter the retroactive effect of appellate proceedings, a decision congress left open in the 1983 amendments. This choice does not limit the availability of judicial or administrative review itself.

Likewise, the Secretary's policy here does not limit the availability of judicial or administrative review in this case. The Secretary's policy regarding the basis for the Medicare fraction is appealable and subject to judicial review, just as the Secretary's IPPS prospective-only policy was subject to review in *Methodist Hospital of Sacramento*, 38 F. 3d 1225 (1994). Moreover, the Provider may challenge the "type" of day included in the calculation and the process for determining the Medicare fraction. Consequently, the Board incorrectly relied on this basis to determine that the regulation could not be interpreted to preclude the

recalculation of the Medicare fraction based on later data.

## II. CMS has historically used best available data in computing IPPS payments.

### A. The Board erred regarding the precision of the calculation.

The Board erred in finding that CMS was required to conduct a precise calculation and, thus, that the Medicare fraction could be corrected with later data. As a practical matter, the Board decision means that the Medicare fraction would be always subject to recalculations based on later updated data. In reaching this conclusion, the Board found that an estimate, rather than an accurate determination, was not permissible. The Board further concluded that, even if CMS were allowed to use the "best available data", CMS' process for determining the Medicare fraction was not likely to produce the best available data.

The Administrator finds that the Intermediary properly argued that CMS' Medicare fraction must be based on the "best available data." This is consistent with the Secretary's various pronouncements stating that a basic tenet of the prospective payment system is that the rates are based on the best data available at the time.[34] The best available data is "accurate" data in fact for purposes of payments under IPPS. The Secretary specifically stated that, with respect to the Medicare DSH fraction, his goal is to obtain reasonably accurate but not perfect calculations.[35]

The Administrator finds that the Board inappropriately relied on *Georgetown University Hospital v. Bowen*, 862 F. 2d 323 (D.C. Cir. 1988), in concluding that the Medicare fraction must, in effect, be calculated consistent with reasonable cost payment methodology. The Board noted that the D.C. Circuit Court of Appeals concluded that the IPPS statute required the Secretary to calculate the hospital-specific portion based on "allowable operating costs of the inpatient hospital services" not estimated allowable costs." *Id* at 326-27. Consequently, the Board stated that the court required the Secretary to make retroactive corrective adjustments to payments made for prior cost reporting periods under a hospital-specific rate that was ultimately determined to have been calculated in an erroneous manner.

However, with respect to *Georgetown*, the Administrator finds that the court expressly recognized the distinction between the payment provisions under the hospital-specific component of IPPS and those under IPPS. The court found that the hospital-specific portion of the IPPS rate retained and incorporated the previous reasonable-cost regime into the IPPS rate during the transition period. The *Georgetown II* court stated that:

We note that when PPS statute instructs the Secretary to determine "allowable operating costs per discharge" under the new prospective payment methodology ... It involves an entirely different sense of the term: costs that are allowable under the new system may not be subject to retrospective revision, but that certainly does not mean that the same must be true when the statute refers to costs that were allowable under an entirely different methodology. *Georgetown II*, 862 F. 2d at 327 n.11.

Thus, the *Georgetown II* ruling with respect to the IPPS hospital-specific rate would not be relevant to the analysis in this instant appeal.[36] The payment provision under this appeal involves an adjustment to an IPPS payment adjustment. The DSH payment does not involve the prior reasonable cost methodology, but is purely an IPPS methodology.

The Board also erroneously finds a correlation between the DSH payment and the reasonable cost methodology as the DSH payment is based on hospital-specific data from a prior cost reporting period. Thus, the Board found that the payment is retrospective in nature. However, IPPS rates are generally based on historical data. For example, the wage index is based on hospital-specific data from retrospective cost reporting period from four years earlier. Consequently, the fact that the DSH payment methodology is based on historical data does not make it equivalent to the reasonable cost payment methodology.

In addition, despite the intended prospective nature of IPPS, a provider is still subject to the reconciliations of payments in year end settlements.[37] Such reconciliations do not negate the character of IPPS. The Administrator disagrees with the Board's conclusion that the concerns of predictability, timeliness and finality that underlie the IPPS payment are not present with respect to the IPPS DSH payment. The Secretary's policy to determine that Medicare fraction based on certain timely data ensures that the Medicare fraction remains the same regardless of whether a later recalculation would result in a higher or lower Medicare fraction. The possibility that this decrease in its Medicare fraction could occur in requesting a recalculation in

058

this case was obviously contemplated by the Provider. The Provider's consultant agreed to be liable to the Provider for any loss of disproportionate share hospital payments that would occur as a result of a decrease in the SSI percentage.[38]

Further, various other payments which are prospective in nature are dependent upon predicted DSH payments.[39] The Administrator concludes that, consistent with other payment aspects of the IPPS methodology, the Secretary is not bound to arrive at payments reflective of the retrospective reasonable cost methodology, but rather may make payment determinations based on the "best available data." and that to do so in this case is consistent with the underlying goals of IPPS.

The Board's decision seems to suggest that there are no acceptable rates of error that can be allowed in calculating the Provider's Medicare fraction. But even under reasonable cost methodology, costs are often determined, not through discrete direct costing to Medicare, but through a step-down method using a cost allocation statistic resulting, in effect, an estimate of the costs to be allocated to Medicare. Therefore, the Board's standard applied in this case even seems to exceed even that required under a reasonable cost payment methodology.

The Board's decision also provides for the possibility of a DSH calculation never being permanently determined. Under the Board's reasoning, a hospital with a DSH appeal pending would always be entitled to have the most recent version of the MEDPAR used to calculate the DSH payment, regardless of the number of years that had passed since the cost reporting period was closed, as long as it had an appeal pending.

In addition, the Board's finding that CMS must have complete accuracy in the counting of SSI days, allows the provider to challenge each and every day included or not included in the SSI calculation. This standard subjects CMS to a case-by-case adjudication of each and every stay, each and every day and each and every patient. Such a standard is inconsistent with the general basic tenets of IPPS and the efficient administration of the Medicare program. The Board erroneously determined that the use of the word "number" in the DSH statute thus requires absolute precision in the Medicare fraction when in fact the word in and of itself is not a synonym for precision.

Based on the scope of the number of stays involved in each Medicare fraction for each year over the entire Medicare program, the Administrator finds that the Board's standard is not reasonable and is contrary to the best available data standard used to allow for the efficient administration of the Medicare program. The Board's standard is not consistent with the reality of the 11 million claims reported in 1986 and 12 million reported claims in 2004 which underlies the DSH payment.

The U.S. Supreme Court recognized in *Califano v. Boles*, 443 U.S. 282 (1979), n. 1, that: "a process of case-by-case adjudication that would provide a perfect fit in theory would increase administrative expenses to a degree that benefit levels would probably be reduced, precluding a perfect fit in fact. *Matthews v. Lucas*, 427 U.S. 495, 509 (1976) *Weinberger v. Salfi*, 422 U.S. 749, 776-777 (1975)." *Id* at n.1 In that case, the court noted that:

The magnitude of the task of the Social Security Administration in attaining accuracy and promptness in the actual allocation of benefits pursuant to classifications of beneficiaries under federal law is not amenable to the full trappings of the adversary process: fairness can best be assured by Congress and the Social Security Administration through sound management techniques and quality control designed to achieve acceptable rates of error. *Id.* at 546.

The Provider attacks the CMS management of the DSH program and the lack of documentation of the oversight of its quality control methods in calculating the Medicare fraction. The Board alleges willful failure by the agency (without any supporting evidence) to comply with the routine computer standards However, the record shows that, despite these alleged problems, the policies and methods used by CMS resulted in an acceptable rate of error, to the extent of being an almost nonexistent rate of error. In the end, the Provider has failed to demonstrate that these alleged problems had any impact on its DSH reimbursement.

**III. The Secretary stated through rulemaking that he will use the June updates of the MEDPAR matched to the SSI data to calculate the Medicare fraction.**

CMS has stated that it would calculate the Medicare fraction based on the June update of the MEDPAR.[40] The policy has been pronounced in various Federal Registers that the providers would receive there

Medicare fraction based on the June updates of the MEDPAR.[41] The use of the June MEDPAR Data was subject to notice and rulemaking procedures.[42] The use of the June MEDPAR updates corresponded to the best data available at the time the annual IPPS rule was to be published each year.[43] The Provider is precluded from using any other data but the June MEDPAR data, for calculating the Provider's SSI ratio.[44] Similarly, the Board is precluded from granting any relief to have the calculation performed with data other than the June MEDPAR update.

However, without waiving any of the foregoing positions adopted by the Administrator, the Administrator addresses the various issues raised by the Provider and the factual and legal findings made by the Board below. This includes the data to be used in the Medicare fraction and, in particular, the data used in the numerator and the data used in the denominator and the related SSI records match.

## IV. The Provider failed to demonstrate that the Secretary did not use the best data available in the denominator or numerator of the Medicare Fraction

A. Denominator . The Provider challenges the use of the MEDPAR data to compute the Medicare fraction and its effect on the denominator of the fraction. The Provider claims that the PS&R should be used because the PS&R uses days paid to the provider. If the PS&R is used, the denominator will be smaller resulting, at least theoretically, in an increase in the Provider's DSH SSI patient percentage. The Intermediary argues that the covered/utilized days should be used and that the MEDPAR is the best data available.

The Administrator agrees with the Board with respect to this finding that the "denominator of the Medicare calculation is to include utilized or covered days, not paid days only."[45] The Board also correctly determined that the "PS&R is not appropriate for determining the denominator because it does not include utilized days; MEDPAR is the data base required to be used."[46] However, the Administrator disagrees with the Board's finding that the MEDPAR data used is "inaccurate as revealed by unexplained discrepancies."[47] In addition, the Board stated that "it is not possible to determine whether the inaccuracies would decrease the Medicare fraction." However, the Administrator finds that, in fact, the Provider failed to demonstrate by a preponderance of the evidence that any of the alleged flaws in the calculation of the denominator would have an adverse impact on its DSH payment.

### 1. The Type and number of Days in the Denominator of the Medicare Fraction

With respect to the types of days that belong in the denominator of the Medicare fraction, the Provider argued that CMS should have used the PS&R file to do its calculations, because the PS&R contains days paid to the Provider. The Provider believes that the denominator should include only those days for which a provider receives payment from Medicare, rather than days that are covered by Medicare and charged as utilized days to the patient.[48]

The Provider asserted that, although the regulations speak of "covered days," CMS has interpreted "covered days" to mean "paid day." The Provider also argued that the MEDPAR files used by CMS to compute the Medicare fraction for years 1993-1995 (1) omitted some patient days that were covered and paid under Part A; and (2) included some patient days that were not covered nor paid under Part A.

Relying on the statute's use of "entitled to benefits" and the regulation's reference to "covered" patient days, the Board held that the MEDPAR file should be used for the DSH Medicare fraction denominator calculation. Moreover, the Board concluded that the Medicare/SSI fraction should include Medicare covered/utilized days. The Secretary's reference to the MEDPAR file in various Federal Register preambles to the regulations indicated that the Secretary intended to use the MEDPAR file for the DSH Medicare fraction denominator calculations.

However, the Board concluded that the use of the MEDPAR count of total Medicare days for the denominator was unreliable since the Intermediary was unable to explain the discrepancies between: those days on the MEDPAR file but not on the PS&R report; and those days on the PS&R report but not on the MEDPAR file. However, it is unclear from the Board's finding what was suppose to be done with respect to the denominator when the SSI fraction was ordered to be recalculated by the Board.

### 2. The preamble requires the use of the MEDPAR.

First, with respect to whether CMS should use the PS&R or the MEDPAR file, as the source for the denominator of the Medicare fraction, the preamble to the final rule implementing the DSH adjustment states that:

The number of patient days of those patients entitled to both Medicare Part A and SSI will be determined by matching data from the Medicare Part A Tape Bill (PATBILL) file with the Social Security Administration's (SSA's) SSI file.[49]

In the September 1, 1987 preamble to the final rule, the Secretary stated that the PATBILL file was the functional equivalent of the Medicare Provider Analysis and Review (MEDPAR) file. The Secretary stated that:

We regret any confusion created by our reference in the May proposed notice to the PATBILL as our source file for our analysis. *The MEDPAR file contains the same data as the PATBILL file but is in a simplified, reformatted record layout.* Both files contain the same diagnostic and procedure data for up to five diagnosis and three procedures 100 percent of Medicare inpatient hospital bills. Although we use the two names *interchangeably*, technically we *use the MEDPAR FILE.*[50]

In addition, the preambles to the September 4, 1990 and September 1, 1995 final rules on DSH identify the MEDPAR by name as the source for the denominator of the Medicare fraction. Thus based on the above passages, the Administrator agrees with the Board's determination that the MEDPAR file should be used as the source of the denominator of the Medicare fraction. In contrast, the Administrator finds that there is no reference in the Federal Register (or elsewhere, for that matter) to the PS&R as the source for the denominator of the Medicare fraction.

In addition, the Secretary again explained that it was appropriate to continue to use the MEDPAR for Medicare DSH calculation in response to commenters in the final FFY 2006 IPPS rule. The Secretary explained that:

We believe it is appropriate to continue to use the MEDPAR for Medicare DHS calculations. Principally, as documented in the Federal Register the MEDPAR system has been the Medicare Part A data source for the Medicare DSH calculation since the implementation of the DSH adjustment. More importantly, the MEDPAR system and the PS&R do not necessarily contain the same data. The MEDPAR system contains utilized days and the PS&R contains days paid tp the provider by Medicare. The PS&R does not contain certain types of days that should be included in the denominator of the Medicare fraction, such as covered days that were paid by a Medicare managed care organization (MCO). For these reasons, we are not proceeding with the commenters recommendations at this time.[51]

Accordingly, the Administrator finds that the CMS properly used the MEDPAR for the calculation of the Provider's Medicare fraction in this case.

**D. Specific records.**

Finally, the Board relies on the provider allegations that the reconciliation of MEDPAR and PS&R records show that the CMS' data was flawed. In June 2001 CMS furnished the Provider with MEDPAR data for FY 1993, 1994 and 1995. In the Spring of 2003, the Provider and the Intermediary attempted to reconcile differences for the fiscal years 1994 and 1995 between the numbers of Medicare days reflected in the MEDPAR data which CMS furnished to the Provider in June 2001 and the numbers of Medicare paid days reflected on the Part A PS&R reports which the Intermediary furnished to the Provider in 1999 (referred to as the 2003 reconciliations).

The reconciliation showed Medicare paid days associated with 61 stays on the intermediary Part A PS&R that are not included in CMS MEDPAR data and that 47 stays included in the CMS MEDPAR data were not included in the Intermediary Part A PS&R for the FYEs 1994 and 1995. There was no difference between the MEDPAR and PS&R for FYEs 1993 and 1996. There were approximately 35,000 stays on the PS&R for all four years involved. Without addressing whether any of the 61 stays were incorrectly omitted, the record shows that approximately 99.82 percent of the stays were accepted by both parties as accurately represented. The Administrator finds that this percentage shows that the MEDPAR data used to construct the denominator was the best available data. Moreover, the Provider failed to demonstrate by a preponderance of the evidence that the data used in the denominator of the DSH fraction had an adverse

impact on it DSH reimbursement.

### 3. *The Type of Days in the Denominator of the Medicare Fraction*

#### a. Paid v. Covered/Utilized Days

Next, with regard to whether CMS should use "paid days" or "covered/utilized days" the Administrator agrees with the Board's determination that the Medicare/SSI fraction should include Medicare covered/utilized days.

The regulations at 42 C.F.R. §412.106(b), describe the calculation of the Medicare fraction as:

(2) *First computation: Federal fiscal year.* Fore each month of the Federal fiscal year in which the hospital's cost reporting period begins, HCFA --

(i) Determines the number of *covered* patient days that --

(A) Are associated with discharges occurring during each month; and

(B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation. (Emphasis added.)

In the May 6, 1986 final rule implementing the DSH adjustment CMS stated that:

[I]f a Medicare beneficiary is eligible for SSI benefits (excluding state supplementation only) during a month in which the beneficiary is a patient in the hospital, the *covered* Medicare Part A inpatient days of hospitalization in that month will be counted for the purpose of determining the hospitals Disproportionate patient percentage."[52] (Emphasis added.)

In the August 11, 2004 final rule CMS stated that the denominator of the Medicare fraction included only *covered* days:

Section 1886(d) (5) (F) of the Act provides for additional payments for hospitals that serve a disproportionate share of low income patients. A hospital's disproportionate share adjustment is determined by calculating two patient percentages (Medicare Part A/Supplemental Security Income (SSI) *covered days* to total Medicare *covered days*, and Medicaid but not Medicare Part A *covered days* to total inpatient hospital days), adding them together and comparing that total percentage to the hospital's qualifying criteria. (Emphasis added.)

Finally, the preamble to the final rule revising the Medicare hospital inpatient prospective payment systems stated that CMS' policy has been that "only *covered* patient days are included in the Medicare fraction."[53]

In this case, the Provider argued that the Medicare fraction should include only paid days instead of covered/utilized days. The Board disagreed with the Provider's contention and held that the Medicare fraction denominator properly included covered/utilized days even though the hospital may not have received payment.[54] The Administrator agrees with the Board's determination that the Medicare/SSI fraction includes Medicare "covered/utilized days" in the denominator of the DSH calculation. The Administrator finds that the regulation at 42 C.F.R. §412.106(b) and the various preamble text cited above, clearly state that the denominator is made up of "covered days." The Administrator finds that CMS considers "covered days" to mean days for which the beneficiary was entitled to have payment made by Medicare.[55]

The Administrator further finds that, CMS has never considered "covered days" to mean only days for which the provider has received payment from Medicare. For example, days for which the provider is denied payment due to technical reasons are nevertheless counted as "covered days" *that are charged to the beneficiary as utilized days.*[56] Such technical reasons include, the provider's failure to bill timely, or the care rendered was substandard in quality. Thus, the Administrator finds that it makes sense to charge the beneficiary with utilized days with respect to these technical denials because the beneficiary is having his or her care covered by Medicare - i.e., the provider is prevented by the Medicare statute from billing the

beneficiary.[57] (Emphasis added.) The Administrator finds that CMS has consistently interpreted "covered days" to mean, days for which the beneficiary's care is covered by (or paid by) Medicare and for which utilization is charged to the beneficiary. Therefore, CMS properly included covered days, instead of paid days in the calculation of the Provider's Medicare fraction.

**b. No-Pay Days: HMO/MSP Days.**

The Administrator also finds that days paid by Health Maintenance Organization (HMO) under contract with Medicare are days that are not paid to the provider by Medicare but are *covered days*. Such days are covered under Medicare because HMOs are required to cover inpatient hospitalization services, and utilization is charged to the beneficiary for such days.[58] CMS has interpreted "covered days" in the context of the denominator of the Medicare fraction to include HMO days. In the September 4, 1990 final rule CMS stated:

 [W]e believe it is appropriate to include [in the denominator of the Medicare fraction] the days associated with Medicare patients who receive care at a qualified HMO. Prior to December 1, 1987, we were not able to isolate the days of care associated with Medicare patients in HMOs and, therefore, were unable to fold this number into the calculation. However, as of December 1, 1987, a field was included on the Medicare Provider Analysis and Review (MEDPAR) file that allows us to isolate those HMO days that are associated with Medicare patients. Therefore, since that time, we have been including HMO days in SSI/Medicare percentages.[59]

The Provider asserted that Medicare HMO days should be excluded from Medicare/SSI fraction. The Provider asserted that CMS did not adequately notify Providers that they were to bill no-pay bills in order to have Medicare HMO days included in the DSH calculation.

The Board held that there was no evidence that including HMO days in the DSH calculation resulted in a diminished payment to the hospital as the Provider suggests. The Board further found that inclusion of HMO days was not inconsistent with the statute or the regulations. Finally, the Board held whether CMS included or excluded HMO days in another program was irrelevant and not properly before the Board in the present case.

The Administrator agrees with the Board's determination and finds that §411 of the Medicare Hospital Manual dated 09/89, entitled Submitting Inpatient Bills in No-Payment Situations states that Provider's are to "submit bills for all stays, including those for which no program payment can be made." This section further requires Providers to submit no-payment bills "for services provided to an HMO enrollee for which an HMO has jurisdiction for payment."[60] The Administrator finds that the Provider has the responsibility to submit its HMO (and other) no-pay bills in order to properly reflect the Medicare beneficiaries inpatient hospital utilization, which will then only be reflected in the MEDPAR file.

Finally, the Administrator finds that days in which Medicare was the secondary payer (MSP) are also covered days counted in the MEDPAR file based upon the utilized days for the stays. The Provider argued that CMS reversed its position as to whether or not MSP stays should be counted in the denominator.

The record shows that as of April 1, 1995, MSP claims did not appear on the PS&R report type 110, which is used to settle cost reports, but instead, appeared on an adjunct version of the PS&R, i.e., PS&R report type 11A, which was not used to settle the cost report. Section of the Medicare Intermediary Manual, Part 3, sets forth rules for determining the amount of covered days where Medicare is the secondary payer. Section A.3. states that if the primary payer pays an amount for Medicare covered services that is equal to or less than the deductible and coinsurance that would apply if Medicare was the primary payer, the number of days in the stay equal the number of covered days (provided that the beneficiary has not exhausted coverage). The same section also provides, however, that if the primary payer pays an amount that is more than the deductible and coinsurance that would apply if Medicare was the primary payer, the number of covered days in the stay are determined on a pro rata basis. Accordingly, the Administrator finds that the days in which Medicare was the secondary payer are also covered days counted in the MEDPAR file based upon the utilized days for the stays.

**B. Numerator.** The Administrator finds that the Board erroneously concluded that there were systematic errors in CMS' matching process which entitled the Provider to a recalculation of its SSI fraction based on new data and a new matching protocol for the SSI days. The Administrator finds that the Provider failed to

show by a preponderance of the evidence that CMS' method for computing the Medicare fraction was flawed and had an impact on its DSH reimbursement.

Regarding the number of days that were computed for the numerator, the Provider alleges that there were matching flaws in the data by pointing to specific records. In addition, the Provider's consultant puts forth several theories on the matching process to show that either SSA did not provide complete data to CMS or that CMS failed to properly match data that SSA did provide. In addition, the Provider argues, as a matter of policy, that certain days either should have been included or not included, as a matter of policy. The following days are at issue: 1) retroactive SSI determinations/holds and suspensions; 2) manual or forced SSI payments; 3) Title II matching problems (beneficiaries without Title II numbers) 4) stale records from the SSI data; and 5) Section 1619(b) of the Social Security Act.

The Board acknowledges that each intermediary is bound to apply the Medicare fraction computed by CMS in determining a hospital's entitlement to the DSH payment. The Board ruled with respect to the numerator of the Medicare fraction that "the match process between CMS' MEDPAR and SSI data is flawed;" that "the flawed match may deflate the DSH percentage;" that "the incomplete SSI data tends to deflate the DSH percentage;" that "the Provider is not required to quantify the financial impact of each of the flaws identified, nor is it required to show an exact number of incorrectly counted days."[61] "The Board concluded that the Intermediary's determination of the Medicare percentage [Medicare fraction] is reversed and this case is remanded to the Intermediary to recalculate the DSH Medicare percentage [Medicare fraction] consistent with this decision."[62] The Administrator disagrees with the Board's finding and order.

## 1. Provider failed to demonstration that CMS' data was not accurate.

The record shows that there was a lengthy and contentious disagreement about the release of data. Eventually, the Provider did request and receive 627 individual-specific SSI eligibility records from SSA in an attempt to demonstrate that flaws in the data matching impacted its DSH payment.[63] This involved 569 records for deceased individuals[64] and 58 records of individuals that consented to have the information released.[65] The Provider reviewed all 627 records.

The Provider did not attempt to use any statistical sampling methodology. The Provider only requested records for individuals for whom the MEDPAR data that it received from CMS indicated no SSI days were associated with their stay.[66] That is, the Provider only requested those records that could only increase its Medicare DSH payments if later information was different from the original record. The Provider also only requested records for those individuals that the Provider, based on State Medicaid data believed were, or likely were, eligible for SSI.

The record shows that the selected records involved 10 individuals, representing 12 stays who were not credited with SSI days in the MEDPAR data but who according to the updated SSI data were eligible for SSI at the time of discharge. The Intermediary did not concede that any of these days were erroneously excluded from the day count.[67] However, even assuming that these days were improperly excluded in the original calculation, this means that approximately 1.59 percent of the individuals failed to match from a sample constructed from the individuals that indicated no SSI days were associated with the stay. Based on this sampling which should have captured a disproportionate number of errors in the data to the Provider's favor, the Administrator finds that the Provider failed to demonstrate that the data used in calculating the numerator of the Medicare fraction was not the best available data and that its reimbursement was affected by these errors.

## 2. Retroactive determinations/suspensions/holds

The Provider also challenged the data by specifically arguing that, at least theoretically, the CMS match does not capture all of the Provider's SSI days because the SSI record is created before certain retroactive determinations are made or that the data match does not account for "suspensions" and "holds." The Provider argues that later MEDPAR and SSI records should be used in the DSH calculation. CMS' policy recognizes that not all retroactive determinations made on SSI entitlement (whether granting or denying) would be included in the SSI record forwarded to CMS. However, CMS has determined that such actions would have a minimal impact on a provider's Medicare DSH fraction which combined with the need for finality in the process, makes the use of later data impractical and no more accurate.

In response to specific commenters, the Secretary addressed the use of updated SSI eligibility information

that may include retroactive grants or denials of eligibility, to revise calculations of hospital DSH Medicare fractions. The Secretary responded that:

We understand that many hospitals are concerned that later data matches may produce a different Medicare fraction. However, we believe that there needs to be administrative finality to the calculation of a hospital's Medicare fraction. CMS has previously stated that its goal is to obtain reasonably accurate but not perfect calculations (51 Fed. Reg. 16777). Additionally, our data have shown that 98 to 99 percent of SSI eligibility determinations are made and remain unchanged 6 months after the end of the Federal fiscal year. There will be a minimum of 6 months between the end of the hospital's cost reporting period and April 1 date that we have receive SSI eligibility information. The time lag between the close of a hospital's cost reporting period and the April 1 date that we receive eligibility information could actually be much longer for many hospitals. For a hospital with an October 1 to September 30 cost reporting period, we will use the SSI eligibility information from 6 months after its year ends. However, we will be using SSI eligibility from 17 months after a hospital's year ends with a November 1 to October 31 cost reporting period. Given the time between the end of hospital's cost reporting periods and when we are furnished with SSI eligibility information for that period, we believe it is highly unlikely that a subsequent data run will produce data that is significantly different than one completed 6 months after the end of the Federal fiscal year.

Therefore, we will use the SSI eligibility information provided to CMS by SSA 6 months after the end of the Federal fiscal year (or April 1) to calculate the DSH Medicare fraction. We will match these data to the MedPAR system once and conduct no further matches after that time. For cost reporting periods that span 2 Federal fiscal years, a hospital will receive the data for the 2 Federal fiscal years once the data from the second year have been matched against the SSI data available to CMS 6 months after the end of that year. Although it is possible that these data will be available up to 17 months after the cost reporting period has ended, hospitals will continue to be permitted to use the data to determine whether they prefer to base their calculations on data from the Federal fiscal year or their cost reporting period. The calculation from the requested time period will be used in the final settlement for the cost reporting period.[68]

However, the Board concluded that: "the omission of retroactive awards is a systematic error that *may* deflate the DSH Medicare percentage *if* retroactive awards involve Medicare beneficiaries."[69] However, the Administrator finds that the Provider has failed to demonstrate by a preponderance of the evidence that such omissions have had any impact on its DSH reimbursement.

The Provider, for support, refers to one stay in the sample of 627 patients, where it alleged that "the stay was included in the denominator reflected in the CMS MEDPAR data, but that the SSI days were omitted from the numerator because the individual's SSI payments appear to have been in suspension in March 1995 when SSA prepared the annual SSI tape for fiscal year 1994."[70] Without conceding whether this is true, the Administrator finds that this stay represents 1/6 of one percent of the sample. In addition, because the Provider did not chose SSI records for individuals who were credited with SSI days and only requested records of individuals who were not credited with SSI days, the sample could not show instances where individuals lost their SSI eligibility retroactive to the month of discharge.[71]

Moreover, while it is not the Intermediary's burden to demonstrate that these days were not a factor in deflating the Provider's Medicare fraction, the Intermediary presents arguments that in fact would support such a conclusion. The Provider's consultant argues that the most likely reason for a suspension of benefits is for representative payee development or the need to obtain a valid address.[72] However, if this were true, the SSI Annual Statistical Report, 2002[73] shows that for 1994-1996, the number of recipients whose SSI eligibility was suspended for whereabouts unknown or no representative payee numbered about 100,000 for each year. In contrast, the number of SSI recipients whose eligibility was terminated due to income and resource predeterminations was about 500,000-600,000 each year. As such, the number of retroactive disallowances outnumbers the number of retroactive awards. Even in the worse case scenario, were all of the 100,000 retroactively allowed suspensions involve Medicare beneficiaries and none of the approximately 500,000 retroactive disallowances involve Medicare beneficiaries, the allowances would represent less than one percent of all 12 million stays.

The Intermediary also logically concluded that the scenario in which a Medicare beneficiary is in the hospital, is not eligible for SSI at that time and thus is not counted in the numerator of the fraction for the June MEDPAR and subsequently wins a disability appeal establishing SSI eligibility for the month of discharge would be rare. Individuals pursuing appeals of determinations that they are not disabled for purposes of SSI

typically are not aged individuals. Similarly, the standards for establishing disability for Medicare purposes are essentially the same for establishing disability for SSI purposes.[74] Thus, it is reasonable to assume that the individuals successful in appeals of SSI disability denials are not comprised of Medicare beneficiaries.[75]

The Board rejects the Intermediary's position, as it alleges the Intermediary ignores the fact that a Medicare beneficiary might qualify for SSI for the first time because of illness or injury resulting in a hospitalization that limits their resources. The claim for SSI benefits may not be made until well after the hospitalization, and the adjudication of the claim might be much later. However, the Board ignores the fact that there is always a delay in the transmission of the SSA data, making it more likely the individual would have already received an initial favorable determination when the SSI match is made based on diminished income. The Medicare beneficiaries qualification for SSI benefits based on age and income makes it significantly less likely that there will be further adjudication unlike a disability claim by a younger individual. Therefore, the Intermediary properly concluded that individuals pursuing appeals of disability determinations are most likely not to be Medicare beneficiaries.

**3. *Manual or forced pay of SSI Benefits*.**

The Provider alleges that the matching process is flawed because the matching process is unable to account for instances in which an SSI beneficiary received payment as a result of an SSA Field Office manually ordering the payment be made and, thus, that Medicare/SSI individual is not included in the numerator of the Medicare fraction.. The Provider's witness testified that she had never seen a forced pay situation.[76] In contrast, the Provider's consultant testified that it occurred frequently, although he could not provide any independent corroborating evidence and admitted that he had no personnel experience with the systems for processing manual pays.[77] Subsequently, there was conflicting testimony as to the frequency of manual pays and whether a manual pay would always result in a terminated record.[78] The Provider showed only one stay not counted because it involved a manual payment. This omission is .15 percent, significantly less than one percent of the entire "sample" selected from records most likely to exaggerate any omissions. The Administrator finds that the Provider has failed to demonstrate that the data used by CMS for the calculation of the Medicare fraction adversely impacted the Provider's reimbursement due to the omission of SSI days because of manual or forced payments to that the CMS calculation was improper.

**4. *Beneficiaries without Title II numbers*.**

The Provider alleges that CMS failed to match SSI beneficiaries who do not receive Title II numbers to Medicare stays in the MEDPAR. The Provider maintains that these records are eliminated from the social security records before the matching process begins. However, the CMS programmer responsible for the SSI/MEDPAR match program confirmed that CMS generates a Title II number from each social security number on the SSR tape. Therefore, if a record on the social security tape does not contain a Title II number, CMS uses the Title II number it has created from the individual's social security number in the matching process.

CMS writes two HICANs from the SSA record, one based on the social security number and one from the Title II field. For example, where a wife was originally entitled to Medicare based on her husband's account and subsequently becomes entitled to Medicare based on her own account and had an inpatient stay while entitled to Medicare based on her own account the following would occur. In this case, CMS would take the SSN from the SSN field of the SSR and append a Medicare beneficiary Identification Code (BIC) of A to it. This action creates a HICAN based on the individual's own earnings (HICAN1). CMS also identifies a HICAN from Title II field on the SSA records thus regardless of whether the hospital stay is with HICAN1 of HICAN 2, the individual will be identified as an SSI beneficiary.[79] In addition, the CMS programmer stated that CMS does not eliminate records for individual for whom no numerator appears in the Title II or CAN field.[80]

The Administrator also notes that the Secretary specifically declined, as a matter of policy, to adopt a commenter's request that CMS allow hospitals to choose the data file CMS would use to conduct the SSI eligibility/MEDPAR data match. Similar to the Provider's arguments in this case, the commenter suggested that hospitals be allowed to request that the data match be made by social security number, health insurance claim account number (HICAN), name, gender, date of birth, or Title II identifier, or a combination of the factors. The Secretary explained that:

We do not use social security numbers to conduct the SSI/MedPAR data match because the social security numbers are used on a "wage earner" basis that is not necessarily specific to an individual

Medicare beneficiary (or hospital patient) The HICAN are unique to each beneficiary. Because of this we do not have social security numbers for every Medicare beneficiary in the MEDPAR data.

In addition, we do not agree that individual hospitals should be given the choice to run the SSI/MEDPAR data match by alternative criteria. Such variations between providers would result in an inconsistent matching methodology and inconsistent DSH Medicare fraction calculations, among providers.[81]

The Administrator notes that, to the extent that the Provider may have identified a scenario for which the Medicare beneficiaries' SSI days would not be credited (e.g., remarried widow on second husband's account) the Provider only identified one instance in the sample drawn to exaggerate any such errors, where this occurred, a percentage of .15 percent, significant less than one percent. Therefore, the Administrator finds that the Secretary's policy determination not to use alternative identifiers is supported by the record in this case.

### 5. Stale records

Up until approximately February 1996, SSA's annual tapes did not include SSI records that had been "terminated" and were inactive prior to the time of SSA transmission of the tapes to CMS. Based upon this policy, the Provider claims that it was arbitrary and capricious to have used the MedPAR data matched with the SSI data. However, the record in this case shows that stale records were not a significant issue for providers, especially those in the Provider's circumstances, that had their Medicare fractions calculated on the basis of the Federal fiscal year instead of their cost years.

The Administrator notes that the Provider's opening statement included an observation that there were "[f]ive hundred thousand terminations a year that will become inactive ... and all of those were [] omitted from the calculations at issue here. At least for fiscal years `93, `94."[82] The Provider has only about 9,000 discharges annually. By stating that such records were "omitted," the Provider appears to be saying that the records would have otherwise been reflected in CMS' calculation of the Medicare fractions. Such a statement is unsupportable. The Provider elicited testimony from one of its witnesses that there were 500,000 termination actions a year during FYs 1993 to 1996, but even assuming this unsubstantiated statement is accurate, the Provider's witness did not say how many of the terminations involved Medicare beneficiaries who had inpatient stays.[83]

In 1996, upon learning that SSA had not been supplying it with stale records, CMS obtained updated SSI records from SSA. These records included the stale records restored.[84] CMS matched this updated SSI information with existing MEDPAR files, and kept a record count of the number of stays in the existing MEDPAR files that had no SSI days associated with them as compared to the number of stays in the MEDPAR file that had SSI days associated with them after taking the updated SSI information into account. These record counts can be found at Provider's Exhibit No. 64, pp. 1518-1520, at places indicated by the line, "old equal to zero, new not equal to zero."

CMS also kept a record count of the number of stays in the existing MEDPAR files that had SSI days associated with them as compared to the number of stays in the MEDPAR file that had no SSI days associated with them after taking the updated SSI information into account. These record counts appear in Provider's Exhibit No. 64, pp. 1518-1520, at the places indicated by the line, "old not equal to zero, new equal to zero."

CMS kept track of how many stays for which both the existing MEDPAR files, and the MEDPAR files after taking the updated SSI information into account, showed SSI days, but for which the number of SSI days were not the same for one file as compared to the other. These record counts appear in Provider's Exhibit No. 64, at pp. 1518-1520, at the places indicated by the line, "both not equal to zero."

In addition, to be taken into consideration is the fact that the record counts display unedited data.[85] Prior to calculating the Medicare fractions of hospitals each year based on the MEDPAR file, CMS runs the MEDPAR file through a series of edits which are designed to identify and edit out stays that do not belong in the calculation prior to calculation, e.g., stays in a PPS-excluded area of the hospital such as a rehabilitation unit.[86] The Intermediary witness testified that approximately 450,000-500,000 records drop out each year due to her use of edits, and that this would have been true during the years at issue in this case.[87] Thus, the total record counts of about 12 million for FYs 1993-1996[88] are overstated by about 4 percent. All else being equal, that would also mean that the "old equal to zero, new not equal to zero" and "old not equal to zero,

new equal to zero" counts would also be overstated by about the same percentage, but, naturally, we have no way of determining whether the actual percentage would be greater or lesser for any given year or any given hospital.

The existing MEDPAR files that were matched with the updated SSI data were not the versions that were used to perform the original calculations, but instead were later versions of the same FY files. The importance of this is that the later versions of a MEDPAR file for a given fiscal year can be expected to have had more missing stale records than the version used to perform the original calculations. That is true because, with respect to the later versions, more time would have elapsed between the hospital stay and the compilation of the SSI tape, and thus, there is a greater opportunity for a patient to have died or otherwise to have had his/her record become inactive and then stale.

In examining the "old not equal to zero, new equal to zero" figures for FYs 1993 and 1994 that appear in Exhibit No. P-64 at 1529, the "old not equal to zero, new equal to zero" count is 2,497. The Provider alleges that the number of retroactive SSI awards are much greater than the retroactive terminations of SSI, but for this purpose it is assumed that the retroactive awards are equal to the retroactive terminations (2,497), and that the remaining portion of the 48,616 "old equal to zero, new not equal to zero" record count, or 46,119, represents stale records. Reducing the 46,119 by four percent to account for the records that would have been edited out by Ms. Rosenberg leaves a total of 44,274 stale records prior to any adjustment for the fact that the version of the FY 1993 MEDPAR under comparison here was the December 1995 version, and not the June 1994 version.

In addition, the June 1994 version of the MEDPAR would have been matched with the SSI tape sent to CMS at the end of March or beginning of April 1994, or in other words, the June 1994 version would have been matched with an SSI tape that was created 12 months after the middle of the fiscal year. The December 1995 version of the MEDPAR would have been matched with the SSI tape sent to CMS at the end of March or beginning of April 1995, and thus, would have been matched with an SSI tape that was created 24 months after the beginning of the fiscal year, a period twice as long. Assuming that an equal number of records became stale each year, that means the 44,274 figure should be reduced by half, and that the number of stale records that did not get picked up in the match of the June 1994 MEDPAR with the SSI tape were about 22,150. Because there were approximately 5,200 PPS hospitals around this time,[89] that would mean that the average size hospital with the average SSI population would have had about four stale records omitted from its calculation, some more, some less, some zero.

The Administrator finds that the figures for 1994 are even less significant.[90] The version of the FY 1994 MEDPAR file under comparison in Exhibit No, P-64 is the March 1996 update, which would have been matched on the basis of the tape that SSA sent to CMS at March-end or beginning-April 1995, which is the same tape that would have been matched against the June 1995 version of the FY 1994 MEDPAR. This explains why the "old not equal to zero, new equal to zero" count is zero (there would be no subsequent terminations reflected if there has not been any change in the SSI tape), and also explains why the "old equal to zero, new not equal to zero" record count was only 17,070 records." A reduction of the 17,070 records by four percent to account for records that would have been edited out by Ms. Rosenberg leaves a total of 16,387 stale records. Dividing that number by the approximate number of 5,200 PPS hospitals would mean that the average size hospital with the average SSI population would have had about three stale records omitted from its calculation.

The MEDPAR public use extracts in the record also supports a finding that the stale records issue was not significant and that CMS consistent with the IPPS scheme, corrected the problem prospectively only. The data shown at Exhibit No. I-18, i.e., the Medicare fractions for the Provider for 1993 through 2000, shows that the Provider's Medicare fraction rose each year (with the exception of 1998-1999) by about the same percentage. If a significant number of stale records had been omitted by SSA, it is reasonable to conclude that there would be a noticeable Medicare fraction increase between 1994 and 1995, and then a steady rise from 1995 forward, but that is not the case. Instead, these figures show a more or less continuous, steady rise from one year to the next, including from 1994 to 1995. Moreover, also reflected in Exhibit No. I-18, the Medicare fractions for all hospitals in the country, for this time period, and the Medicare fractions for all Massachusetts hospitals, show a similar pattern. Thus, all indications are that the stale record issue was not significant.

Further, the Provider argues and the Board appears to accept that the December 1996 version of the FY 1994 MEDPAR had 400 more SSI days and 2600 more covered days. The Provider's consultant concludes

that 200 of the 400 days must be due to the effects of stale records and retroactive determinations.[91] However, the witness' extrapolation does not seem consistent with the national and state-wide observations of the effects of stale data in the Medicare fraction. The Administrator concludes that it was reasonable for CMS not to have retroactively recomputed the Provider's Medicare fractions so as to include any stale records for those years.

**6. *Section 1619(b) beneficiaries***

The Board determined that individuals addressed in §1619(b) of the Act ("§1619(b) beneficiaries) should be included in the numerator of the DSH computation, as set forth at 42 CFR 412.106(b)(2). Section 1619(b) reads, in relevant part, as follows:

Blind or disabled individuals receiving supplemental security income benefits.

(1) ... *[F]or purposes of title XIX [Medicaid.]*, any individual who was determined to be a blind or disabled individual eligible to receive a benefit under section 1611 [SSI] or any federally administered State supplementary payment for a month and who in a subsequent month is ineligible for benefits under this title (and for any federally administered State supplementary payments) because of his or her income shall, nevertheless, be *considered* to be receiving supplemental security income benefits for such subsequent month provided that ... --[certain conditions are met].... [Emphasis added.]

The relevant language of the DSH statute at Section 1886(d)(5)(F) refers to a fraction comprised of a numerator of which the number of paid days is made up of patients who were entitled to Medicare and "supplemental security income benefits under Title XVI." In addition, the relevant language of the regulation at §412.106(b) states that the days to be included are "furnished to patients who during that month were *entitled to both Medicare Part A and SSI*, excluding those patients who received only State supplementation.... (Emphasis added.)

Further, the Board determined that, pursuant to application of the special SSI eligibility rule set forth at 20 CFR 416.264, individuals who are "considered" to be eligible for SSI but are ineligible because of their income, should be counted in the computation at 42 CFR 412.106(b)(2), above. In relevant part, 20 CFR 416.264 states that:

The special SSI eligibility status applies *for the purposes of establishing or maintaining your eligibility for Medicaid. For these purposes* we *consider* you to be a blind or disabled individual receiving benefits *even though you are in fact no longer receiving regular SSI benefits or special SSI cash benefits.* You must meet the eligibility requirements in §416.265 in order to qualify for the special SSI eligibility status. (Emphasis added.)

Applying the law to the facts of this case, the Administrator finds that the Intermediary properly excluded §1619(b) beneficiaries from the computation set forth in 42 CFR 42.106(b)(2). Section 1619(b) expressly states that "for purposes of title IX [Medicaid]," certain individuals will be "considered" to be receiving SSI benefits during the month if certain conditions are met. Moreover, 20 CFR 416.264 states that the special SSI eligibility status referenced therein "applies for the purposes of establishing or maintaining your eligibility for Medicaid." Thus, all of the regulations relied upon by the Board in this case expressly state that they are applicable only for purposes of Medicaid eligibility. Section 1619(b) was written narrowly to limit its application to certain individuals in very specific situations, i.e., those who lost their eligibility for SSI, and, therefore, for Medicaid, because of income due to employment. The policy objective appears to be that of a work incentive, i.e., the continuation of Medicaid benefits even though the individual exceeds SSI income limits, and the elimination of the need to reapply for SSI cash benefits if the individual again becomes unable to work. Where the statutory conditions are met, §1619(b) beneficiaries will only be "considered" to be receiving SSI. Section 1619(b) does not reinstate their actual SSI cash payments.[92]

The Administrator finds the Board erroneously relied upon 20 CFR 416.264 to resolve the §1619(b) issue, for that regulation expressly states that individuals in the special SSI status "are in fact no longer receiving SSI benefits or special SSI cash benefits." Thus, §1619(b) beneficiaries are not "entitled to both Medicare Part A and SSI," as required by 42 CFR 412.106(b)(2), and, therefore, were correctly excluded from the regulatory computation.

**V. *Credibility of Witnesses***

The Board decision relies, in part, on the testimony of David Pfeil, president of Southwest Consultant Associates and Gerry Smith, Vice President of Southwest Consulting Associates.[93] While both individuals are identified as consultants, the Provider did not proffer either witness as experts.[94]

The record shows that both offered opinion testimony, similar to that which would be offered by an expert as to the effects of certain alleged CMS data flaws on the DSH patient percentage.[95] Jerry Johnson, employee of the Provider stated that the Provider had engaged Southwest Consulting Associates to work on the matter on behalf of the hospital on this appeal and that he had not personally done a lot of the data analysis and examination.[96] The record also shows that Southwest Consultant Associates has a 35 percent contingency fee arrangement and is paying all of the legal and consulting fees and expenses in relation to these appeals.[97] Such agreements are generally found to be against public policy and void.[98] There is no indication that the consultants thought the agreement was void when they testified in this case. Therefore, the existence of the agreement must be taken into consideration when evaluating the witnesses' credibility in this case.[99]

Alan Schafer was another consultant engaged by the Provider's representative.[100] His compensation agreement was not discussed in the testimony, although it would have been correctly a subject of examination.[101] However, certain data that he analyzed was selected through Gerry Smith,[102] while other of Schafer's testimony at times consisted of antidotal evidence without any independent corroborating evidence.

Numerous courts have addressed the problems of credibility when a witness is compensated on a contingency fee basis.[103] As the court noted in Creative Dimensions in Management v. Thomas Group, Inc., 1999 U.S. Dist. LEXIS 2757 (March 11, 1999), that:

The testimony of an interested lay witness about historical facts generally does not pose a risk of the same proportion as that of an expert with a contingent financial interest. The concealment of a contingent financial relationship with a witness would be unconscionable. With the disclosure of such an arrangement, an opinion proffered by an expert would likely be so undermined as to be deprived of any substantial value. See Gediman v Sears, Roebuck & Co., 484 F. Supp. 1244, 1248 (D. Mass. 1980) ("an agreement to give an opinion on a contingent basis, particularly on an arithmetical scale, attacks the every core of expert testimony"). Jurors, however, routinely take and assess the testimony of parties and persons related to them who have a direct financial interest in the outcome of a case. "With many witnesses and of course parties, interest is unavoidable. An expert however, whose only relevance is his expertise, should not have that expertise flawed." (Emphasis added.) Id. n.4.

Further, the First Circuit Court of Appeals found in Crowe v. Bolduc, 334 F. 3d 124, 132 (1st Cir. 2003)

The problem was exacerbated here because the witnesses, admittedly not called as experts, gave what amounted to opinion testimony as to the meaning of the contract language. The majority rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy. The rule was adopted precisely to avoid even potential bias....[104]

The Administrator finds that the Board failed to weight the credibility of the consultants Pfiel[105] and Smith opinion testimony (and Schafer for related reasons) in light of the financial interest these consultants have in the outcome of the litigation.[106]

## VI. Administrative burden

Finally, the Board's decision concludes that to redesign the computer program to recalculate the Medicare fraction to correct the claimed errors with updated data would not be an administrative burden for these cost years. The Board's decision chooses to look beyond this particular Provider's appeal in finding that this Provider need not show harm.[107] Yet, the Board's decision ignores the enormity of the Medicare Program in finding that the implementation of its order would be no administrative burden, despite its retrospective and wide reaching implications.[108]

The Administrator concludes that the Board erred in adopting the Provider's narrow view of the administrative burden which ignores the whole of CMS implementation scheme for IPPS. As the court in

*Methodist, supra,* acknowledged, the provider's position in that case could "cause a significant if not debilitating disruption to the Secretary's administration of the already complex Medicare program." *Methodist Hospital,* 38 F. 3d at 1233. The Board failed to consider the wider implications of its decision in this case, despite the full knowledge of the cases presently pending before it on this issue and despite the fact that the Provider has not been able to demonstrate any financial harm to justify any such relief as the Board has ordered and may in fact experience a reduction in DSH payment.

In sum, the Board's standard applied in this case, which requires an errorless match in order to withstand the Board's scrutiny, is inconsistent with the IPPS and the efficient administration of the Medicare program. The Administrator finds that the Provider is not entitled to a recalculation of its Medicare fraction for the cost years involved in this case.

## DECISION

The decision of the Board is modified in accordance with the foregoing opinion. The Administrator finds that the CMS' determination of the Provider's Medicare fraction is proper and is hereby affirmed.

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF THE HEALTH AND HUMAN SERVICES**

Date: 5/11/06

[1] Pub. Law No. 89-97.

[2] Section 1811-1821 of the Act.

[3] Section 1831-1848(j) of the Act.

[4] Under Medicare, Part A services are furnished by providers of services.

[5] Pub. Law No. 98.21.

[6] H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).

[7] Section 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. L. No. 99-272). *See also* 51 Fed. Reg. 16772, 16773-16776 (1986).

[8] The Pickle method is set forth at section 1886(d)(F)(i)(II) of the Act.

[9] Under the Administrative Procedure Act, the proponent of the rule has the burden of proof. 5 USC 556(d). Thus, a provider has the burden to establish its claim for reimbursement before the Board. In this instance, the Provider has the burden of proof to support its claim for additional DSH payments by a preponderance of the evidence. (*Fairfax Hospital Association v. Califano,* 585 F. 2d 602 (4th Cir. 1978) CMS/HCFA Ruling79-60c.)

[10] Exhibit P-42 at 1232, Transcript of Oral Hearing (Tr.) at 124-25.

[11] Exhibit P-41 at 1181, Tr. at 175-78.

[12] Exhibit P-42 at 1221-22.

[13] Exhibit P-42 at 1225.

[14] Board's decision at page 10-11, Provider's Position Paper pp. 15-16.

[15] Tr. 2039-40.

[16] Dean Evidentiary Hearing Tr. 76-78, P-42, Tr. 1218-1219, P-13 at 118, Tr 1414.

[17] Dean E.H. Tr, 54-59)

[18] P-42, Tr. 1219; P-13 at Tr. 116, Tr. 1727)

[19] Tr. 1726.

[20] *See* Intermediary Post-Hearing Brief, pp 4-6 and the Intermediary Post-Hearing, Brief, Exhibit 1, Parties Stipulations.

[21] Exhibit I-8 at 60, Tr. 1340, 1345.

[22] Tr. at 1340.

[23] Tr. at 1341.

[24] Tr. at 1341, 1343.

[25] Tr. at 1343.

[26] Tr. at 1347-48.

[27] 51 Fed. Reg. 31454, 31459-60 (Sept 1986).

(The 2002 MEDPAR file contains over 12 million records. See, e.g., *http://www.cms.gov/IdentifiableDataFiles/05_MedicareProviderAnalysisandReviewFile.asp.*)

[28] 51 Fed. Reg. 16777.

[29] 51 Fed Reg. 31459-60. (*See also* "[I]n the interim final rule we proposed matching SSI eligibility records to the Medicare bills on a Federal fiscal year basis because we believe this is the most efficient approach." 51 Fed. Reg. 31454 (Sept. 3, 1986))

[30] 51 Fed Reg. 31459-60.

[31] 70 Fed. Reg. 47278, 47439-47440.

[32] In reference to a specific objection raised by a commenter regarding the CMI, the Secretary announced: "We do not believe that hospitals should be allowed to substitute other criteria for the one we published in the NPRM (notice of proposed rulemaking. We selected the 1981 case-mix index for this criterion because it represents the most current published data available at the time. The basic tenet of the prospective payment system is that the rates paid to hospitals are determined prospectively and are based on the best data available at the time. Thus, a hospital knows in advance what its payment amounts will be." See 49 Fed. Reg. 34728 34743-44 No commenters raised the issue of recalculating the SSI ratio in the initial rule implementing the DSH SSI calculation and thus the issue was not explicitly addressed in the final rule.

[33] Intermediary Exhibit I-10, p. 11.

[34] *See* 49 Fed. Reg. 34728 34743-44.

[35] 51 Fed Reg. 16777.

[36] *See also Los Angeles* at 43 ("Nor is it accurate to claim that as the hospitals do, that outlier payments are entirely divorced from PPS. As an initial matter, the provisions resulting to outliers are contained in the same subsection of section 1395ww as those establishing the PPS regime. See 1395ww(d). Moreover, Congress established outlier payments not as a distinct reimbursement methodology but as a carefully crafted supplement to PPS. For that reason *Georgetown II*, which concerned retroactive adjustments under the pre-PPS "reasonable cost" system --clearly a payment methodology lacking any relationship to PPS --is

inopposite." *Id.* n. 43

[37] The Secretary explained the method of payment: ``The process we will use for making payments to hospitals that serve a disproportionate share of low income patients will be similar to the process we use to make the additional payment for the indirect medical education costs; that is we will make interim payments based on the latest available data subject to a year-end settlement on a cost reporting period basis. For purposes of making these interim payments, the initial determination of a hospital's eligibility for this payment will be made by the hospital's Medicare fiscal intermediary based on Medicaid statistical data as reported on the hospital's most recent cost report and the SSI and Medicare data to be supplied by HCFA's central offices. *See* 51 Fed. Reg. 16772 (May 6, 1986).

[38] Intermediary's Exhibit I-10 at p. 11.

[39] *See* 42 CFR 412.80(c) with respect to the calculation of outlier payments. Further, during the cost years at issue, the IPPS rule was required to be published by September 1 of each FFY, thus, the latest data available to CMS was the June update of the MEDPAR for the previous year.

[40] Tr. 2039-40.

[41] Tr. 12039; 60 Fed. Reg. 45778, 45924 (Sept.1, 1995); 59 Fed Reg. 45330, 45494 (Sept 1, 1994) 58 Fed Reg. 46270, 46456 (Sept.1, 1993) 57 Fed. Reg. 39746, 39986 (Sept. 1, 1992). *See* 51 Fed. Reg. 16772 (May 6, 1986)("The number of patients days of those patients entitled to both Medicare Part A and SSI will be determined by matching data from the Medicare Part A Tape Bill file and the Social Security Administration SSI file."

[42] *See* e.g. *Methodist Hospital of Sacramento v Shalala*, 38 F 2d 1225, 1229-35 (D.C. Cir. 1994); *Jewish Hospital v Secretary*, 19 F. 2d 270, 272-76 (6th Cir.) (where courts have found agency statements in preamble portion of the Federal Register publication constituted agency statutory interpretation). *Compare Health Insurance Ass'n of America v Shalala*, 23 F 3rd 412, 423 (D.C. Cir 18994) (where agency statement found to be nonbinding even though published in the code of federal regulations.)

[43] *See*, e.g., 60 Fed Reg. 45778, 45924 (Sept. 1, 1995)(referring to more recent hospital data in the June 1994 MEDPAR update).

[44] *Universal Health Services v. Thompson*, 363 F.3d 1013 (9th Cir. 2004) ("because the hospitals failed to raise the arguments advanced in the cases in annual notice-and-comment rulemaking determining the outlier thresholds that directly affected their Medicare reimbursement notice we conclude that arguments have been waived.") *Texas Oil and Gas Ass'n v. EPA*, 161 F. 3d 923 (5th Cir. 1998) (arguments that agency rule was arbitrary and capricious were waived by failure to raise them during notice and comment period. *Nader v. NRC*, 523 F. 2d 1045 (D.C. Cir. 1975).

[45] Board Decision p. 42.

[46] Board Decision p. 42.

[47] Board Decision p. 42.

[48] Utilized days are Medicare benefit days available to the patient, whereby the patient is not responsible for payment. *See* §1812 of the Act; 42 C.F.R. §409.60 *et. seq.*

[49] 51 Fed. Reg. 16772 at 16777 (May 6, 1986).

[50] 52 Fed. Reg. 33143, 33144 (September 1, 1987). *See also* 52 Fed. Reg. 3304, 3305 (September 1, 1987) ("[t]he MEDPAR file contains the same data as the PATBILL file but is in a simplified, reformatted record layout"). See also 52 Fed. Reg. at 22080, 22085 (Jun 10, 1987).

[51] 70 Fed. Reg. 47278, 47441 (August 12, 2005).

[52] 51 Fed. Reg. 16772 at 16777 (May 6, 1986)

[53] 69 Fed. Reg. 48916 at 49098 (Aug. 11, 2004)

[54] Board Decision at 38.

[55] A letter from Nancy Edwards, then Acting Director, Division of Hospital Payment Policy, describes the denominator of the Medicare fraction as including "covered patient days utilized by patients under Medicare Part A." Provider's Exhibit P-40 at 1093.

[56] Medicare Intermediary Manual §3620.D.6.

[57] Section 1886(a) (1) of the Act states that, under the terms of its provider agreement, a provider agrees:

(A)(i) not to charge, except [for coinsurance and deductibles]. Any individual or any other person for items or services for which such individual is entitled to have payment made under this title (or for which he would be so entitled if such provider of services had complied with the procedural and other requirements under or pursuant to this title ...),

***

(K) not to charge any individual or any other person for which payment under this title is denied under section 1154(a)(1)(B) [that the quality of service did not meet professionally recognized standards of health care].

[58] See 42 C.F.R. §417.101(a) (2) (ii); See also the Medicare Health Maintenance Organization/Competitive Medical Plan Manual §2102.

[59] 55 Fed. Reg. at 35994 (Sept. 4, 1990)

[60] Section 411 of the Medicare Hospital Manual Publication 10, dated 09/89. See also Intermediary's Exhibit I-20.

[61] Board Decision, pp. 41-42.

[62] Board Decision, p 42.

[63] Tr 635-36, 645.

[64] Tr. 425.

[65] Tr 637.

[66] Tr. 652.

[67] See Intermediary Post-hearing brief, pp. 39-40.

[68] 70 Fed. Reg. 47278, 47439-47440.

[69] Board Decision at p 29.

[70] Provider's Position Paper at 43-44.

[71] The Provider did not request SSI data for FYs for which the original MEDPAR files that produced the original calculations existed. The Provider requested the SSI data for files for which only the December 1996 update existed.

[72] Tr. 356, 358.

[73] Exhibit I-17.

[74] *Compare* section 223(d) of the Social Security Act with section 1614(a)(3)(A) of the Act. *Compare* 20 CFR 404.1505 with 416.905 and 416.906.

[75] In addition, ESRD Medicare beneficiaries only make up .002 percent of Medicare beneficiaries. Exhibit P-195 at 3393.

[76] Tr. 161-162.

[77] Tr. 478-790.

[78] Tr. 222-225.

[79] Tr. 1340-1, 1343, 1347-1348.

[80] Tr. 389-92.

[81] *See* 70 Fed Reg. 47440-47441 (August 12, 2005).

[82] *See* Tr. at 61-62.

[83] *See Id.* at 323-324.

[84] The SSI information which SSA supplied in 1996 did not include simply stale records restored to historical data (e.g., the same data supplied to CMS in, say, 1993, with the addition of stale records), but rather included updated data (i.e., data reflecting any retroactive changes in individuals' SSI eligibility) plus restored stale records. *See* Tr. at 2045-46. Because the SSI data supplied by SSA to CMS in 1996 was updated data, and not just restored stale records data, one cannot tell what portion of the "old not equal to zero, new equal to zero" record counts are due to restored stale records and what portion is due to updates in individuals' SSI eligibility status Tr.2050-52.

[85] *See* Tr. at 2050-52.

[86] *See* Exhibit No. P-40 at 735, Exhibit No. P-40 at 1275-76.

[87] *See* Tr. at 2050-52.

[88] Exhibit No. P-64 at 1528-30.

[89] *See* Tr. Sep. 22, 2004 at 2055.

[90] *See* Exhibit No. P-64 at 1529.

[91] Tr. 35-37, 874-77, 927-29.

[92] The Conference Report states that "when a disabled SSI recipient's earnings rise to the point that he no longer qualifies for the Federal SSI benefits, State Supplementary payments or the special benefit status [under section 1619(a)] he would nevertheless continue to retain eligibility for medicaid and social services as though he were an SSI recipient ..." H.R. Conf. Rep. 99-944 at 49.

[93] *See*, e.g., Board decision at n. 137, referring to Smith testimony regarding additional 200 days as an unexplained discrepancy and something other than "new or additional Medicare covered days coming in the denominator." The Board than concluded that the "discrepancies" between the earlier calculation and the 1996 run alone (i.e., the additional days beyond the expected 200 days testified to by Smith) "illustrates that the original data was inaccurate with respect to the stale data." *Id.* at 25; Board decision at p. 24, referring to Pfiel's testimony that changes to the Medicare fraction would have a major impact on hospitals that treat a large indigent population and Board ruling at p. 25; Board decision at p. 22 adopting Pfiel's opinion

testimony with respect to the use of multiple alternative identifiers.

[94] A consultant is generally considered to be one "who gives expert advice." *The American Heritage Dictionary. Wikipedia.* ("A consultant (from the Latin, *concultus,* meaning legal expert) is a professional who provides expert advice in a particular domain or area of expertise.")

[95] *See* Fed. Rules of Evidence, Rule 701 ("If the witness is not testifying as an expert, the witness testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the *perceptions* of the witness and (b) helpful to a clear understanding of the witnesses testimony or the determination of a fact in issue."); Fed. Rules of Evidence, Rule 702 ("If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience training or education may testify thereto in the form of an opinion or otherwise." While the Board is not bound by the Federal Rules of Evidence (42 CFR 405.1855), such rules can provide helpful and practical guidance.

[96] Tr. 971.

[97] *See* Intermediary Exhibit I-10, Provider's Response to CMS Second Set of Interrogatories and Request for Production of Documents, p.11.

[98] *See e.g. Reffett, et.al. v Commissioners of Internal Revenue,* 39 T.C. 869, 878 (1963) "[I]t seems to be rather generally accepted rule that all agreements to pay witnesses extra compensation contingent on the success of the lawsuit are against public policy whether the agreement is with an ordinary witness, an expert witness or a witness who cannot be compelled to testify, because such agreements constitute a direct temptation to commit perjury." *Alexander v. Watson, supra, Hough v State,* 145 App. Div. 718, 130 N.Y. Supp. 407 (1911); *Sherman v. Burton,* 165 Mich. 293, 130 N.W. 667 (1911); Annot., 16 ALR 1457, 1460, 1464 (1922)". *See also Accured Fin. Service v. Prime Retail,* 298 F. 3d 291, 300 (4th Cir. 2001) (addressing that supplying expert testimony for a contingent fee as against public policy. *Id.* at 299); *New England Telephone & Telegraph Company v Board of Assessors of Boston,* 392 Mass. 865, 872 (1984)("The majority rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy.") *Belfonte v. Miller,* 243 A.2d 150. 152-153 (1968) (addressing that supplying expert testimony for a contingent fee as against public policy. *Id* at 152.)

[99] Further, where the method of compensation is altered, "the stake in the litigation would be eliminated thereby significantly meeting the policy concerns.... Of course, the witness would still be subject to impeachment on the grounds of bias with respect to evidence prepared and opinions formulated during the period in which the witness labored under the contingency fee agreement." *Mushroom Transportation v Continental Bank,* 70 B.R. 416, 418 (1987)

[100] Tr. 414-415.

[101] As the court noted in *New England Telephone & Telegraph Company v. Board of Assessors of Boston.,* supra, 392 Mass. 865, 870, the expectation of future business cannot be a ground for disregarding testimony, however, ``an expert witness "financial interest in... a continuing business relationship including an expectation of more..... work `may bear on his credibility, but does not warrant a blanket determination that the witness lacks credibility." Id. at 870. Mr. Schafer would have properly been examined, not only as to his compensation arrangement, but also as to his expectation of future work especially in light of the allegation that there are in excess of one thousand cases pending on this issue.

[102] Tr. 420, 434. The court noted in *Mushroom Transportation v Continental Bank,* 70 B.R. 416 (1987) that any pre-trial assistance rendered to other witnesses by expert paid on contingency fee may be grounds for impeachment of that witness. *Id.* at .n.5

[103] *See,e.g, Davey v. Chang,* 286 B.R. 54 (2002)(distinguishing between rules of evidence and rules of ethics noting that in Universal Athletic Sales Co. v. American Sign, 546 F. 2d 530(3rd Cir. 1976) the court found nothing in the rules of evidence bars such testimony, but acknowledging that witness had incentive to shade testimony and was a consideration in assessing credibility, but not dispositive.)

[104] The court in this case also pointed out that the problems inherent with the payment of a witness by

contingent fee is addressed in many codes of professional responsibilities (such as the Maine bar Rule 3.7(g)(3)), by explicitly prohibiting the practice. *See*, e.g., Pa. Code of Professional Responsibility DR-109 (C), *Shore v. Parklane*, 1978 U.S. Dist. LEXIS 14211 (1978) (referring to NY Judiciary Law, Disciplinary Rule, 7-109(c) and AICPA (Accounting) Ethics Ruling section 302).

[105] The Provider also submitted certain evidence through the consultant regarding the treatment of other hospitals with which CMS allegedly reached a settlement. To the extent such evidence is intended to show liability for the claim, it is not properly considered and part of the record. The court in *Board of Trustees, supra*, allowed in settlement evidence only where it was to show arbitrary and capricious action on the part of the agency, in that the Agency inconsistently applied its policy. The Court ultimately found that the evidence in the end did not support a finding of arbitrary and capricious action by the agency.

[106] In contrast, for example, the Board basically rejected all of the Intermediary arguments and inappropriately shifted the burden of proof to the Intermediary because of the data location and release problems. However in weighing evidence the record shows that the Intermediary's arguments were mostly based on independent statistics, the transparent mathematical analysis of those statistics and testimony of Federal employees with no financial interests in the outcome of the case.

[107] The Provider initially appealed issues that met the $10,000 amount in controversy, so the matter of the lack of financial harm does not affect this issue of jurisdiction. (*See*, e.g., Provider's Request for Hearing, dated March 19, 1999, FYE Sept 30, 1996) However, although not argued before the Board, it is difficult to reconcile the Provider's failure to show financial harm and the need for the Provider to show "dissatisfaction" with the amount of its DSH payment as required under Section 1878(a) of the Act as an element of Board jurisdiction. Jurisdiction can never be waived, despite the Board's finding that the Provider did not have to show harm.

[108] The record shows that no CMS employee was questioned as to the administrative burden the proposed relief would have program wide. Therefore the Board erred in finding that statements of CMS' own employees support such a finding.

© 2008, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPE COD HOSPITAL, *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )    Civil No.  07-1883 (RCL) |
| | ) |
| MICHAEL O. LEAVITT, SECRETARY | ) |
| United States Department of Health and Human Services, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**NOTICE REGARDING BULKY ATTACHMENT**

On February 8, 2008, Plaintiffs filed with the Electronic Case Filing system their

Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition

to Defendant's Motion to Dismiss, including Plaintiff's Partial Administrative Record.

The Partial Administrative Record is in paper form only and is being maintained in the

case file in the Clerk's Office.  This document will be available for public viewing and

copying between the hours of 9:00 a.m. to 4:00 p.m., Monday through Friday.

Respectfully submitted,


/s/ Christopher L. Keough
Christopher L. Keough
  DC Bar No. 436567
John M. Faust
  DC Bar No. 433553
Stephanie A. Webster
  DC Bar No. 479524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

February 8, 2008

## CERTIFICATE OF SERVICE

I hereby certify that, on this 8th day of February, 2008, I caused the foregoing

Notice Regarding Bulky Attachment to be filed and served using the Court's ECF system

and also caused same to be served on the persons listed below, in the manner indicated:

CHRISTOPHER BLAKE HARWOOD        *(via Federal Express)*
PETER S. SMITH
U.S. Attorney's Office
555 Fourth Street, NW
Suite 4220
Washington, DC 20530

LAWRENCE J. HARDER        *(via Federal Express)*
Supervisory Trial Attorney
U.S. Department of Health and Human Services
Office of the General Counsel
Center for Medicare & Medicaid Services Division
Room C2-05-23
7500 Security Boulevard
Baltimore, MD 21244

I also certify that a copy of the Partial Administrative Record was today served upon the

above counsel by the method specified for each to the address shown above.

/s/ Christopher L. Keough
Counsel for Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPE COD HOSPITAL, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil No.  07-1883 (RCL) |
| ) | |
| MICHAEL O. LEAVITT, SECRETARY ) | |
| United States Department of Health and Human Services, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## <u>PROPOSED ORDER</u>

Upon consideration of the Plaintiffs' motion for summary judgment, Defendant's motion to dismiss, the memoranda in support of the motions, the decisions below, and evidence in the record, it is hereby:

ORDERED that Plaintiffs' motion for summary judgment be, and hereby is, GRANTED; and it is

FURTHER ORDERED that Defendant's motion to dismiss be, and hereby is, DENIED; and it is

FURTHER ORDERED that Defendant's calculation and implementation of the rural floor budget neutrality adjustment for Federal fiscal years 2007 and 2008 be, and hereby are, declared invalid because they conflict with the budget neutrality requirement in section 4410 of Balanced Budget Act of 1997, Pub. L. No. 105-33; and it is

FURTHER ORDERED that this matter is remanded to Defendant, who shall, within 180 days of the date of this Order: (i) correct the Prospective Payment System standardized amount for Federal fiscal year 2007 by eliminating the <u>duplicative</u> budget neutrality adjustments for the effects of the wage index rural floor from 1998 through 2007; (ii) determine a corrected standardized amount for Federal fiscal year 2008 by restoring <u>all</u> budget neutrality adjustments previously taken out of that rate for the rural floor; and (iii) pay Plaintiffs the additional sums due with respect to Medicare patient discharges in Federal fiscal years 2007 and 2008 as a result of the foregoing corrections, plus interest calculated in accordance with 42 U.S.C. §1395oo(f)(2).

_____
United States District Judge